**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

The Family of Eastman Trust, *et al.*

Plaintiffs,

v.

5:26-CV-01321
(MAD/MJK)

Hon. Thomas Benedetto, *et al.*

Defendants.

---

Jessica R. Eastman, Trustee of The Family of Eastman Trust, *pro se*

Mitchell J. Katz, U.S. Magistrate Judge

To the Honorable Mae A. D'Agostino, U.S. District Court Judge:

**ORDER and REPORT-RECOMMENDATION**

Eastman commenced this action on July 2, 2026, by filing a Complaint. (Dkt. 1). On July 7, 2026, U.S. District Court Judge Mae A. D'Agostino administratively closed this matter for failure to pay the filing fee. (Dkt. 5). On July 24, 2026, Eastman filed an application to proceed *in forma pauperis* (*"IFP"*) (Dkt. 6) at which time the Clerk was directed to reopen the case (Dkt. 7). On August 26, 2026, Eastman filed an Emergency Motion ("Emergency Motion"). (Dkt. 10). The Clerk has sent the Complaint, *IFP* Application, and Emergency Motion to the Court for review. (Dkts. 1, 6, 10).

## I. *IFP* APPLICATION

Eastman declares in her *IFP* application that she is unable to pay the filing fee. (Dkt. 6). After reviewing Eastman's *IFP* application, this Court finds that she is eligible for *IFP* status.

## II. PROCEDURAL HISTORY

In addition to this action, Eastman has filed two other actions in the United States District Court for the Northern District of New York.

On March 19, 2026, Eastman commenced an action titled *The Family of Eastman Trust and Jessica Rose Eastman v. County of Jefferson et al.*, 5:26-CV-00436 (ECC/PJE). On March 19, 2026, U.S. District Judge Elizabeth C. Coombe administratively closed 5:26-CV-00436 because Eastman did not pay the filing fee. (5:26-cv-436, Dkt. 4). Judge Coombe gave Eastman 30 days to either pay the filing fee or submit a completed and signed *IFP* application. (5:26-cv-436, Dkt. 4). On April 22, 2026, Eastman filed a motion for leave to proceed *in forma pauperis*. (5:26-cv-436, Dkt. 6). At that time, Judge Coombe issued a text order reopening the case. (5:26-cv-436, Dkt. 7). On August 26, 2026, Eastman filed an Emergency Letter Motion in 5:26-CV-00436. (5:26-CV-00436, Dkt. 8). On September 28, 2026, Magistrate Judge Paul J.

Evangelista issued a Report-Recommendation & Order. (5:26-cv-436, Dkt. 10). For purposes of this case and as more fully discussed below, Magistrate Judge Evangelista's Report-Recommendation & Order addressed the Emergency Letter Motion which is identical to the one Eastman filed in this case and in 5:26-cv-01320.

On July 2, 2026, Eastman commenced an action titled *The Family of Eastman Trust and Jessica R. Eastman v. Trooper J.R. Fay, et al.*, 5:26-cv-01320 (MAD/MJK). On July 3, 2026, U.S. District Judge Mae A. D'Agostino deemed 5:26-cv-1320 related to the case currently before the Court. By Order dated July 7, 2026, U.S. District Judge Mae A. D'Agostino administratively closed 5:26-cv-01320 because Eastman did not pay the filing fee or file an application to proceed *in forma pauperis*. (5:26-cv-1320, Dkt. 5). Judge D'Agostino gave Eastman 30 days to either pay the filing fee or submit a completed and signed *IFP* application. (5:26-cv-1320, Dkt. 5). Eastman did not comply with Judge D'Agostino's deadline. On August 26, 2026, Eastman filed an Emergency Letter Motion in 5:26-CV-01320. (5:26-cv-01320, Dkt. 7). By text order dated August 28, 2026, Judge D'Agostino denied the Emergency Letter

Motion because the action remained administratively closed. (5:26-cv-01320, Dkt. 8).

## III. BACKGROUND

The Court assumes familiarity with the facts of this case which the Court will incorporate in its analysis where necessary. The Complaint alleges violations of: (1) 18 U.S.C. §§ 241 and 242; (2) "due process of the law;" and (3) "constitutional law." (Dkt. 1, pg. 1).[1] The Court will separately address the Emergency Letter Motion (Dkt. 10) at the conclusion of its analysis of the Complaint.

## III. STANDARD OF REVIEW

Courts must consider the sufficiency of the allegations set forth in the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A. Section 1915(e)(2) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *IFP*, "the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or

[1] All page references are to the page numbers assigned by the CM/ECF pagination system.

(iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(a)-(b). The term "prisoner" includes pretrial detainees. 28 U.S.C. § 1915A(c).

Second Circuit jurisprudence suggests that 28 U.S.C. § 1915(e)(2)(B)'s review of *pro se* complaints is a two-step inquiry.

At step one, courts apply the traditional special solicitude afforded to *pro se* plaintiffs. *See, e.g.*, *Rosa v. Doe*, 86 F.4th 1001, 1007 (2d Cir. 2023). Indeed, courts are "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). "The solicitude afforded to *pro se* litigants takes a variety of forms. It most often consists of liberal construction of pleadings" and "motion papers."

*Id.* (cleaned up). So, at step one, courts must "accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor." *White v. Schmidt*, No. 22-1267, 2024 WL 1266245, at *2 (2d Cir. 2024) (summary order) (quoting *Harnage v. Lightner*, 916 F.3d 138, 140-41 (2d Cir. 2019)). And once the court has done so, it must then construe the *pro se* submission "to raise the strongest arguments that [it] suggest[s]." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*) (cleaned up).

At step two, courts subject the liberally construed pleading to Rule 8's pleading standard. *See, e.g.*, *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (*per curiam*) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2005) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) when affirming a district court's dismissal of the plaintiff's complaint under 28 U.S.C. § 1915); *see also Edwards v. Erfe*, 588 F. App'x 79, 80 (2d Cir. 2015) (summary order) (citing *Sykes* and affirming the District Court's *sua sponte* dismissal of a prisoner rights case); *Hirsch v. Rochester City Police Dep't*, 578 F. App'x 49, 50 (2d Cir. 2014) (summary order) (same in a civil rights case); *Sheehy v. Brown*, 335 F. App'x 102, 103-04 (2d

Cir. 2009) (summary order) (citing *Iqbal* and affirming the District Court's dismissal of a claim under 20 U.S.C. § 1915(e)(2)).

While the Second Circuit has never formally stated that Rule 8's pleading standard applies, the Court infers that the Second Circuit has adopted that position. To arrive at this conclusion, the Court focuses on two pieces of evidence. First, the Circuit has cited *Iqbal* and *Twombly*—which clarified Rule 8s pleading standard. *See Sykes*, 723 F.3d at 403. Second, the other circuit courts have authorized district courts to apply the Rule 12(b)(6) standard when reviewing claims under § 1915(e)(2)(B). *See Herrera v. Agents of Pennsylvania Bd. of Prob. & Parole*, 132 F.4th 248, 254 n.5 (3d Cir. 2025) (applying Rule 12(b)(6)'s standard to § 1915(e)(2)(B) review); *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (same); *Hale v. King*, 642 F.3d 492, 497 (5th Cir. 2011) (*per curiam*) (same); *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (same); *Coleman v. Lab. & Indus. Rev. Comm'n of Wisconsin*, 860 F.3d 461, 468 (7th Cir. 2017) (same); *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (same); *Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007) (same); *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008) (same). Nothing in the Second Circuit's jurisprudence leads this Court to

believe that it would break stride with eight other circuit courts. This evidence, altogether, leads this Court to believe that the Second Circuit approves of this Court's application of Rule 12(b)(6)'s standard to § 1915(e)(2)(B) reviews *after* applying special solicitude to the *pro se* submission.

When applying Rule 8 to pleadings, the Court must determine if a claim is facially plausible. *See Iqbal*, 556 U.S. at 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This means that *pro se* complaints, even while liberally construed, "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Sykes*, 723 F.3d at 403 (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

In sum, the Court's role, when reviewing a Complaint under

§ 1915(e)(2)(B), is two-fold. First, the Court must draw all inferences in the *pro se* plaintiff's favor and construe their submission to raise the strongest possible argument. Second, the Court must then review the Complaint and determine if it plausibly alleges enough facts for the Court to reasonably infer that the defendant would be liable for the alleged misconduct.

## IV. DISCUSSION

The Court recommends:

1. dismissal of Eastman's claims under 18 U.S.C. §§ 241 and 242 *without prejudice and without leave to amend* for lack of subject matter jurisdiction;

2. dismissal of Eastman's claims against Defendant Brown w*ithout prejudice and with leave to amend*;

3. dismissal of the Complaint against Trooper J.R. Fay *without prejudice and with leave to amend*;

4. dismissal of Eastman's claim against the Oswego County Support Unit *without prejudice and with leave to amend*; and

5. dismissal of the Complaint against Judge Benedetto *with prejudice and without leave to amend*.

### A. The Court construes The Family of Eastman Trust to be synonymous with Jessica R. Eastman.

It is well-established in this Circuit that a corporate entity cannot proceed *pro se*. *See Melanie Clarke BPR Ov Tr. V. Deutsche Bank Tr.*

*Co. Ams.*, No. 26-CV-1904, 2026 WL 937249, at *1 (S.D.N.Y. Apr. 7, 2026) (citing *Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007)). Other courts considering the issue have found that a non-attorney trustee cannot represent a trust in court. *See J.J. Rissell, Allentown, PA Tr. v. Marchelos*, 976 F.3d 1233, 1236 (11th Cir. 2020) ("[A] nonlawyer trustee has no authority to represent a trust in court. A trustee represents the interests of others and would therefore be engaged in the unauthorized practice of law if allowed to appear pro se as a nonlawyer." (internal quotation marks omitted)); *see also Knoefler v. United Bank of Bismarck*, 20 F.3d 347, 348 (8th Cir. 1994) ("A nonlawyer, such as these purported 'trustee(s) pro se[,]' has no right to represent another entity, i.e., a trust, in a court of the United States.").

Here, there is nothing within the four corners of the Complaint and its attached exhibits to suggest that Eastman is an attorney licensed to practice law or admitted to practice in the United States District Court for the Northern District of New York. Because Eastman is not an attorney, the Complaint should be dismissed.

However, "[p]laintiff's complaint sounds in the familiar refrain of the so-called sovereign citizen." *Aran v. Dep't of Treasury & Internal*

*Revenue Serv.*, No. 21-CV-04748, 2022 WL 377957, at *3 (E.D.N.Y. Feb. 8, 2022). And because the allegations in the Complaint and the exhibits attached thereto suggest that Eastman is a "sovereign citizen,"[2] the Court construes the designation of The Family of Eastman Trust in the caption to be synonymous with Eastman. The Court therefore deems Eastman to be the *pro se* plaintiff in this matter.[3]

### B. Eastman's claims under 18 U.S.C. §§ 241 and 242 should be dismissed for lack of subject matter jurisdiction.

The Court recommends dismissal of Eastman's claims under 18 U.S.C. §§ 241 and 242 *without prejudice and without leave to amend* for lack of subject matter jurisdiction.

Eastman seeks relief under 18 U.S.C. §§ 241 and 242. "Title 18 of the United States Code encompasses laws on crimes and criminal procedure," *Limtung v. Thomas*, 19-CV-3646, 2019 WL 6253815, at *3

---

[2] "[The pro se complaint's] language, and that of Plaintiff's attached filings, to the extent comprehensible, appears to advance theories attributable to the sovereign citizen movement, 'a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior.'" *Steven Joseph Kelly, as Tr./Gen. Ex'r for the Steven Joseph Kelly MRP Tr., Plaintiff, v. Barclays Capital, Inc., Defendant.*, No. 26-CV-04105, 2026 WL 1745788, at *1 (S.D.N.Y. June 17, 2026) (quoting *United States v. Ulloa*, 511 F. Appx. 105, 106 n.1 (2d Cir. 2013) (summary order)).

[3] The Court notes that the Clerk's Office has already listed Jessica R. Eastman as a Plaintiff in this matter.

(E.D.N.Y. Nov. 21, 2019). There is no private right of action under 18 U.S.C. § 242. *See Storm-Eggink v. Gottfried*, 409 Fed.Appx. 426, 427 (2d Cir. 2011) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994)). Similarly, "nothing in the language or structure of [18 U.S.C.] § 241 suggests that Congress intended to create a private right of action under that section." *See id.* (citations omitted); *see also Lettieri v. Garver*, No. 23-CV-1547 (BKS/ML), 2026 WL 2035478, at *7 (N.D.N.Y. Jul. 15, 2026) ("a private plaintiff cannot pursue a claim under the criminal statutes found in Title 18 of the United States Code") (quoting *Bennett v. New York State Thruway Auth.*, No. 22-CV-0337, 2024 WL 1053222, at *17 (N.D.N.Y. Mar. 11, 2024) (Hurd, J.)). And because there is no private right of action to enforce federal criminal statutes, "[t]here is no federal question jurisdiction under 28 U.S.C. § 1331 . . ." *Shidagis v. Broome Cnty. D.S.S.*, No. 23-CV-0031, 2023 WL 2140019, at *1 (N.D.N.Y. Feb. 21, 2023) (Sannes, C.J.). The Court therefore recommends dismissal of Eastman's claim under 18 U.S.C. §§ 241 and 241 *without prejudice and without leave to amend* for lack of subject matter jurisdiction. *Id.*; *see also The Family of Eastman Trust and Jessica Rose Eastman v. County*

*of Jefferson*, 5:26-cv-00436 (ECC/PJE) (N.D.N.Y. Sept. 28, 2026) (dismissal of Eastman's claims under 18 U.S.C. §§ 241 and 242 recommended for lack of subject matter jurisdiction).

### C. The claims against Jean A. Brown should be dismissed under Fed. R. Civ. P. 8.

The Court recommends dismissal of Eastman's claims against Defendant Brown w*ithout prejudice and with leave to amend*.

Pleadings must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief …" Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted" so adverse parties have "the opportunity to file a responsive answer, prepare an adequate defense, and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (cleaned up). Fed. R. Civ. P. 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought[.]" Fed. R. Civ. P. 8(a)(1), (3). "Although 'no technical form is required,' the Federal Rules make clear that each allegation contained in the pleading 'must be simple, concise, and direct.'" *Cole v. Smrtic*, No. 24-CV-847, 2024 WL 4870495, at *2 (N.D.N.Y. Nov. 21, 2024) (quoting

Fed. R. Civ. P. 8(d)). Allegations "so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order).

The allegations against Defendant Brown do not give her adequate notice of the claims against her. The Complaint alleges that "[t]he lawyer has yet to bring forth the Trustee with the bid bond, performance bond and payment bond for this taxable event." (Dkt. 1, pg. 4). Beyond that, the Complaint neither alleges any factual predicate for Eastman's claims nor any constitutional rights, if any, Defendant Brown purportedly violated. Stated differently, Eastman's Complaint is an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 556 U.S. at 678. And that is not enough to state a claim. *See, e.g., Lesson v. Jane Doe*, No. 25-CV-00188 (AMN/TWD), 2025 WL 1291533 (N.D.N.Y. May 5, 2025) (Adopting Report and Recommendation which dismissed a plaintiff's excessive force claim because that plaintiff failed to "identify what force" was used against him or "how it was excessive.").

Even if the Complaint complied with Fed. R. Civ. P. 8, dismissal is still warranted because (a) Defendant Brown is a not a state actor; and (b) no conspiracy has been alleged between Defendant Brown and any state actor. To state a claim under 42 U.S.C. § 1983, Eastman must allege that Defendant Brown's challenged conduct is attributable to her acting under color of state law, which it is not. *See Whalen v. County of Whalen*, 126 F.3d 400, 405 (2d Cir. 1977). It is well settled that private and court-appointed attorneys are not persons acting under color of state law "when performing a lawyer's traditional function." *Polk County v. Dodson*, 454 U.S. 312, 325, (1981); *see also McCloud v. Jackson*, 4 F. App'x 7, 9-10 (2d Cir. 2001) (summary order).

However, liability under § 1983 can attach if the attorney conspires with a state actor to deprive the plaintiff of his or her constitutional rights. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980); *see also McCloud*, 4 F. App'x at 11 (finding that privately-retained counsel could not be held liable under § 1983 "because there was no showing that he worked with state officials to deprive [the plaintiff] of federal rights"). "To state a claim against a private entity on a § 1983 conspiracy theory, the complaint must allege facts demonstrating that

the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. Nassau County*, 292 F.3d 307, 324 (2d Cir. 2002) (citation omitted). "[C]onclusory allegations are insufficient to state a § 1983 claim against [a private entity]." *Id.*

As noted, Eastman's allegations against Defendant Brown are minimal and there are no facts alleging a conspiracy between Defendant Brown and any state official to support a § 1983 claim. Although the Court is skeptical that an amended pleading will cure the defects in Eastman's purported claim against Defendant Brown and because of the special solicitude afforded to *pro se* litigants, the Court recommends *dismissal without prejudice and with leave to amend*.

**D. The Complaint should be dismissed against Trooper J.R. Fay.**

The Court recommends dismissal of the Complaint against Trooper J.R. Fay *without prejudice and with leave to amend* because it does not comply with Fed. R. Civ. P. 8 and 10.

The Complaint alleges that "Trooper J.R. Fay came to [Eastman's] home without a warrant shown to [Eastman] with proper procedure and searched [Eastman's] home [and] threatened a child." (Dkt. 1, pg. 4). That is the extent of the allegations against Trooper J.R. Fay. The

paucity of allegations does not fairly afford Trooper J.R. Fay notice of the claims against them and specifically, what, if any, of Eastman's constitutional rights were violated. The Court therefore recommends dismissal of the Complaint against Trooper J.R. Fay under Fed. R. Civ. P. 8.

The Court also recommends dismissal of the Complaint against Trooper J.R. Fay *without prejudice and with leave to amend* because it does not comply with Fed. R. Civ. P. 10 which governs the "Forms of Pleadings." Fed. R. Civ. P. 10 states in relevant part that "the title of the complaint must name all parties." Here, Trooper J.R. Fay's name is absent from the caption. Dismissal is therefore warranted.

### E. The claims against the Oswego County Support Unit should be dismissed.

The Court recommends dismissal of the Complaint against the Oswego County Support Unit *without prejudice and with leave to amend*.

To the extent the Oswego County Support Unit is a municipal agency, the Court recommends dismissal *without prejudice and with leave to amend*. "A department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence.

Therefore, municipal departments . . . are not amenable to suit[.]" *Coston v. Conway*, No. 19-CV-1552 (GLS/ATB), 2020 U.S. Dist.LEXIS 131785, at *8 (N.D.N.Y. June 15, 2020) (quoting *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999)).

Recognizing Eastman's *pro se* status, the Court assumes that she intended to name Oswego County and not the Oswego County Support Unit as a defendant. With that assumption, the Complaint fails to plausibly allege a claim against Oswego County. "[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). A plaintiff establishes the existence of a policy or custom by plausibly alleging: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to

subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Kurtz v. Hansell*, No. 20-CV-3401, 2021 WL 1143619, at *18 (S.D.N.Y. Mar. 24, 2021) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

Here, the Complaint lacks any allegations plausibly stating that Oswego County has a policy, custom or practice that caused the purported deprivation of Eastman's constitutional rights. The Court therefore recommends dismissal *without prejudice and with leave to amend*.

**F. Eastman's claims against Judge Benedetto should be dismissed**.

The Court recommends dismissal of the Complaint against Judge Benedetto *with prejudice and without leave to amend*.

Judges have absolute immunity for judicial acts performed in their judicial capacities. *See Mireles v. Waco*, 502 U.S. 9, 11 (1991); *see also Shtrauch v. Dowd*, 651 F. App'x 72, 73-74 (2d Cir. 2016) (summary order) ("Generally, acts arising out of, or related to, individual cases before the judge are considered judicial in nature") (cleaned up). "Judicial immunity applies even when the judge is accused of acting

maliciously or corruptly." *Coon v. Merola*, No. 19-CV-394 (DNH/ATB), 2019 WL 1981416, at *3 (N.D.N.Y. Apr. 8, 2019) (cleaned up). ""The only two circumstances in which judicial immunity does not apply is when"' the judge "'takes action outside"' their "'judicial capacity"' or "'when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.'"' *Id.* (quoting *Mireles*, 502 U.S. at 11-12).

Here, Eastman sues Judge Benedetto because he allegedly failed to "show [Eastman] his F.A.R.A. license to show he is lawful to try this case." (Dkt. 1, pg. 3). Eastman alleges a violation of the Foreign Agent Registration Act, which is not applicable to Judge Benedetto.[4] The Court takes judicial notice of the fact that Judge Benedetto is an elected official and not an agent of a foreign principal. And because there are no allegations that Judge Benedetto acted outside his "judicial capacity" or "in the absence of jurisdiction," the Court recommends dismissal of the Complaint against him *with prejudice and without leave to amend* because he is immune.

---

[4] "The general purpose of the [Foreign Agent Registration] Act is to protect the security and foreign relations of this country by requiring agents of foreign principals to identify themselves and disclose their activities." *Atty Gen. of US. v. Irish N Aid Comm.*, 530 F. Supp. 241, 245 (S.D.N.Y, 1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982).

**G. Eastman's Emergency Letter Motion should be denied.**

Eastman's Emergency Letter Motion is denied as moot.

Eastman filed the Emergency Letter Motion in 5:26-cv-00436, 5:26-cv-01320, and 5:26-cv-01321. They are identical. Because Magistrate Judge Evangelista issued a Report-Recommendation and Order on September 28, 2026 specifically ruling on the relief requested, this Court need not do so as well. Eastman's Emergency Letter Motion is therefore denied as moot.

## V. OPPORTUNITY TO AMEND

Generally, before the court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the court should afford a plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, the Court recommends that Eastman be afforded an opportunity to file an amended pleading except for her claims:

(a) against Judge Benedetto which the Court recommends be dismissed *with prejudice and without leave to amend* because any amendment would be futile; and (b) arising under 18 U.S.C. §§ 241 and 242 *without prejudice and without leave to amend* for lack of subject matter jurisdiction.

If the District Court permits Eastman to file an amended pleading, she is reminded of her obligations under Fed. R. Civ. P. 8 that the amended complaint contain a short and plain statement showing that she is entitled to relief. Eastman is also reminded of her obligations under Fed. R. Civ. P. 10 to specifically identify all potential defendants in the caption of the action. While the amended pleading should contain sufficient facts to provide Defendants with notice of the claims against them, it should not contain material that is irrelevant to her claims. Finally, Eastman is reminded of her obligation to comply with Fed. R. Civ. P. 18 and 20.

## VI. CONCLUSION

**WHEREFORE**, based on the findings above, it is hereby

**ORDERED**, that Eastman's motion to proceed *in forma pauperis* (Dkt. 6) is **GRANTED**, and it is further

**RECOMMENDED** that the District Court:

1. dismiss Eastman's claims under 18 U.S.C. §§ 241 and 242 *without prejudice and without leave to amend* for lack of subject matter jurisdiction;

2. dismiss Eastman's claims against Defendant Brown *without prejudice and with leave to amend*;

3. dismiss the Complaint against Trooper J.R. Fay *without prejudice and with leave to amend*;

4. dismiss the Complaint against the Oswego County Support Unit *without prejudice and with leave to amend*; and

5. dismiss the Complaint against Judge Benedetto *with prejudice and without leave to amend*; and it is further

**ORDERED** that the Clerk provide Eastman with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[1] Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984

F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: October 14, 2026.

Digitally signed by Mitchell J Katz
Date: 2026.10.14 09:28:10 -04'00'

Hon. Mitchell J. Katz
U.S. Magistrate Judge

2024 WL 1266245
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Paul WHITE, Plaintiff-Appellant,
v.
Sandra SCHMIDT, aka Sandra Kroger Schmidt, aka Sandra K. Schmidt, Defendant-Appellee,
Pat Doe, (1–10), Defendants.
Paul White, Plaintiff-Appellant,
v.
Teodocia Santos, Ella Abney, Personally and as Executrix of the Estate of Albert Abney, Pat Doe, Defendants-Appellees. *

* The Clerk of Court is directed to consolidate these appeals for purposes of decision.

22-1267, 22-1911
|
March 26, 2024

Appeals from judgments of the United States District Court for the Northern District of New York (Mae A. D'Agostino, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED IN PART** and **VACATED IN PART** and **REMANDED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Paul White, pro se, Coxsackie, NY.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: ROBERT D. SACK, WILLIAM J. NARDINI, MYRNA PÉREZ, Circuit Judges.

**SUMMARY ORDER**

***1**

* * *

Plaintiff-Appellant Paul White, *pro se* and incarcerated, appeals from the April 26, 2022, and August 1, 2022, *sua sponte* dismissals of two federal lawsuits (Mae A. D'Agostino, *District Judge*), each pursuant to the *Rooker-Feldman* doctrine. White's appeals have been considered in tandem and consolidated for disposition. In 2015, White was convicted in New York state court of grand larceny and fraud, stemming from a scheme to defraud investors in a North Carolina real estate development. *See Spota v. White*, No. 29681-12, 2016 WL 6427362, at *2, 4 (N.Y. Sup. Ct. Suffolk Cnty. Oct. 28, 2016) (explaining the background of the criminal case in a decision on a civil forfeiture proceeding). The Supreme Court, Suffolk County, awarded $2.975 million in restitution to his victims, who included Sandra Schmidt, Teodocia Santos, and Ella and Albert Abney (the "Abneys"). *Id.* at *2. White's appeal of the criminal judgment is, as of the time of writing, still pending.

In 2014, the Suffolk County District Attorney's Office brought a civil forfeiture action against White and obtained a $2.4 million judgment. *Id.* at *4, 9. After the judgment was entered, White retained an attorney who obtained a decision in a North Carolina court, which he claims held that the investors had received their bargained-for-benefit, consisting of the validly deeded ownership of the property.

In 2017, White sued Schmidt and the Abneys in the Eastern District of New York, claiming that they had provided false statements to the Suffolk County District Attorney's Office and had testified falsely at grand jury proceedings and at his criminal trial, which resulted in their unjust enrichment by virtue of the restitution judgment that had been entered in their favor. In two different orders, the Eastern District dismissed the action, reasoning that the defendants were entitled to witness immunity, and in the alternative, the court lacked subject matter jurisdiction to entertain the unjust enrichment claim under *Rooker-Feldman. See generally White v. Abney*, No. 17-cv-4286, 2020 WL 5848647 (E.D.N.Y. Sept. 30, 2020); *White v. Abney*, No. 17-cv-4286, 2021 WL 1176218 (E.D.N.Y. Mar. 29, 2021).

In 2021, White filed the actions underlying these appeals. He sued Schmidt in the Northern District of New York, claiming that the restitution judgment had been satisfied by the North Carolina decision and that she had been unjustly enriched by a sum that he had separately paid to her. In a separate action, he sued Santos and the Abneys, raising substantially identical claims.

In 2022, the district court *sua sponte* dismissed each action as barred under the *Rooker-Feldman* doctrine and,

alternatively, by collateral estoppel or *res judicata*, based on the preclusive effect of the Eastern District's earlier *Rooker-Feldman* procedural holding. *See generally White v. Schmidt*, No. 21-cv-854, 2022 WL 1222805 (N.D.N.Y. Apr. 26, 2022); *White v. Santos*, No. 21-cv-417, 2022 WL 3025723 (N.D.N.Y. Aug. 1, 2022). White timely appealed. We assume the parties' familiarity with the case.

***2** We review *de novo* a *sua sponte* dismissal of a complaint, including a dismissal based on collateral estoppel, *res judicata*, or lack of subject matter jurisdiction under *Rooker-Feldman*. *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (*sua sponte* dismissal); *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 368 (2d Cir. 1997) (collateral estoppel and *res judicata*); *Edwards v. McMillen Cap., LLC*, 952 F.3d 32, 35 (2d Cir. 2020) (*Rooker-Feldman*). When reviewing a *sua sponte* dismissal, we "accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor." *Harnage v. Lightner*, 916 F.3d 138, 140–41 (2d Cir. 2019). [1]

1 Unless otherwise indicated, case quotations omit all internal quotation marks, alteration marks, footnotes, and citations.

Recognizing the "special solicitude" this Court must afford *pro se* litigants, *see Rosa v. Doe*, 86 F.4th 1001, 1007 (2d Cir. 2023), we nevertheless conclude that White's claims against Schmidt and the Abneys are barred by *res judicata*, or claim preclusion. "[C]laim preclusion ... operates in two ways: (1) it bars claims that were brought and decided in a prior litigation; and (2) it bars all other claims relating to the same transaction against the same defendant that could have been brought at that time." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000). *White v. Abney* involved claims by White against Schmidt and the Abneys, so claim preclusion bars him from now raising any claims "relating to the same transaction ... that could have been brought" at the time he filed suit in *White v. Abney*. *Id.* White alleges that the following had occurred before he filed his complaint in *White v. Abney*: (1) the Suffolk County Court entered restitution judgments in favor of Santos, the Abneys, and Schmidt against White, (2) White obtained a decision from the North Carolina Superior Court determining that the defendants in these cases held valid deeds for the properties at issue, and (3) White paid approximately $31,000 each to Schmidt and the Abneys in partial satisfaction of the restitution judgments.

In the present cases, White seeks a declaratory judgment that the Suffolk County Court restitution judgments against him were satisfied by the North Carolina decision, and a return of the money he has paid to the defendants based on a theory of unjust enrichment distinct from the theory of unjust enrichment White relied on in *White v. Abney*. However, because White allegedly paid the defendants a partial restitution before the North Carolina decision was issued, and the North Carolina decision was issued before White initiated *White v. Abney*, White could have included his current claims for declaratory relief and unjust enrichment against Schmidt and the Abneys in *White v. Abney*. Accordingly, White's claims against Schmidt and the Abneys are barred by *res judicata.*

Santos, however, was not included as a defendant in *White v. Abney*, so claim preclusion cannot apply to White's current claims against Santos. *See N. Assurance*, 201 F.3d at 87. We therefore consider whether White's claims against Santos are barred under the *Rooker-Feldman* doctrine or collateral estoppel, as the district court found. We determine that they are not. Under the *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). For a federal court to abstain under *Rooker-Feldman*,

> ***3** (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 641 (2d Cir. 2021). Here, the relevant state-court judgment is the criminal restitution judgment, which White alleges has been satisfied, not the civil forfeiture judgment. The civil forfeiture court did not address White's challenge to the restitution order, explaining instead that White's challenge was an improper collateral attack on the criminal conviction, which had to be raised instead on direct criminal appeal. *See Spota*, 2016 WL 6427362, at *4. Thus, if White is

complaining of an injury from a state-court judgment, the relevant judgment is the criminal restitution judgment.

The application of *Rooker-Feldman* here was improper because the criminal restitution judgment was not final at the time the federal lawsuit commenced. In *Hunter v. McMahon*, 75 F.4th 62, 65, 67, 70–71 (2d Cir. 2023), this Court concluded that the *Rooker-Feldman* doctrine could not apply when an appeal remains pending in state court at the time a complaint is filed, because *Rooker-Feldman* applies only after state-court proceedings have "ended." Because White's criminal appeal remains pending, the relevant state court proceeding had not concluded before White filed his complaint. Accordingly, the district court erred by dismissing the complaint based on *Rooker-Feldman.*

Although the district court alternatively dismissed the complaint on the basis of collateral estoppel, we do not affirm on this ground. In *White v. Abney*, the Eastern District dismissed White's complaint against Schmidt under the *Rooker-Feldman* doctrine. *Abney*, 2020 WL 5848647, at *7. While collateral estoppel can bar reconsideration even of erroneous prior rulings, our decision in *Hunter* amounted to a significant clarification of our law on this fairly significant issue of *Rooker-Feldman*'s proper scope. *See Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005) ("[E]ven where the specified elements of collateral estoppel are present, reexamination of a legal issue is appropriate where there has been a change in the legal landscape after the decision claimed to have preclusive effect."). Accordingly, we do not affirm the judgment based on the preclusive effect that the *Rooker-Feldman* holding in *White v. Abney* might have.

* * *

In sum, the district court erred by relying on the *Rooker-Feldman* doctrine to *sua sponte* dismiss White's complaints. We decline to affirm on the alternative grounds of collateral estoppel. However, the district court's judgments with respect to Schmidt and the Abneys can be affirmed on the alternative ground of *res judicata.* We express no view on the merits (or lack thereof) of the underlying suit against Santos, which is better addressed by the district court in the first instance.[2] Therefore, the judgments of the district court are **AFFIRMED IN PART** and **VACATED IN PART** and **REMANDED** for further proceedings.

2 We acknowledge that the district court may decide that a stay is warranted pending the outcome of the criminal restitution judgment appeal. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005) ("Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay ... the federal action in favor of the state-court litigation.").

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 1266245

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (10)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Appellant's Brief** Paul WHITE, Appellant-Plaintiff, v. Teodicia SANTOS and Ella Abney, Personally, and Ella Abney as Executrix of the Estate of Albert Abney, Respondents-Defendants. 2022 WL 10084079 | | C.A.2 | Sep. 28, 2022 | Brief |
| **2. Appellant's Brief** Paul WHITE, Appellant-Plaintiff, v. Teodicia SANTOS and Ella Abney, Personally, and Ella Abney as Executrix of the Estate of Albert Abney, Respondents-Defendants. 2022 WL 1468427 | | C.A.2 | Apr. 18, 2022 | Brief |
| **3. Appellant's Brief** Paul WHITE, Appellant-Plaintiff, v. Sandra SCHMIDT, Respondent-Defendant. 2022 WL 1468431 | | C.A.2 | Mar. 18, 2022 | Brief |
| **4. Appellant's Brief** Paul WHITE, Appellant-Plaintiff, v. Sandra SCHMIDT, Respondent-Defendant. 2022 WL 1468434 | | C.A.2 | Mar. 18, 2022 | Brief |
| **5. Docket 22-1911** White v. Santos | — | C.A.2 | Sep. 01, 2022 | Docket |
| **6. Docket 22-1267** White v. Schmidt | — | C.A.2 | June 06, 2022 | Docket |
| **7. Docket 22-89** White v. Santos | — | C.A.2 | Jan. 14, 2022 | Docket |
| **8. Docket 22-92** White v. Schmidt | — | C.A.2 | Jan. 14, 2022 | Docket |
| **9. Docket 1:21-CV-00854** White v. Schmidt et al | — | N.D.N.Y. | July 29, 2021 | Docket |
| **10. Docket 1:21-CV-00417** White v. Santos et al | — | N.D.N.Y. | Apr. 13, 2021 | Docket |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (12)**

**Direct History (12)**

1. White v. Schmidt
2021 WL 3856741 , N.D.N.Y. , Aug. 30, 2021

*Appeal Dismissed by*

2. White v. Schmidt
2022 WL 17406134 , 2nd Cir. , Apr. 21, 2022

*AND Report and Recommendation Adopted by*

3. White v. Schmidt
2022 WL 1222805 , N.D.N.Y. , Apr. 26, 2022

*Affirmed in Part, Vacated in Part, Remanded by*

4. White v. Schmidt
2024 WL 1266245 , 2nd Cir.(N.Y.) , Mar. 26, 2024

*On Remand to*

5. White v. Santos
2025 WL 1610573 , N.D.N.Y. , Mar. 10, 2025

*Report and Recommendation Adopted by*

6. White v. Santos
2025 WL 1275846 , N.D.N.Y. , May 02, 2025 , appeal dismissed (2d Cir. 25-1462) ( Nov 25, 2025 )

7. White v. Santos
2021 WL 6339606 , N.D.N.Y. , Oct. 18, 2021

*Appeal Dismissed by*

8. White v. Santos
2022 WL 18282866 , 2nd Cir. , Apr. 21, 2022

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

*AND Report and Recommendation Adopted by*

9. White v. Santos
2022 WL 3025723 , N.D.N.Y. , Aug. 01, 2022

*Affirmed in Part, Vacated in Part, Remanded by*

10. White v. Schmidt
2024 WL 1266245 , 2nd Cir.(N.Y.) , Mar. 26, 2024

*On Remand to*

11. White v. Santos
2025 WL 1610573 , N.D.N.Y. , Mar. 10, 2025

*Report and Recommendation Adopted by*

12. White v. Santos
2025 WL 1275846 , N.D.N.Y. , May 02, 2025 , appeal dismissed (2d Cir. 25-1462) ( Nov 25, 2025 )


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 937249
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Melanie CLARKE BPR OV TRUST., Plaintiff,
v.
DEUTSCHE BANK TRUST COMPANIES AMERICAS and Aldermore Bank PLC, Defendants.

26 Civ. 1904 (JPC)
|
Signed April 7, 2026

**Attorneys and Law Firms**

Melanie Clarke BPR OV Trust, Pro Se.

ORDER

JOHN P. CRONAN, United States District Judge:

***1** On March 6, 2026, Plaintiff Melanie Clarke BPR OV Trust ("Clarke") filed a Complaint against Deutsche Bank Trust Company Americas ("Deutsche Bank") and Aldermore Bank PLC ("Aldermore Bank") (collectively, "Defendants") and moved for a preliminary injunction. Dkts. 1, 3. On March 18, 2026, this case was reassigned to the undersigned. *See* Mar. 18, 2026 Notice of Case Reassignment. Then, on March 23, 2026, the Court ordered Clarke to serve the Complaint and the motion for a preliminary injunction on Defendants, and further ordered Defendants, within one week of such service, to file a response to Clarke's motion for a preliminary injunction. Dkt. 7.

On March 26, 2026, and March 27, 2026, Clarke served Deutsche Bank and Aldermore Bank, respectively, in accordance with the Court's March 23, 2026 Order. Dkts. 13-14. Deutsche Bank opposed Clarke's motion for a preliminary injunction on April 2, 2026, Dkt. 15, but the docket does not reflect a response from Aldermore Bank.

The Court extends *sua sponte* Aldermore Bank's deadlines to respond to Clarke's motion for a preliminary injunction until three weeks from this Order. Within one week of this Order, Clarke is directed to serve a copy of this Order upon Aldermore Bank in the same manner it served Aldermore Bank on March 27, 2026.

Also within three weeks of this Order, Deutsche Bank should file a motion to dismiss or an Answer to Clarke's Complaint. Deutsche Bank need not file a premotion letter in advance of any motion to dismiss.

Finally, the Complaint indicates that Clarke is represented in this action by Melanie Kate Clarke, who appears to be a non-lawyer trustee. Dkt. 1 at 3. It is well-established in this Circuit that a corporate entity cannot proceed *pro se, see Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007), and other courts to consider the issue have found that a non-attorney trustee cannot represent a trust in court, *see, e.g.*, *J.J. Rissell, Allentown, PA Tr. v. Marchelos*, 976 F.3d 1233, 1236 (11th Cir. 2020) ("[A] nonlawyer trustee has no authority to represent a trust in court. A trustee represents the interests of others and would therefore be engaged in the unauthorized practice of law if allowed to appear pro se as a nonlawyer." (internal quotation marks omitted)); *Knoefler v. United Bank of Bismarck*, 20 F.3d 347, 348 (8th Cir. 1994) ("A nonlawyer, such as these purported 'trustee(s) pro se[,] has no right to represent another entity, i.e., a trust, in a court of the United States."). Within one week of this Order, Clarke should file a letter stating why it believes its case may prosecuted by Melanie Kate Clarke.

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 937249

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 377957
United States District Court, E.D. New York.

Raymond ARAN, Plaintiff,
v.
DEPARTMENT OF TREASURY AND INTERNAL REVENUE SERVICE, Defendants.

21-CV-4748(EK)(LB)
|
Signed 02/08/2022

**Attorneys and Law Firms**

Raymond Aran, Astoria, NY, Pro Se.

**MEMORANDUM & ORDER**

ERIC KOMITEE, United States District Judge:

***1** *Pro se* plaintiff Raymond Aran has filed a pleading titled "Petitioner Request to Dismiss for Lack of Jurisdiction" that I construe as a complaint. ECF No. 6. In essence, Plaintiff argues that the defendant — the U.S. Treasury — lacks "jurisdiction" to tax him. For the reasons set forth below, the action is dismissed.

## I. Background

Plaintiff appears to challenge his obligation to pay income tax. The underlying facts of that challenge are not set forth in the complaint itself, but some details emerge from various exhibits attached to the complaint. The exhibits indicate that plaintiff owes income tax to New York State and to the Internal Revenue Service, and that he has been served with notices that his property is subject to levy or seizure because of his failure to pay. Compl. at 55-58, 74-82. The remedy he seeks is also unclear, but it appears that Plaintiff wishes this Court to declare that the state and federal government do not have "jurisdiction" to tax him.

## II. Legal Standard

In reviewing Plaintiff's complaint, the Court is mindful that the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Notwithstanding the liberal pleading standard afforded to *pro se* litigants, however, plaintiff must establish that the court has subject matter jurisdiction over the action. *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000). "[S]ubject-matter jurisdiction, because it involves the court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). The subject-matter jurisdiction of the federal courts is limited: Federal jurisdiction exists only when a federal question is presented or when there is diversity of citizenship and the amount in controversy exceeds $75,000. *See* 28 U.S.C. §§ 1331-32. Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (internal citation omitted). When subject-matter jurisdiction is lacking, the court must dismiss the complaint. *Id.*; *see also* Fed. R. Civ. P. 12(h)(3).

Moreover, even when, as here, a plaintiff has paid the filing fee, a district court may dismiss the case *sua sponte* if it determines that the action is frivolous. *Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000). An action is frivolous as a matter of law when it is "based on an indisputably meritless legal theory" – that is, when it "lacks an arguable basis in law ... or a dispositive defense clearly exists on the face of the complaint." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 473 (2d Cir. 1998). This standard authorizes dismissal when, among other things, it is "clear" that the defendant is immune from suit. *Montero v. Travis, 171* F.3d 757, 760 (2d Cir. 1999).

## III. Discussion

### A. The United States is the Actual Party in Interest

***2** As an initial matter, neither the IRS nor the Department of the Treasury are subject to suit here. The IRS is an agency of the United States. *See* 26 U.S.C. 7801(a)(1) ("[T]he administration and enforcement of [Title 26 of the United States Code] shall be performed under the supervision of the Secretary of the Treasury."). No suit may proceed against the IRS either for a refund of tax allegedly improperly collected or for monetary or injunctive relief because Congress has not authorized suit against the IRS in its own name. *See generally* *Blackmar v. Guerre*, 342 U.S. 512, 515 (1952) (holding that Congress must give express authorization for an

agency to be sued in its own name); *Calixte v. IRS.gov*, No. 21-CV-1419, 2021 WL 3847935, at *1 (E.D.N.Y. Aug. 26, 2021) ("Congress has not authorized suit against the IRS.") (citing *Liffiton v. Keuker*, 850 F.2d 73, 77 (2d Cir. 1988)); *In re Hall*, 629 B.R. 124, 141 (Bankr. E.D.N.Y. 2021) ("[W]here a plaintiff – including a taxpayer – seeks to assert a claim concerning its tax liability, it is the United States, rather than its agency the IRS that may be sued.").

Therefore, neither the IRS nor the Treasury Department is a proper defendant here; the Court treats this lawsuit as one against the United States. *See e.g., Dubay v. IRS*, No. 3:96-CV-1399, 1997 WL 76577, at *2 (D. Conn. Feb. 7, 1997).

**B. Subject Matter Jurisdiction**

1. Sovereign Immunity

With the United States identified as the appropriate defendant, the case must be dismissed on the basis of its sovereign immunity. "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see also Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) ("[The] shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities."). Absent such a waiver, courts have no subject matter jurisdiction over cases against the United States government. *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004).

A waiver of sovereign immunity "must be unequivocally expressed in statutory text, and cannot simply be implied." *Id.* at 150 (internal citations omitted). Aran's complaint invokes no Internal Revenue Code provision or other statute on point. And while the IRC does permit an action against the Service for "wrongful" collection of taxes under certain circumstances, 26 U.S.C. § 7433, the relevant statute also requires a plaintiff to exhaust administrative remedies as a prerequisite to suit in federal district court. *See Roberts v. I.R.S.*, 468 F. Supp. 2d 644, 649 (S.D.N.Y. 2006). Aran has not pleaded that he pursued, let alone exhausted, any administrative remedies. Nor has he alleged the other elements of a Section 7433 claim. Aran has therefore failed to establish that this action is within the scope of the Government's consent to be sued. His suit is barred by the doctrine of sovereign immunity.

2. The Anti-Injunction Act

In addition, the Anti–Injunction Act ("AIA") permits the United States to assess and collect taxes without judicial intervention. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736–37 (1974); *Black v. United States*, 534 F.2d 524, 526–27 (2d Cir. 1976). Specifically, it states that, excluding certain exceptions not implicated here, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The Supreme Court has held that this statutory provision bars suit against the United States for an injunction against the collection of taxes. *Enochs v. Williams Packing & Nav Co.*, 370 U.S. at 6. Therefore, to the extent that Plaintiff requests injunctive relief preventing the IRS from collecting on his tax liabilities, his request is barred by the Anti–Injunction Act.

3. The Declaratory Judgment Act

***3** Plaintiff essentially asks the Court to declare that he is not subject to the provisions of the Internal Revenue Code. Because the Plaintiff requests that the Court make declarations regarding the payment of his taxes, his declaratory judgment claims are barred by the Declaratory Judgment Act and dismissed for lack of jurisdiction. While the Declaratory Judgment Act empowers courts to "declare the rights and other legal relations of any interested party seeking such declaration," it expressly excepts cases "with respect to Federal taxes." 28 U.S.C. § 2201(a); *S.E.C. v. Credit Bancorp, Ltd.*, 297 F.3d 127, 137 (2d Cir. 2002) ("Thus, whether or not that Act waives the sovereign immunity of the United States with respect to other types of actions, it explicitly excludes from any such waiver the power to declare rights or obligations with respect to federal taxes.").

Accordingly, to the extent Plaintiff seeks declaratory relief, the Court lacks jurisdiction under the Declaratory Judgment Act. *Calen v. United States*, No. 18-CV-182183, 2020 WL 3129063, at *8 (E.D.N.Y. Mar. 13, 2020), report and recommendation adopted, No. 18-CV-2183, 2020 WL 2537262 (E.D.N.Y. May 19, 2020).

**C. Frivolous Claim**

Plaintiff's complaint sounds in the familiar refrain of the so-called sovereign citizen, with its references to Plaintiff as a "secured party," "sui juris," "non-participant in any government programs," its attachments of the "discharge" of his birth certificate and social security card and UCC financing statements, and arguments that are consistent with a sovereign citizen ideology. As the Second Circuit has

explained, "[t]he sovereign citizens are a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 F. App'x 105, n. 1 (2d Cir. 2013). They seek to "delay proceedings" by "raising numerous — often frivolous — arguments, many alleging that the Courts or the Constitution lack any authority whatsoever." *United States v. McLaughlin*, 949 F.3d 780, 781 (2d Cir. 2019).

Courts have resoundingly rejected the particular sovereign-citizen type of claim Plaintiff appears to advance here, namely, that his status as a sovereign citizen relieves him of his obligation to pay taxes. *See, e.g., Bey v. State of Indiana,* 847 F.3d 559, 559-61 (7th Cir. 2017) (referring to attempts to evade taxation under sovereign citizen theories as "frivolous"); *United States v. Mundt*, 29 F.3d 233, 237 (6th Cir. 1994) (dismissing "free sovereign" type of arguments in a federal tax case as "completely without merit" and "patently frivolous"); *see also Cheek v. United States*, 498 U.S. 192, 199 (1991) (rejecting sovereign-citizens' argument that the income tax is unconstitutional). As the case law makes clear, Plaintiff's claim lacks an arguable legal basis and must be dismissed as frivolous.

**D. Leave to Amend Denied as Futile**

Any amendment in this case would be futile. *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 15 (2d Cir. 2018) ("Leave to amend may properly be denied if the amendment would be futile.") (citing *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)). First, the sovereign immunity, the Anti-Injunction Act, and the Declaratory Judgment Act bars Aran's suit against the United States, and he could not possibly overcome the jurisdictional bar by pleading additional facts. Second, his entire complaint is derived from various sovereign citizen theories, which have already been held to be "patently frivolous." *United States v. Studley*, 783 F.2d 934, 937 n. 3 (9th Cir. 1986) (noting that theories of immunity to taxation based on sovereign citizenship had been "thoroughly rejected by every branch of the government for decades" and "such utterly meritless arguments" were "the basis for serious sanctions [to be] imposed on civil litigants who raise them").

**IV. Conclusion**

***4** For the reasons set out above, the complaint is dismissed for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12 (h)(3), and as frivolous. *See Fitzgerald*, 221 F.3d at 363-64; *Livingston*, 141 F.3d at 473; *Montero*, 171 F.3d at 760.

Although Plaintiff paid the filing fee to commence this action, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is respectfully directed to correct the caption to reflect the fact that Plaintiff is suing both the IRS and the Department of Treasury, enter judgment, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 377957, 129 A.F.T.R.2d 2022-668, 2022-1 USTC P 50,115

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:21-CV-04748**<br>Aran v. The Department of Treasury et al | — | E.D.N.Y. | Aug. 23, 2021 | Docket |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1745788
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven Joseph KELLY, as Trustee/General Executor for the Steven Joseph Kelly MRP Trust, Plaintiff,
v.
BARCLAYS CAPITAL, INC., Defendant.

26-CV-04105 (JAV)
|
Signed 06/17/2026

**Attorneys and Law Firms**

Steven Joseph Kelly, Pro Se.

MEMORANDUM OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge

***1** On May 15, 2026, Plaintiff Steven Joseph Kelly as Trustee of the Steven Joseph Kelly MRP Trust ("Plaintiff"), proceeding *pro se*, initiated this action against Barclays Capital, Inc. ("Defendant") for breach of fiduciary duty and neglect in violation of the Trust Indenture Act of 1939 ("TIA"). *See generally* ECF No. 1 ("Complaint" or "Compl."). For the reasons that follow, the Complaint is *sua sponte* dismissed.

## BACKGROUND

### A. Factual Allegations

Plaintiff attached to the Complaint a "Certificate of Dishonour and Administrative Default" addressed to Defendant, a document titled "Steven Kelly Mortgage Securitisation Report," and a document titled "Administrative Ripening Log." *See generally* Compl., Exs. 1-3. The Complaint identifies Plaintiff as the administrative agent for the STEVEN JOSEPH KELLY MRP TRUST. Compl., Ex. 1 at 2. According to the Complaint, Defendant, as "Indentured Trustee," failed to act following receipt of a Notice of Adverse Claim and Notice of Default on May 7, 2026. *Id.*, ¶ 2; Compl., ¶ 2. Because Defendant failed to respond within the "ripening period," Plaintiff avers that Defendant is in a state of "administrative dishonour" and has facilitated "conversion of the trust asset," identified as Finsbury Square 2020-2 PLC, in violation of sections 315 and 316(b) of the TIA. Compl., ¶¶ 1-4. Specifically, the Complaint alleges that Defendant allowed its servicer "to proceed with a foreclosure action based on a debt that has been forensically balanced." Compl., ¶ 4.

### B. Procedural History

Plaintiff's Proof of Service indicates that he served documents to various entities by Royal Mail in the United Kingdom but does not indicate that any document was sent to Defendant, Barclays Capital, Inc. *See generally* ECF No. 4. The Complaint states that Defendant was sent a "Certificate of Dishonour and Administrative Default" but does not indicate that the Complaint itself was served on the Defendant. Compl., ¶ 3.

Although Plaintiff filed an "Opposition to Defendant's Motion to Dismiss" on June 13, 2026, ECF No. 8, to date, Defendant has not appeared or participated in the action.

## DISCUSSION

The Complaint asserts claims under the TIA, 15 U.S.C. §§ 77aaa–77bbbb, for alleged breach of fiduciary duty. *See* Compl., ¶ 4. Its language, and that of Plaintiff's attached filings, to the extent comprehensible, appears to advance theories attributable to the sovereign citizen movement, "a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 Fed. Appx. 105, 106 n. 1 (2d Cir. 2013). First, sovereign citizens argue that "a person has a split personality: a real person and a fictional person called the 'strawman.' Adherents claim that government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman." *Thompson v. Donald J. Trump, Inc., USA*, No. 23-CV-2025 (LTS), 2023 WL 3948906, at *2 (S.D.N.Y. June 12, 2023) (cleaned up). The strawman is often represented by spelling the individual's name in capital letters, as Mr. Kelly's trust is spelled throughout his filings. *See Thompson v. Donald J. Trump, Inc., USA*, No. 23-CV-2025 (LTS), 2023 WL 3948906, at *2 (S.D.N.Y. June 12, 2023) (cleaned up); *see generally* ECF No. 1. Plaintiff also identified his "status" as "sovereign national" in the report included with his complaint, *see* Compl., Ex. 2 at 2, and a "Natural Person,"

*see* ECF No. 8. Finally, certificates of "dishonor" have been used in other filings by plaintiffs asserting sovereign citizen theories, which Plaintiff included as Exhibit 1 of the Complaint. *See Johnson, Tr. for MMJ Enter. Foreign Express Tr. v. Dominion Energy S.C., Inc.*, No. CV 3:25-6161-JFA-SVH, 2025 WL 2585513, at *3 (D.S.C. July 3, 2025); *Balash-Ioannidou v. Contour Mortg. Corp.*, No. 22-CV-4506 (AMD) (LB), 2022 WL 3358082, at *2 (E.D.N.Y. Aug. 15, 2022) (observing that action by sovereign citizen adherent who attempted to rely on "notary presentments" and "certificates of dishonor" to demonstrate satisfaction of a debt was frivolous).

***2** This Court "has the inherent power to dismiss without leave to amend or replead where the substance of the claim pleaded is frivolous on its face, or where amendment would otherwise be futile." *Dieujuste v. Sin*, 731 F. Supp. 3d 440, 455 (E.D.N.Y.), *reconsideration denied*, 734 F. Supp. 3d 232 (E.D.N.Y. 2024), *aff'd*, 125 F.4th 397 (2d Cir. 2025). "An action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (cleaned up). Sovereign citizen theories "have been consistently rejected by federal courts as legally frivolous." *Barton v. Clark*, No. 23 CIV. 5827 (LGS), 2023 WL 6929178, at *6 (S.D.N.Y. Oct. 19, 2023). Therefore, this action must also be dismissed on this basis even when construed liberally as a pro se pleading. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006).

The submitted papers also fail to comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "complaint that is so poorly composed as to be functionally illegible is subject to dismissal under Rule 8." *Avramham v. N.Y.*, No. 20-CV-4441 (LLS), 2020 WL 4001628, at *2 (S.D.N.Y. July 15, 2020) (cleaned up). Here, the complaint includes as allegations that the "the Trustee has failed to rebut the Trust's superior beneficial interest or address the 26-digit IRMF fingerprint proving the debt is balanced at the U.S. Treasury," or "[The Defendant] allow[ed] its Nominee to proceed with a foreclosure action based on a debt that has been forensically balanced, where the Original Issue Discount ($OID$) is equivalent to the face value ($OID = \text{Face Value} - \text{Issue Price } \$0.00$)." Compl. at 1. The Complaint is therefore incomprehensible on its face.

Finally, in his Civil Cover Sheet, the Plaintiff to this action is named as the Steven Joesph Kelly MRP Trust, ECF No. 2, with Mr. Kelly proceeding as the Trustee of such trust. But a trust cannot proceed *pro se* in an Article III court. The statute governing appearances in federal court, 28 U.S.C. § 1654, only allows two types of representation: " 'that by an attorney admitted to the practice of law by a governmental regulatory body and that by a person representing himself.' " *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007) (quoting *Eagle Associates v. Bank of Montreal,* 926 F.2d 1305, 1308 (2d Cir. 1991). Accordingly, "[t]he statute does not permit 'unlicensed lay[persons] to represent anyone else other than themselves.' " *Id.* (quoting *Eagle Associates,* 926 F.2d at 1308). "Thus, a nonlawyer trustee cannot bring claims on behalf of a trust." *Nasledie Davudova Express Tr. v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 24-CV-7633 (LTS), 2024 WL 4769687, at *2 (S.D.N.Y. Nov. 13, 2024) (citing *Bell v. S. Bay Eur. Corp.*, 486 F. Supp. 2d 257, 259 (S.D.N.Y. 2007)).

## CONCLUSION

Accordingly, this action is **DISMISSED**, and the Clerk is directed to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 1745788

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2035478
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David C. LETTIERI, Plaintiff,
v.
Randall E. GARVER; New York State Troopers; New York State Trooper Doe; The Broome County Humane Society; David Gaska; Karen Matson; Vestal Animal Hospital; Vestal Animal Veterinarian Doe; Miroslav Lovric; Brenda Kay Sannes; and Lawrence Joseph Vilardo, Defendants.

3:23-CV-1547 (BKS/ML)
|
Signed July 15, 2026

**Attorneys and Law Firms**

DAVID C. LETTIERI, Plaintiff, Pro Se, Devens Federal Medical Center, Post Office Box 879, Ayer, Massachusetts 01432

**REPORT and RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

## I. BACKGROUND

### A. Procedural History

***1** On October 8, 2025, the undersigned issued an Order and Report-Recommendation that outlined the procedural history in this action. (Dkt. No. 43.) The undersigned's Report and Recommendation recommended that Plaintiff's Amended Complaint be dismissed with leave to replead to the extent that it asserted claims against Defendant New York State Trooper Doe in his individual capacity, the Broome County Humane Society, David Gaska, Karen Matson, Vestal Animal Hospital, and Vestal Veterinarian Doe. (Dkt. No. 43 at 24.) In addition, the undersigned recommended dismissal without leave to replead Plaintiff's claims against Defendants New York State Troopers and New York State Trooper Doe in his official capacity. (*Id.*)

On May 26, 2026, Chief United States District Judge Brenda K. Sannes adopted the undersigned's Report and Recommendation. (Dkt. No. 51.)

On June 9, 2026, Plaintiff filed a second amended complaint, which is currently before the Court for review. (Dkt. No. 57.)

### B. Second Amended Complaint

Construed as liberally[1] as possible, Plaintiff's Second Amended Complaint appears to allege that his civil rights were violated by Defendants Randall E. Garver, New York State Troopers, New York State Trooper Doe, the Broome County Humane Society, David Gaska, Karen Matson, Vestal Animal Hospital, Vestal Animal Veterinarian Doe, Miroslav Lovric, Brenda Kay Sannes, and Lawrence Joseph Vilardo (collectively "Defendants").[2] (*See generally* Dkt. No 57.)

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 The Clerk of the Court is directed to add defendants Randall E. Garver, Miroslav Lovric, Brenda Kay Sannes, and Lawrence Joseph Vilardo as defendants to this action.

The factual allegations asserted in the Second Amended Complaint are substantially the same as those in the Amended Complaint. (*Compare* Dkt. No. 36, *with* Dkt. No. 57.) Those allegations were described at length in the undersigned's Report and Recommendation dated October 8, 2025. (Dkt. No. 43 at 4-7.) With the Second Amended Complaint, Plaintiff adds as defendants: (1) Randall E. Garver, (2) Miroslav Lovric, (3) Brenda Kay Sannes, and (4) Lawrence Joseph Vilardo. (Dkt. No. 57 at 1.) The Second Amended Complaint alleges that Defendant Garver "admitted to deleting the footage" but does not specify what footage was allegedly deleted. (Dkt. No. 57 at 5.) The Second Amended Complaint alleges that Defendants Lovric and Sannes have blocked Plaintiff's access to the Court. (*Id.* at 6-7.) Plaintiff alleges that Defendant Lovric "know[s] David Gaska since David Gaska was on both cases."[3] (*Id.* at 7.) The Second Amended Complaint alleges that Defendant Vilardo "has admitted to the charge that the plaintiff was arrest to be false with fabricated evidence" and that Defendant Vilardo "had been making frivolous and meritless decisions." (*Id.* [errors in original].)

3 Plaintiff has filed at least twelve other cases in this district including three other actions that

assert claims against Defendant Gaska: (1) *Lettieri v. Gaska*, 3:24-CV-0102 (GTS/ML), (2) *Lettieri v. Broome County Sheriffs*, 3:24-CV-0156 (LEK/ML), and (3) *Lettieri v. Matson*, 3:24-CV-0434 (GTS/ML). These three other actions by Plaintiff against Defendant Gaska are closed.

***2** Based on these factual allegations, Plaintiff asserts the same fourteen causes of action that were set forth in the Amended Complaint[4] (Dkt. No. 43 at 6-7) and (1) twelve claims of abuse of process against Defendants Lovric, Sannes, and Vilardo related to other civil actions that Plaintiff has commenced in federal court ("Fifteenth Claim," "Sixteenth Claim," "Seventeenth Claim," "Eighteenth Claim," "Nineteenth Claim," "Twentieth Claim," "Twenty-first Claim," "Twenty-second Claim," "Twenty-third Claim," "Twenty-fourth Claim," "Twenty-sixth Claim," and "Twenty-seventh Claim"); (2) a claim of conversion pursuant to New York common law ("Twenty-fifth Claim"); and (3) a claim pursuant to 18 U.S.C. § 1030 against Defendant Garver ("Twenty-eighth Claim"). (Dkt. No. 57 at 7-22.) As relief, Plaintiff seeks monetary damages, and injunctive relief in the form of, *inter alia*: (1) termination of Defendants Gaska, Matson, and Vestal Animal Veterinarian Doe from their "positions," (2) termination of the right to practice medicine with respect to Defendant Vestal Animal Hospital, (3) reformation of policies, (4) expungement of records at Defendant Vestal Animal Hospital, (5) that all cases before Defendants Lovric, Sannes, and Vilardo be vacated and dismissed, (6) granting of *in forma pauperis* status in several other cases and a direction that the United States Marshal complete service of process, (7) vacating a transfer order in another action and the ability to proceed with the action, and (8) that an immunity defense be barred in another action. (Dkt. No. 57 at 22-24.)

4 (1) a claim of unlawful search and seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendants related to the taking of Plaintiff's girlfriend's dog ("First Claim"); (2) a claim of slander and libel based on statements Defendants made that Plaintiff is a person who abuses animals ("Second Claim"); (3) a claim of abuse of process based on Defendant Trooper Doe's threat to arrest Plaintiff ("Third Claim"); (4) a claim of unlawful search and seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983 ("Fourth Claim"); (5) a claim that Defendant Gaska "forc[ed Plaintiff] to surrender property" in violation of the Fourth Amendment and 42 U.S.C. § 1983 ("Fifth Claim"); (6) a claim of excessive force against Defendant State Trooper Doe based on his threatened use of bodily harm ("Sixth Claim"); (7) a claim that Defendants committed the crime of frauds and swindles pursuant to 18 U.S.C. § 1341 ("Seventh Claim"); (8) a claim that Defendants committed the crime of fraud by wire, radio, or television pursuant to 18 U.S.C. § 1343 ("Eighth Claim"); (9) a claim that Defendants committed common law fraud ("Ninth Claim"); (10) a claim that Defendants committed the crime of interference with commerce by threats or violence pursuant to 18 U.S.C. § 1951 ("Tenth Claim"); (11) a claim that Defendants committed the crime of laundering monetary instruments pursuant to 18 U.S.C. § 1956 ("Eleventh Claim"); (12) a claim that Defendants New York State Troopers, Broome County Humane Society, and Vestal Animal Hospital are all liable pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) ("Twelfth Claim"); (13) a claim that Defendant New York State Trooper Doe violated Plaintiff's right to counsel pursuant to the Sixth Amendment and 42 U.S.C. § 1983 ("Thirteenth Claim"); and (14) a claim that Defendant Vestal Animal Hospital committed malpractice ("Fourteenth Claim"). (*See* Dkt. No. 43 at 6-7; *compare* Dkt. No. 36 4-11 [Amended Complaint setting forth fourteen causes of action], *with* Dkt. No. 57 at 7-16 [Second Amended Complaint setting forth the first fourteen causes of action that appear to largely mirror the fourteen causes of action from the Amended Complaint].) The Second Amended Complaint also appears to add the United States District Court for the Northern District of New York and the United States District Court for the Western District of New York as parties to the Twelfth Claim. (Dkt. No. 57 at 14-15.)

Plaintiff was granted IFP status. (Dkt. No. 33.)

## II. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

Because Plaintiff is proceeding *in forma pauperis*, his Second Amended Complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B). The legal standard governing review of a pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) was discussed at length in the Order and Report-Recommendation

issued by the undersigned dated May 6, 2025, and will not be repeated here. (Dkt. No. 33 at 5-6.)

***3** Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also* *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

## III. ANALYSIS

### A. Claims Pursuant to 42 U.S.C. § 1983

#### 1. Claims Against Defendants New York State Police and New York State Trooper Doe in his Official Capacity

Chief Judge Sannes dismissed Plaintiff's claims against Defendants New York State Police and New York State Trooper Doe in his official capacity without leave to amend. (Dkt. No. 51 at 4.) Thus, I recommend that to the extent Plaintiff asserts any claims against Defendants New York State Police and New York State Trooper Doe in his official capacity, those claims be dismissed. [5]

5 In the alternative, I recommend that Plaintiff's claims against Defendants New York State Troopers and New York State Trooper Doe in his official capacity be dismissed based on Eleventh Amendment sovereign immunity. (Dkt. No. 43 at 7-8.) To the extent that the Second Amended Complaint is liberally construed as seeking injunctive relief from Defendants New York State Troopers and New York State Trooper Doe in his official capacity, I recommend dismissal of those claims. "[J]udgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146 (1993) (citing *Green v. Mansour,* 474 U.S. 64, 73 (1985)). However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law. *See* *Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Ex Parte Young,* 209 U.S. 123 (1908). "In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (quoting *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011)); *see also* *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, N.Y.*, 945 F.3d 83, 110 (2d Cir. 2019) (" '[C]onjectural' injuries do not suffice under Article III.") (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983)) ("[The plaintiffs] lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury."). Plaintiff fails to allege facts plausibly suggesting that he is at risk of future harm by Defendants New York State Troopers and New York State Trooper Doe in his official capacity.

#### 2. Claims Against Defendant Broome County Humane Society

The Second Amended Complaint alleges that "a state trooper had came up to the plaintiff and threat to arrest the plaintiff with a loaded gun ... [unless Plaintiff] surrender[ed] the dog to the Broome County Humane Society." (Dkt. No. 57 at 4.) The Second Amended Complaint alleges that Defendant Broome County Humane Society's records reflected that Plaintiff was the owner of the dog, but really the dog belonged to his girlfriend. (*Id.*) Plaintiff alleges that Defendant Broome County Humane Society claimed that Plaintiff neglected the dog. (*Id.*) Further, the Second Amended Complaint alleges that Defendant Broome County Humane Society is "clothed with state law, New York State law because of making them a peace officer in agriculture and market law." (*Id.* at 6; *accord id.* at 2.)

***4** As set forth in the undersigned's Report and Recommendation dated October 8, 2025, these allegations fail to plausibly suggest that Defendant Broome County Humane Society violated Plaintiff's constitutional rights or took any action against Plaintiff. (Dkt. No. 43 at 10.) Moreover, the Second Amended Complaint fails to allege facts plausibly suggesting that Defendant Broome County Humane Society's alleged actions are fairly attributable to the state. (*Id*. at 10-11.) Plaintiff's conclusory allegation that Defendant Broome County Humane Society is clothed with state law, without attributing any actions taken by Defendant Broome County Humane Society, fails to allege that its actions should be fairly attributable to the State.

### 3. Claims Against Defendant Matson

As set forth in the undersigned's Report and Recommendation dated October 8, 2025, Plaintiff alleges that Defendant Matson accepted Plaintiff's $2,000 payment on August 18, 2020, which Plaintiff understood covered the remaining treatment for his girlfriend's dog. (Dkt. No. 57 at 3-4.) This allegation is insufficient to plausibly suggest that Defendant Matson was personally involved in violation of Plaintiff's constitutional rights. (Dkt. No. 43 at 11-12.)

### 4. Claims Against Defendant Gaska

#### a. First Claim: Unreasonable Search and Seizure

For the reasons set forth in the undersigned's Report and Recommendation dated October 8, 2025, I recommend that Plaintiff's First Claim—asserting an unreasonable search and seizure claim based on the taking of Plaintiff's girlfriend's dog—be dismissed for failure to state a claim upon which relief may be granted. (Dkt. No. 43 at 12-13.) More specifically, Plaintiff's allegation that he had no ownership rights to the animal that was seized (Dkt. No. 57 at 4, 5), is insufficient to state a claim upon which relief may be granted. (Dkt. No. 43 at 12-13 [holding that Plaintiff failed to assert a possessory interest in the dog allegedly seized where Plaintiff consistently referred to the dog as his girlfriend's and alleged that he had "no ownership to the animal"].)

#### b. Fourth and Fifth Claims: Unlawful Search and Seizure

For the reasons set forth in the undersigned's Report and Recommendation dated October 8, 2025, I recommend that Plaintiff's Fourth and Fifth Claims—asserting unlawful search and seizure based on Defendant Gaska's alleged conduct on August 11, 2020—be dismissed for failure to state a claim upon which relief may be granted. (Dkt. No. 43 at 15-17.) More specifically, Plaintiff's allegation that "[a]fterwards the plaintiff had found out David Gaska had came on the plaintiff property on August 11, 2020 ... (Dkt. No. 57 at 5), is insufficient to state a claim upon which relief may be granted. (Dkt. No. 43 at 15-17 [holding that there are areas of a property where a reasonable expectation of privacy does not attach and thus, law enforcement may enter without a warrant].) Despite the Court previously identifying this deficiency in the Amended Complaint, the Second Amended Complaint does not clarify where on Plaintiff's property Defendant Gaska allegedly entered and as set forth previously, there are spaces within a property that a state actor may enter without a warrant. (Dkt. No. 43 at 16-17.)

### 5. Claims Against Defendant Garver

The only claim that appears to be asserted against Defendant Garver is the Twenty-eighth Claim, which is discussed below in Part III.B. of this Report and Recommendation. (Dkt. No. 57 at 21-22.)

### 6. Claims Against Defendants Vestal Animal Hospital and Vestal Animal Veterinarian Doe

For the reasons set forth above in Part III.A.4.a. of this Report and Recommendation, I recommend dismissal of any unlawful search and seizure claim against Defendants Vestal Animal Hospital and Vestal Animal Hospital Veterinarian Doe to the taking of Plaintiff's girlfriend's dog.

### 7. Claims Against Defendant Trooper Doe in His Individual Capacity

#### a. First Claim: Unlawful Search and Seizure


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

***5** For the reasons set forth above in Part III.A.4.a. of this Report and Recommendation, I recommend dismissal of any unlawful search and seizure claim against Defendant Trooper Doe in his individual capacity related to the taking of Plaintiff's girlfriend's dog.

#### b. Third Claim: Abuse of Process

For the reasons set forth in the undersigned's Report and Recommendation dated October 8, 2025, I recommend that Plaintiff's Third Claim—asserting abuse of process against Defendant Trooper Doe in his individual capacity—be dismissed for failure to state a claim. (Dkt. No. 43 at 14-15.) More specifically, Plaintiff's allegation that Defendant Trooper Doe threatened to arrest Plaintiff if Plaintiff did not surrender his girlfriend's dog (Dkt. No. 57 at 4, 8), is insufficient to state a claim upon which relief may be granted. (Dkt. No. 43 at 14-15 [citing *Xydous v. City of Utica*, 24-CV-0135, 2025 WL 1755201, at *12 (N.D.N.Y. June 25, 2025) (Suddaby, J.) (holding that "a mere *threat* to effect a warrantless arrest—is not a legal process that is *regularly issued by or filed in a court* (unlike, for example, an arrest *warrant* issued by a judge, or the application for such a warrant which is filed in a court).") (emphasis in original)].)

#### c. Sixth Claim: Excessive Force

For the reasons set forth in the undersigned's Report and Recommendation dated October 8, 2025, I recommend that Plaintiff's Sixth Claim—asserting excessive force against Defendant Trooper Doe in his individual capacity—be dismissed for failure to state a claim upon which relief may be granted. (Dkt. No. 43 at 17-18.) More specifically, Plaintiff's allegation that Defendant Trooper Doe threatened Plaintiff by pointing a gun at him (Dkt. No. 57 at 4, 9), is insufficient to state a claim upon which relief may be granted. (Dkt. No. 43 at 17-18 [citing *Pierre v. City of New York*, 531 F. Supp. 3d 620, 627 (E.D.N.Y. 2021) (holding that "threats of force, including the drawing of a gun, cannot constitute excessive force as a matter of law.")].)

#### d. Thirteenth Claim: Right to Counsel

For the reasons set forth in the undersigned's Report and Recommendation dated October 8, 2025, I recommend that Plaintiff's Thirteenth Claim—asserting that his right to counsel was violated by Defendant Trooper Doe in his individual capacity—be dismissed for failure to state a claim upon which relief may be granted. (Dkt. No. 43 at 18-19.) More specifically, Plaintiff's allegation that during an investigatory juncture, he requested a lawyer and Defendant Trooper Doe told him that he did not need one (Dkt. No. 57 at 4, 15), is insufficient to state a claim upon which relief may be granted. (Dkt. No. 43 at 18-19 [citing *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 465 (E.D.N.Y. 2010) (holding that "[g]enerally, New York State courts hold that a criminal proceeding, and with it the right to counsel, is initiated by the filing of an accusatory instrument.") (internal quotation marks omitted)].)

### 8. Claims Against Defendants Lovric, Sannes, and Vilardo

Plaintiff asserts twelve claims of abuse of process against the undersigned, Chief Judge Sannes, and Judge Vilardo (Fifteenth Claim, Sixteenth Claim, Seventeenth Claim, Eighteenth Claim, Nineteenth Claim, Twentieth Claim, Twenty-first Claim, Twenty-second Claim, Twenty-third Claim, Twenty-fourth Claim, Twenty-sixth Claim, and Twenty-seventh Claim). (Dkt. No. 57 at 16-21.)

***6** Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). "As a general matter, judges are not absolutely immune from suits for prospective injunctive relief." *McKeown v. N.Y. State Com'n on Judicial Conduct*, 377 F. App'x 121, 124 (2d Cir. 2010) (citing *Mireles v. Waco*, 502 U.S. 9, 10 n.1 (1991) (per curiam). However, Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

Plaintiff's claims against the undersigned, Chief Judge Sannes, and Judge Vilardo, involve the performance of our judicial functions. (*See generally* Dkt. No. 57.) More specifically, Plaintiff alleges that Chief Judge Sannes "created a frivolous order in which had blocked a motion to this case." (Dkt. No. 57 at 6.) Plaintiff alleges the undersigned has "throw[n] out papers of ob[j]ection to 23-CV-1099 and the third amended complaint to 24-CV-102 along with motions to the cases." (*Id.*) Plaintiff alleges that Judge Vilardo

has issued "frivolous and meritless decisions" which he alleges have helped Defendants in violation of Plaintiff's rights. (*Id*. at 7.) These allegations relate to actions and omissions that were clearly taken while the undersigned, Chief Judge Sannes, and Judge Vilardo were acting in our judicial roles overseeing Plaintiff's civil rights actions. The Second Amended Complaint does not allege that the undersigned, Chief Judge Sannes, or Judge Vilardo violated a declaratory decree or that declaratory relief was unavailable. (*See generally* Dkt. No. 57.)

As a result, Plaintiff's claims for money damages are barred by absolute judicial immunity and to the extent that Plaintiff seeks injunctive relief Section 1983, relief is not available because Plaintiff failed to allege that Defendants Lovric, Sannes, and Vilardo violated a declaratory decree or that declaratory relief was unavailable. *McKeown*, 377 F. App'x at 124.

Moreover, I recommend that Plaintiff's official capacity claims against the undersigned, Chief Judge Sannes, and Judge Vilardo be dismissed based on the doctrine of sovereign immunity. *Rech v. Siragusa*, 23-CV-6039, 2023 WL 2559409, at *5 (W.D.N.Y. Mar. 3, 2023) (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)) (dismissing the plaintiff's claims against federal judges in their official capacities as "barred by sovereign immunity.").[6]

6 Moreover, venue for any claims that Plaintiff asserts against Defendant Vilardo likely lie in the District Court for the Western District of New York. Venue in an action such as this is governed by 28 U.S.C. § 1391(b), which provides, in pertinent part, that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

28 U.S.C. § 1391(b). "In the event of a finding that venue is improper, a court is empowered to dismiss the action or, alternatively, if the interest of justice dictates, to transfer the case to any district in which it could have been brought." *Glover v. Goord*, 06-CV-1037, 2007 WL 2454193, at *6 (N.D.N.Y. Aug. 22, 2007) (Kahn, J., adopting report and recommendation of Peebles, M.J.) (citing 28 U.S.C. § 1406(a); *Goldawr, Inc. v. Heiman*, 369 U.S. 463, 465-67 (1962)). As a result, I recommend that, in the alternative, Plaintiff's claims against Defendant Vilardo be dismissed based on improper venue.

### 9. *Monell* Claims (Twelfth Claim)

***7** "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Second Amended Complaint essentially complains of a discrete incident on August 18, 2020, during which Plaintiff was allegedly treated improperly by employees of Defendant New York State Troopers, Broome County Animal Hospital, and Vestal Animal Hospital. (*See generally* Dkt. No. 57.) Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or

"deliberate indifference" to the rights of persons who would come into contact with employees of Defendant New York State Troopers, Broome County Animal Hospital, and Vestal Animal Hospital.

In addition, despite not listing the United States District Court for the Northern District of New York or the United States District Court for the Western District of New York, as defendants, Plaintiff appears to attempt to assert claims pursuant to *Monell* against those entities. (Dkt. No. 57 at 13-15.) Notwithstanding, the United States District Court for the Northern District of New York and the United States District Court for the Western District of New York are immune from suit pursuant to the doctrine of sovereign immunity. *See* *Benyi v. New York*, 20-CV-1463, 2021 WL 1406649, at *7 (N.D.N.Y. Mar. 23, 2021) (Lovric, M.J.) (recommending dismissal of the plaintiff's Section 1983 claims against the federal defendants based on the doctrine of sovereign immunity), *report and recommendation adopted by* 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (Hurd, J.); *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 301 (N.D.N.Y. Nov. 1, 2019) (Hurd, J.) (dismissing the plaintiff's Section 1983 claims against federal defendants for lack of subject matter jurisdiction because the United States is immune from constitutional tort claims).

As a result, I recommend that any claims pursuant to *Monell* be dismissed.

### B. Criminal Law Claims (Seventh Claim, Eighth Claim, Tenth Claim, Eleventh Claim, and Twenty-eighth Claim)

As set forth in the undersigned's Report and Recommendation dated October 8, 2025, "a private plaintiff cannot pursue a claim under the criminal statutes found in Title 18 of the United States Code." (Dkt. No. 43 at 21 [quoting *Bennett v. New York State Thruway Auth.*, 22-CV-0337, 2024 WL 1053222, at *17 (N.D.N.Y. Mar. 11, 2024) (Hurd, J.); citing *Storm-Eggink v. Gottfried*, 409 F. App'x 426, 427 (2d Cir. 2011) (summary order) (collecting cases) (holding that there is no private right of action under Title 18 of the U.S. Code.)].)

***8** As a result, I recommend that any claims Plaintiff asserts pursuant to Title 18 of the U.S. Code be dismissed.

### C. State Law Claims (Second Claim, Ninth Claim, Fourteenth Claim, Twenty-fifth Claim)

Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that the Court decline to exercise jurisdiction over any state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment"). [7]

7 In addition, the undersigned notes that the statute of limitations for defamation claims in New York is one year. N.Y. C.P.L.R. § 215(3). The actions alleged in this action occurred more than two years before the commencement of this action. Hence, the statute of limitations for any defamation claim has likely expired.

## IV. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also* *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v.*

*Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

8 *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

***9** In this instance, I conclude that any further amendments to Plaintiff's Second Amended Complaint would be futile. Plaintiff has already amended his pleading two times and failed to correct the deficiencies identified by the Court in his prior pleadings. (Compare Dkt. No. 1, *and* Dkt. No. 36, *with* Dkt. No. 57.) Any additional amendments to Plaintiff's Second Amended Complaint are not likely to be productive. As a result, I recommend that all claims in Plaintiff's Second Amended Complaint be dismissed without leave to amend. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

Plaintiff is advised that he should not file another amended pleading or a motion to amend the Second Amended Complaint until Chief Judge Sannes rules on this Report and Recommendation. Any further amended pleading or motion to amend that is filed before Chief Judge Sannes's decision with respect to this Report and Recommendation, will be stricken as premature and will not be considered by the Court. As noted below, however, Plaintiff may file objections to this Report and Recommendation.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk of the Court shall add defendants Randall E. Garver, Miroslav Lovric, Brenda Kay Sannes, and Lawrence Joseph Vilardo, to the caption of this action; and it is further respectfully

**RECOMMENDED** that Plaintiff's Second Amended Complaint (Dkt. No. 57) be **DISMISSED WITHOUT LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

9 The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

10 If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2026 WL 2035478

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (6)**

**Direct History (1)**

1. Lettieri v. Garver
2026 WL 2035478 , N.D.N.Y. , July 15, 2026

**Related References (5)**

2. Lettieri v. New York State Police
2024 WL 947536 , N.D.N.Y. , Jan. 29, 2024

*Appeal Dismissed by*

3. Lettieri v. New York State Police
2024 WL 4021320 , 2nd Cir. , June 18, 2024

4. Lettieri v. New York State Police
2025 WL 1305867 , N.D.N.Y. , May 06, 2025 , report and recommendation rejected ( Jun 02, 2025 )

5. Lettieri v. New York State Troopers
2025 WL 2855157 , N.D.N.Y. , Oct. 08, 2025

*Report and Recommendation Adopted by*

6. Lettieri v. New York State Police
2026 WL 1470962 , N.D.N.Y. , May 26, 2026

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1053222
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William Paul BENNETT, Plaintiff,
v.
NEW YORK STATE THRUWAY AUTHORITY, Joanne M. Mahoney, Mayor Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm, Carlos Millan, Patrick Hoehn, Kevin Post, Robert Dressing, Barry Oaksford, Michael Blais, Todd Summerson, and David Naples, Defendants.

6:22-CV-337
|
Signed March 11, 2024

**Attorneys and Law Firms**

WILLIAM PAUL BENNETT, Plaintiff, Pro Se, 1610 North George Street, Rome, NY 13440.

HON. LETITIA A. JAMES, New York State Attorney General, ERIN P. MEAD, ESQ., STACEY A. HAMILTON, ESQ., Ass't Attorneys General, Attorneys for Defendants, The Capitol, Albany, NY 12224.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

### I. INTRODUCTION

***1** On April 8, 2022, *pro se* plaintiff William Paul Bennett ("plaintiff"), a New York State Thruway Authority ("NYSTA") employee, filed this action alleging that his employer and fourteen high-ranking or supervisory NYSTA officials violated his civil rights by, *inter alia*, disciplining him under policies and directives related to the COVID-19 pandemic. Dkt. No. 1. Along with his initial complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 2, and to have counsel appointed to assist him, Dkt. No. 4. Thereafter, plaintiff also filed an amended complaint. Dkt. No. 5.

Plaintiff's amended complaint clocks in at 142 pages. It asserts federal claims under various provisions of the U.S. Constitution, the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983, 18 U.S.C. §§ 241, 242, 351(e), 28 U.S.C. § 4101, and related state law. Plaintiff seeks a total of $39,312,655.65 in damages as well as declaratory and injunctive relief.

On June 10, 2022, U.S. Magistrate Judge Miroslav Lovric conducted a review of plaintiff's IFP Application. Dkt. No. 6. There, Judge Lovric noted that plaintiff was still employed by the NYSTA and receiving his regular, biweekly wages. *Id.* Plaintiff also co-owned some real estate with a non-zero fair market value. *Id.* Because his earnings and holdings put him well above the poverty line, Judge Lovric denied plaintiff's IFP Application. *Id.* Judge Lovric also denied plaintiff's motion for counsel. *Id.* However, Judge Lovric gave plaintiff thirty days in which to pay the filing fee. *Id.* Plaintiff promptly did so. Thereafter, summonses were issued, Dkt. No. 10, and all of the named defendants appeared in this action on July 25, 2022, Dkt. No. 20.

On October 31, 2022, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6) to dismiss plaintiff's amended complaint. Dkt. Nos. 32, 33. Plaintiff opposed. Dkt. No. 39. The matter was reassigned to this Court on February 16, 2024. Dkt. No. 56.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument. [1]

1 Plaintiff has also filed a number of his own motions: he moved for summary judgment against defendant Boehm, Dkt. No. 40, a declaratory judgment, Dkt. No. 41, summary judgment against defendant Post, Dkt. No. 42, filed a letter motion requesting that defendants' motion to dismiss be rejected, Dkt. No. 47, summary judgment against defendants Naples, Oaksford, and Millan, Dkt. No. 48, and declaratory judgment, Dkt. No. 49. Those motions have been held in abeyance pending a decision on this motion to dismiss. Dkt. No. 46.

### II. BACKGROUND

The following facts are taken from plaintiff's amended complaint and its attached exhibits, Dkt. No. 5, and are assumed true for the purpose of assessing defendants' motion to dismiss.

On February 11, 2016, the NYSTA hired plaintiff in the title of General Mechanic / HVAC worker. Am. Compl. at 14. [2]

Plaintiff's interview was conducted by defendant Oaksford and non-party Chandler. *Id.* During the interview, plaintiff had "a full beard and mustache." *Id.* Although neither Oaksford nor Chandler mentioned it at the interview, plaintiff was later told by Oaksford that he "would be required to shave for a mandatory respirator fit test." *Id.* Plaintiff alleges that that no maintenance employees besides Chandler "had used a respirator during the preceding ten (10) years." *Id.*

2 The amended complaint includes numbered paragraphs, but only as to certain allegations on certain pages. Citations to unnumbered facts are found on the pages corresponding to the CM/ECF header.

***2** Plaintiff submitted a "Request for Reasonable Accommodation," in which he requested that he "be permitted to be excused from shaving and the subsequent fit test as respirators are not typically used by anyone in [his] job description." Am. Compl. at 14. According to plaintiff, "the presence of [his] facial hair was part of [his] firmly held religious beliefs and practices." *Id.* The NYSTA asked for "additional documentation." *Id.* Thereafter, plaintiff's request for a Reasonable Accommodation was granted. *Id.* at 14–15.

A year later, plaintiff received a notice informing him that he would need to re-apply for this Reasonable Accommodation. Am. Compl. at 15. When he asked why this was required, plaintiff "was informed by various NYSTA management and EEOC [Equal Employment Opportunity Commission] personnel that such re-application is to make sure that no change in status existed." *Id.* "NYSTA EEOC personnel instructed [plaintiff] to fill out the appropriate form and to put wording to the effect that there were no changes to the previous annual application." *Id.* Thereafter, plaintiff forwarded the re-application to EEOC. *Id.*

Shortly after mailing away his re-application, plaintiff and his co-workers "were assigned to a training class which was held in the break area" of the maintenance facility. Am. Compl. at 15. Defendant Post was the training class instructor. *Id.* At the end of the training, Post approached plaintiff "to tell [him] that he had seen [plaintiff's] second application for Reasonable Accommodation and that it was incomplete." *Id.* Post told plaintiff he "had to submit new documentation, specifically referring to a letter on Church letterhead from the parish priest." *Id.* Plaintiff responded that he had already followed the EEOC's instructions. *Id.*

At that time, Post "proceeded to raise his voice and chastise [plaintiff] in front of his [fellow co-workers] with words that included 'This isn't a fight you want to take on.' " Am. Compl. at 15. Plaintiff walked away. *Id.* But he did not file a grievance against Post. *Id.* Soon thereafter, plaintiff learned that an NYSTA employee named Chris Dulong "was also involved in disciplinary issues regarding facial hair and fit testing requirements" and was later terminated. *Id.* at 15–16.

Thereafter, plaintiff and non-parties Chandler and Bentley were assigned to a NYSTA facility in Utica. Am. Compl. at 16. At some point, Bentley was injured and unable to work. *Id.* So plaintiff took a "two[-]week period of employment known as 'Out of Title.' " *Id.* During that period, plaintiff learned and performed the duties of a "Maintenance Supervisor I," which is the job title that Bentley held. *Id.*

While performing in that position, plaintiff attempted to complete a job at a NYSTA facility in Herkimer. Am. Compl. at 16. But there was an issue with scheduling, so plaintiff told defendant Blais that the job would have to be rescheduled. *Id.* Blais "lost his temper" and "started yelling at [plaintiff]," including shouting that plaintiff didn't "care about taking care of matters at his facility." *Id.* Plaintiff "called" Blais on his "demeanor" and Blais "apologize[d] and revert[ed] to a civil tone." *Id*

On April 17, 2020, NYSTA, with the approval of defendants Mahoney, Driscoll, Konstalid, Barr, Multari, Boehm, and Millan, published and distributed a document called "Safety Gram #192." Am. Compl. ¶ 1. This document "is the first official mention of [a] requirement of use of masks or facial coverings and the proper use thereof." *Id.* According to plaintiff, this Safety Gram is a breach of a collective bargaining agreement that applies to him. *Id.* ¶¶ 1, 5, 18. According to plaintiff, one or more of the named defendants violated his civil rights by wrongfully applying this Safety Gram against him. *Id.* ¶¶ 2–4.

***3** On or about June of 2020, defendants "established a policy regarding a requirement that all YSTA employees complete a 'Wellness Survey.' " Am. Compl. ¶ 11. Plaintiff alleges that this policy is also a breach of the collective bargaining agreement. *Id.* Plaintiff further alleges that he suffered from an unidentified medical condition that made it difficult for him to complete this survey. *Id.* ¶ 13. Plaintiff alleges that defendant Post knew this. *Id.*

On or about July 21, 2020, plaintiff attended a training session at an NYSTA facility in Herkimer. Am. Compl. ¶ 15. The training was conducted by defendant Naples. *Id.* Plaintiff had previously talked with Naples about his Reasonable Accommodation related to his beard, so plaintiff approached Naples to tell him that he believed that Safety Gram #192 violated the collective bargaining agreement and his civil rights. *Id.* Plaintiff alleges that Naples "failed to act" on this verbal; *i.e.*, "non-written" request for a Reasonable Accommodation. *Id.*

On September 30, 2020, defendant Post issued a Memorandum to NYSTA employees about the then-ongoing COVID-19 pandemic. Ex. 7 to Am. Compl. at 88; Am. Compl. ¶ 51. Among other things, this Memorandum required all employees to wear masks indoors in "all public / common areas." *Id.* This Memorandum cautioned that "blatant disregard for the protocols will be addressed appropriately." *Id.*

On October 1, 2020, plaintiff was using a urinal in the men's bathroom when defendant Blais entered the room and ordered plaintiff "to put a mask on." Am. Compl. ¶ 17. Plaintiff responded to Blais that he had two doctor's notes that allowed him "to not wear a mask as long as [he] was social distancing." *Id.* Defendant Blais reported this interaction to his supervisor, who in turn reported it to defendant Post. *Id.* ¶¶ 27, 31.

Several hours later, the NYSTA issued to plaintiff a Job Counseling Memo ("JCM") based on his failure to comply with the NYSTA safety policies and his failure to follow supervisory directives. Ex. 4 to Am. Compl. at 77; Am. Compl. ¶¶ 35, 37. The JCM warned plaintiff that "[s]imilar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action." *Id.*

Later that day, plaintiff contacted defendant Naples, the EEOC official at the NYSTA, to tell him about what had happened in the bathroom and the JCM he had received. Am. Compl. ¶ 57. Naples "conceded that he should have done something with the information he received [from plaintiff] in July" and "instructed [plaintiff] to file a written request for a Reasonable Accommodation." *Id.*

On October 2, 2020, plaintiff submitted to the NYSTA a Request for a Reasonable Accommodation. Ex. 2 to Defs.' Mem., Dkt. No. 33-2.[3] This request sought to "not be required to wear a face covering when working alone or in areas where social distancing can be maintained." *Id.*

3 The Court is reluctant to consider this kind of extraneous material on a motion to dismiss, but the cited material—in particular, the date and content of this document—are integral to plaintiff's claims. Notably, the substance of this document appears in the pleading, too. Am. Compl. ¶ 17.

Plaintiff supported this request with a doctor's note that says he "has difficulty wearing the mask all the time" and "it is okay not to wear the mask if he is alone or working separately while adhering to social distancing and CDC guidelines." Ex. 3 to Defs.' Mem., Dkt. No. 33-3. A few days later, plaintiff sent to various named defendants an e-mail complaint about the October 1 JCM. Am. Compl. ¶ 59.

***4** On October 15, 2020, the NYSTA responded to plaintiff's Request for a Reasonable Accommodation. Compl. at 95. The letter explained that NYSTA would provide him with the following accommodations:

> -You will be issued extra facemasks at the start of your day. You should adhere to the directive on face coverings as follows: "a face covering must be carried on your person at all times while on Authority property and worn when social distancing (i.e., less than 6 feet distance cannot be achieved." You are permitted to remove your facemask as needed for medical reasons provided that you adhere to the above referenced policy and/or supervisor's directive. Please not that when in common areas (such as rest rooms, hallways, etc.) or approaching areas where employees may be gathered, masks are required to be worn.

Am. Compl. at 95.

On October 29, 2020, plaintiff received another JCM based on a "pattern of insubordination and disregard for safety procedures." Am. Compl. at 90; Am. Compl. ¶ 61. According to this JCM, plaintiff had violated COVID-19 safety directives on October 15 and again on October 29. *Id.* During the job counseling meeting on this second JCM, plaintiff alleges that defendant Oaksford told him that he "did not care if" plaintiff "had a Reasonable Accommodation," and that if he was unhappy about following orders he could grieve it through the union later. Am. Compl. ¶ 63. Various defendants signed the second JCM on November 16, 2020. *Id.* ¶¶ 67, 69, 71, 73, 75.

On December 7, 2020, plaintiff received a third JCM. Am. Compl. at 97. This disciplinary memo was issued for

plaintiff's "pattern of failure to follow directives and disregard for safety protocols and procedures." *Id.* ¶ 77. This JCM stated that plaintiff continued to ignore the COVID-19 safety directives that required him to wear a mask in common areas. *Id.* at 97. As before, this JCM warned plaintiff that "[s]imilar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action." *Id.*

On January 20, 2021, defendant Millan notified plaintiff that he was being charged with misconduct for his repeated violations of the COVID-19 safety policies. Am. Compl. at 103; Am. Compl. ¶ 87. This letter explained that a hearing would be conducted on the charge. *Id.* Thereafter, plaintiff, after consulting with a union representative and hiring his own lawyer, entered into a stipulation in which he agreed to plead guilty to the charges in the January 20, 2021 letter and pay a $610.80 fine. Am. Compl. at 101–102; Am. Compl. ¶¶ 87–94.

On February 8, 2021, defendant Hoehn notified plaintiff that he had received a "Report of Unsatisfactory Performance" for the rating period between February 11, 2020 through February 11, 2021." Am. Compl. at 107. This performance rating was based on the fact that plaintiff had received three JCMs; *i.e.*, he had been repeatedly counseled for his failure to follow the NYSTA's COVID-19 directives. *Id.* As a result of this rating, plaintiff missed out a scheduled pay raise. Am. Compl. ¶ 95. He appealed the determination but the NYSTA affirmed the unsatisfactory rating. Compl. at 112.

On July 29, 2021, plaintiff filed a civil rights complaint with the New York State Division of Human Rights ("DHR") alleging that the NYSTA's denial of his pay raise was the result of sexual harassment, non-compliance with his reasonable accommodation, and retaliation. Ex. 6, Dkt. No. 33-6. The DHR conducted an investigation. *See* Am. Compl. at 12–13.

***5** On January 11, 2022, the DHR determined that there was no probable cause to believe that a violation occurred. Ex. 9, Dkt. No. 33-9. Thereafter, the EEOC adopted the DHR's findings and issued plaintiff a so-called "right-to-sue" letter on March 8, 2022. Ex. 10, Dkt. No. 33-10; Am. Compl. at 13.

## III. LEGAL STANDARDS

### A. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 297–98 (N.D.N.Y. 2019) (cleaned up). "The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions." *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based.").

"A facial Rule 12(b)(1) motion is one based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Nicholas*, 433 F. Supp. 3d at 586 (cleaned up). "A plaintiff opposing such a motion bears no evidentiary burden." *Id.* "Instead, to resolve a facial Rule 12(b)(1) motion, a district court must determine whether the complaint and its exhibits allege facts that establish subject matter jurisdiction." *Id.* "And to make that determination, a court must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Nicholas*, 433 F. Supp. 3d at 586 (quoting *Carter*, 822 F.3d at 57). "In opposition to such a motion, a plaintiff must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id.* (cleaned up). "If a defendant supports his fact-based Rule 12(b)(1) motion with material and controverted extrinsic evidence, a district court will need to make findings of fact in aid of its decision as to the subject matter jurisdiction." *Id.*

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint

and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. DISCUSSION

***6** As an initial matter, plaintiff is *pro se.* So his filings must be held to less stringent standards. *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly warned, documents filed *pro se* "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that [they] suggest[ ]." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).

Broadly construed, plaintiff's amended complaint alleges that the NYSTA (and the named defendants) violated his civil rights by writing him up in a series of three job counseling memos (called JCMs) that led to formal charges of discipline and, eventually, an unsatisfactory job performance rating.

The amended complaint and a review of the supporting documentation establishes that plaintiff was issued the JCMs for repeatedly failing to wear a cloth face mask or other face covering inside certain NYSTA facilities and designated common areas in violation of the NYSTA's COVID-19 policies.

Plaintiff contends the JCMs were issued in an irregular and/or improper manner and violated a reasonable accommodation he had received based on his medical condition. According to plaintiff's amended complaint, these and other, related actions amounted to discrimination based on his disability, sex, and/or retaliation.

Notably, plaintiff's amended complaint describes two different reasonable accommodations: a medical accommodation he received vis-à-vis the COVID-19 protocols and an earlier, religious accommodation he received shortly after beginning his employment at NYSTA.

In particular, plaintiff alleges that he has a sincere religious belief that requires him to maintain facial hair and/or a beard. Am. Compl. at 14. The pleading alleges that when a supervisor told him he would need to shave his facial hair for a respirator fit test, he sought and received an accommodation that excused him from shaving or from taking the respirator fit test.[4] *Id.*

4 Plaintiff alleges that an NYSTA employee named Chris Dulong "was also involved in disciplinary issues regarding facial hair and fit testing requirements" and was later terminated. Am. Compl. at 15–16. Plaintiff does not allege that he was terminated or disciplined for his facial hair or for the fit testing requirement.

Importantly, however, there is no indication that the events described in the rest of plaintiff's complaint have anything to do with the accommodation that excused him from the facial-hair / fit-test requirements. Even broadly construed, the allegations about this religious accommodation are entirely distinct from the COVID-19 policy requirement to wear non-fitted disposable masks or other cloth face coverings while still maintaining his facial hair.

Wearing a non-fitted, disposable mask—not shaving his facial hair or fit-testing a respirator—is the requirement imposed by the COVID-19 protocol(s) about which plaintiff complains. Thus, because there is no possible religious-liberty claim that might attach to this fact pattern, the Court will not address this issue further. Instead, the rest of this opinion focuses on the reasonable accommodation plaintiff received vis-à-vis the COVID-19 protocols.[5]

5 Even assuming plaintiff intended to assert this kind of claim, any such claim would fail. *See, e.g.*, *Vanwyckhouse v. Tessy Plastics*, 2023 WL 5452819, at *4 (N.D.N.Y. Aug. 24, 2023) (D'Agostino, J.) (rejecting religious discrimination claim based on COVID-19 workplace masking policy).

***7** Plaintiff's amended complaint purports to assert federal claims under the ADA, Title VII, the U.S. Constitution, 42 U.S.C. § 1983, 18 U.S.C. §§ 241, 242, 351(e), and 28 U.S.C. § 4101.

### A. The ADA

The ADA is divided into five separate titles: Employment (Title I), Public Services (Title II), Public Accommodations (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V). *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 169 (2d Cir. 2013).

The first three titles are the big ones. Together, they work to "forbid[ ] discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I ...; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 508, 516–17 (2004). But Title V often comes up in litigation, too, since it protects people from retaliation, interference, coercion, or intimidation for engaging in any of the activities protected by the statute itself. 42 U.S.C. § 12203(a)–(b).

Plaintiff's allegations relate to his employment with the NYSTA, a New York State agency. ADA claims against a public employer implicate Title I and Title V. *See, e.g.*, *Mary Jo C.*, 707 F.3d at 171 (limiting discrimination claims by public employees to Title I); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 410 (E.D.N.Y. 2010) (noting that Title V concerns retaliation).

The problem for plaintiff is that the Eleventh Amendment shields New York State (and its constituent agencies, such as the NYSTA) from suit under these provisions of the ADA.

This is because "state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." *Jackson v. Battaglia*, 63 F. Supp. 2d 214, 219–20 (N.D.N.Y. 2014) (citation omitted).

With respect to these ADA claims in particular, "Congress has never abrogated New York's sovereign immunity from claims under Title I and V of the ADA and New York has never waived it." *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014).

This immunity extends to "state officials at those agencies working on behalf of the state (*i.e.*, in their official capacities), *Emmons*, 715 F. Supp. 2d at 406, and will bar a plaintiff's claim "regardless of the type of relief sought," *Morales v. New York*, 22 F. Supp. 3d 256, 258 (S.D.N.Y. 2014). Consequently, ADA claims asserted against New York State, its agencies, or its officials under Title I or Title V are barred by the Eleventh Amendment. *Davis v. Vt., Dep't of Corr.*, 868 F. Supp. 2d 313, 322 (D. Vt. 2012).

Plaintiff's amended complaint also asserts these claims against high-ranking and/or supervisory NYSTA officials in their personal and official capacities. To the extent that plaintiff alleges these ADA claims against the individual defendants in their *personal* capacities, those claims must be dismissed because neither Title I nor Title V provide for individual liability in the employment context. *See, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 79–80 (2d Cir. 2010) (per curiam).

***8** Plaintiff's amended complaint also names these individual defendants in their *official* capacities. Under limited circumstances, a plaintiff can pursue an "official-capacity" claim against a public official using a doctrine called *Ex parte Young*, which evades the Eleventh Amendment's bar to suit. *Frantti v. New York*, 2017 WL 922062, at *5 (N.D.N.Y. Mar. 8, 2017). But the doctrine is a narrow one: the plaintiff must plausibly allege (1) an ongoing violation of federal law; and (2) seek relief that can properly be characterized as forward-looking; *i.e.*, prospective. *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 333 (E.D.N.Y. 2014).

The problem here is that even broadly construed, the amended complaint describes, at most, completed violations of the ADA. Plaintiff filed this action in April of 2022, but the most recent significant event described with any detail in his amended complaint is the February 8, 2021 "unsatisfactory" rating that caused plaintiff to miss out on a promotion or pay raise. *See, e.g.*, Am. Compl. ¶ 95. And as of this writing, the State has rescinded the relevant COVID-19 protocols, so there is no existing NYTSA policy (that caused him these specific harms) which could be enjoined.

Thus, to the extent plaintiff has asserted claims under Title I or Title V of the ADA against NYSTA or against the named individual defendants in either their official or personal capacities, those claims must be dismissed as barred by sovereign immunity. [6]

6 This is a Rule 12(b)(1) dismissal. *Morales*, 22 F. Supp. 3d at 268 ("A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction.").

**B. <u>The Rehabilitation Act</u>** [7]

7 If one or more of plaintiff's ADA claims might have proved viable under *Ex parte Young*, they would still fail for the reasons explained in this discussion of the Rehabilitation Act.

The Rehabilitation Act is a body of federal disability law that is available to plaintiff. Although the amended complaint does not reference this statute, the Rehabilitation Act of 1973 provides an avenue for possible relief against a state employer. *Quadir*, 39 F. Supp. 3d at 537 (construing *pro se* complaint as raising disability-related claims under the Rehabilitation Act).

New York has waived sovereign immunity on these claims. *Quadir*, 39 F. Supp. 3d at 537. "Like the ADA, the Rehabilitation Act prohibits disability-based discrimination, but it applies specifically to government agencies and other recipients of federal funds." *Frantti v. New York*, 414 F. Supp. 3d 257, 285 (N.D.N.Y. 2019) (citation omitted).

"[T]he Rehabilitation Act imports the discrimination standards of Title I of the ADA and the retaliation standards of Title V." *Quadir*, 39 F. Supp. 3d at 537; *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) ("Although its terms are broadly drawn, the Rehabilitation Act incorporates the standards of the [ADA].").

As an initial matter, however, any Rehabilitation Act claims against the individual defendants—whether in their personal capacities or their official ones—must be dismissed. *Frantti*, 2017 WL 922062, at *4 (collecting cases dismissing these claims as redundant where claims could proceed directly against the state entity-employer). Instead, these claims must be asserted directly against plaintiff's employer: the NYSTA.

### 1. Discrimination & Accommodation

To make out a *prima facie* claim of employment discrimination against the NYSTA under the Rehabilitation Act, a plaintiff must allege (1) his employer is subject to the Act; (2) he was disabled within the meaning of the Act; (3) he was qualified to perform the essential functions of his job, with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Larnard v. McDonough*, 578 F. Supp. 3d 371, 382 (W.D.N.Y. 2022). A failure-to-accommodate claim works much the same way, but just substitutes the fourth element with the question of whether the employer has refused to make a reasonable accommodation. *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

***9** The Act borrows its definition of "disability" from the ADA. *Larnard*, 578 F. Supp. 3d at 383. The ADA defines a "disability" as any "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).[8] Still, though, "[n]ot every impairment is a 'disability' within the meaning of the ADA." *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005). Instead, there are two requirements: (1) the impairment must limit a "major life activity" and (2) the limitation must be "substantial." *Id.*

8 An alternative way to satisfy the ADA's definition of "disability" is with a showing that the plaintiff was "regarded as" having a disability. 42 U.S.C. § 12102(1)(C). This provision sweeps more broadly than the principal definition of a disability: it extends to conduct related to any "actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." § 12102(3)(A).

As to the first requirement, major life activities include core physical functions like walking, standing, lifting, and other common activities such as reading, concentrating, and working. 42 U.S.C. § 12102(2)(A). As to the second, an impairment qualifies as a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii).

In 2008, Congress amended the ADA "to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Woolf*, 949 F.3d at 94. Even so, "[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment." *B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (cleaned up). As the Circuit has explained, "in assessing whether a plaintiff has a disability, [courts] have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Id.*

Upon review, plaintiff has not plausibly alleged that he suffered from any disability, or was regarded as having or suffering from a disability, under the Rehabilitation Act. In fact, a liberal reading of plaintiff's amended complaint does not even permit the inference that he was "disabled" at all.

Plaintiff repeatedly points out that he received doctor's notes from "two licensed physicians," but these notes do not relieve a plaintiff, even a *pro se* one, from the need to plausibly allege facts tending to establish a qualifying disability. That is

especially so where, as here, the doctor's notes do not identify any particular disability.

Instead, these notes only say that plaintiff was allowed "to not wear a mask as long as [he] was social distancing." Am. Compl. ¶ 17; *see also* Pl.'s Opp'n, Dkt. No. 39 at 3. In his opposition, plaintiff contends that he also suffers from high blood pressure. Pl.'s Opp'n at 11. But the mere fact of a diagnosis is not enough to establish a qualifying disability, either. *Weiss v. Cnty. of Suffolk*, 416 F. Supp. 3d 208, 214 (E.D.N.Y. 2018) ("[N]ot every impairment is a disability.").

To plausibly allege a disability-discrimination claim, the plaintiff needs to allege facts tending to show that he was substantially limited in his ability to perform a major life activity, or that his employer mistakenly regarded him as being so limited in one or more of those areas. *See, e.g.*, *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999) (explaining contours of the "regarded as" provision). [9]

9 On a motion to dismiss, the elements of a plaintiff's *prima facie* case are not treated as an evidentiary burden but are useful as "an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible." *Sosa v. N.Y. City Dep't of Educ.*, 368 F. Supp. 3d 489, 495 (E.D.N.Y. 2019) (citation omitted).

***10** Plaintiff has not done so. Other than noting that his accommodation request involved the provision of extra personal protective equipment ("PPE") because he suffers from a "sporadic runny nose," plaintiff has not alleged that he suffered limitations in his ability to work his job at the NYSTA at all. Pl.'s Opp'n at 3.

Notably, plaintiff's claim(s) hinge upon the allegation he was subjected to COVID-19 workplace protocols that, both on its face and as applied, affected the other employees in his workplace, too. This is true of both the Safety Gram and the Wellness Survey requirements.

This kind of fact pattern; *i.e.*, mistreatment based on a broadly applicable policy, is ordinarily insufficient to raise a plausible discrimination claim. *See, e.g.*, *Niles v. N.Y. City Human Res. Admin.*, 2024 WL 496345, at *6 (E.D.N.Y. Feb. 8, 2024); (finding same); *Newell v. State Univ. of N.Y. Westchester Cmty. Coll.*, 2023 WL 4082030, at *4 (S.D.N.Y. June 20, 2023) (same).

In short, plaintiff has not plausibly alleged a disability-discrimination claim under the Act. *Kosiba v. Catholic Health Sys.*, 2022 WL 21784010, at *7 (E.D.N.Y. Nov. 18, 2022) (Report & Recommendation) (finding same where plaintiff's ADA claims were based on an objection to workplace masking policy imposed during COVID-19 pandemic).

**2. Hostile Work Environment**

"Because the ADA echoes and expressly refer to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—it follows that disabled Americans should be able to assert hostile work environment claims under the ADA." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (cleaned up); *Kelly*, 200 F. Supp. 3d at 399 (assuming that a hostile work environment was actionable under the Rehabilitation Act).

To make out a hostile work environment claim, a plaintiff must plausibly allege that (1) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (2) a specific basis exists for imputing the objectionable conduct to the employer." *Fox*, 918 F.3d at 74. "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.* (cleaned up).

"A plaintiff alleging a hostile work environment claim, therefore, must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Fox*, 918 F.3d at 74.

Upon review, this claim fails because plaintiff has not plausibly alleged that he suffered from a disability, which is a prerequisite to stating a hostile-work-environment claim in the disability context. *Kelly*, 200 F. Supp. 3d at 399–400. Even assuming otherwise, this claim would still fail. To be sure, plaintiff *subjectively* believed his working conditions to be hostile. *See, e.g.*, Dkt. No. 39 at 12 ("The assault took place while the Plaintiff was actively using the urinal, which, in the mind of the Plaintiff, makes the assault sexual in nature."). But subjective beliefs are not enough. In short, plaintiff has not plausibly alleged that, individually or collectively, the conditions described in the amended complaint might be considered *objectively* severe or pervasive.

**3. Retaliation**

***11** The Rehabilitation Act prohibits retaliation against employees for their opposition to practices made unlawful by the Act. *Kelly*, 200 F. Supp. 3d at 402. To make out a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in an activity protected by the Act; (2) the employer was aware of this activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 438 (E.D.N.Y. 2015); *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 126 (D. Conn. 2020).

Upon review, plaintiff's retaliation claim or claims must be dismissed. "It is well established that seeking a reasonable accommodation for a disability constitutes protected activity." *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 129 (E.D.N.Y. 2018) (cleaned up). And even if the disability at issue is not one within the meaning of the Rehabilitation Act, an employee's request for an accommodation can still qualify as protected activity if it is made in good faith. *Id.*

In addition, the three JCMs, the formal disciplinary charges, and the unsatisfactory job performance rating (that caused plaintiff to miss out on a regularly scheduled promotion) qualify as "adverse actions," at least for the purpose of a motion to dismiss. [10]

10 However, the myriad other slights identified by plaintiff do not qualify. *See, e.g.*, *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 f.3d 556, 568–72 (2d Cir. 2011) (holding that investigatory sessions, counseling, threats of termination, hostile behavior during meetings, being made to come to work on a day off under false pretenses, and being switched to a night shift did not qualify).

Even so, plaintiff has not plausibly alleged causation between any of his conduct and one or more of these events. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky*, 921 F.3d at 353 (cleaned up).

There are two, related reasons that plaintiff has not plausibly established causation. First, plaintiff's amended complaint alleges that the mask policy and the wellness survey implemented by the NYSTA applied equally to his co-workers. Second, the accommodation that plaintiff received on this topic did not exempt him from mask wearing.

Instead, the NYSTA provisioned him extra masks, required them to be carried on his person at all times, and stated that they must be *worn* in common areas and when social distancing could not be achieved. This accommodation language even lines up with the language from plaintiff's doctor's notes. The amended complaint's allegations, taken at face value, indicate that plaintiff received the three JCMs for repeatedly violating this accommodation language and the COVID-19 policy, not for engaging in "protected activity" under the Rehabilitation Act.

Although plaintiff characterizes the incidents in the complaint as *not* actually violating the policy (*e.g.*, when defendant Blais caught him without a mask in the men's bathroom, or when he was written up for not wearing a mask inside a larger garage space), the question of whether employee conduct violated a policy is separate from the question of whether an employee has engaged in any "protected activity" for a retaliation claim. *Cf. Johnson v. Maximus Servs., LLC*, 2023 WL 5612826, at *4 (E.D.N.Y. Aug. 30, 2023) (concluding *pro se* plaintiff could not plausibly allege causation "because she refused to comply with the COVID-19 policy, not because she opposed it").

***12** As other district courts considering similar fact patterns have noted, a plaintiff who is "demonstrably at risk" of being disciplined for legitimate reasons prior to engaging in protected activity cannot "rely solely on temporal proximity" to establish retaliation. *Evans v. N.Y. City Dep't of Educ.*, 2023 WL 8034449, at *8 (S.D.N.Y. Nov. 20, 2023) (concluding same where plaintiff opposed workplace COVID-19 mandates).

**C. Title VII**

Title VII "prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination." *Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022) (citation omitted); *see also Bostock v. Clayton County*, 590 U.S. 644, 649 (2020).

Upon review, plaintiff's amended complaint does not plausibly allege that NYSTA's workplace mask requirement,

wellness survey requirement, or its enforcement of those COVID-19 policies against him, made any distinction based on one or more of the immutable or other characteristics protected by the statute; *e.g.*, his sex, race, or religion. Nor has plaintiff plausibly alleged that similarly situated individuals outside of one of these protected classes were treated better than him vis-à-vis these COVID-19 policies.

To the extent that plaintiff has attempted to allege a sexual harassment or "assault" claim based on his alleged interaction with defendant Blais, who observed plaintiff not wearing a mask in the men's bathroom and then reported it to a supervisor, that allegation is insufficient to plausibly allege this—or any other—kind of Title VII claim as a matter of law. Dkt. No. 39 at 12 ("The assault took place while the Plaintiff was actively using the urinal, which, in the mind of the Plaintiff, makes the assault sexual in nature.").

**D. U.S. Constitution & 42 U.S.C. § 1983**

Plaintiff's amended complaint also asserts claims under several provisions of the U.S. Constitution and 42 U.S.C. § 1983. Am. Compl. at 7. Notably, however, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). In other words, § 1983 is just the procedural mechanism used by a plaintiff to maintain a lawsuit based on a violation of a constitutional right. *Id.* Accordingly, plaintiff's allegations under § 1983 and the U.S. Constitution must be considered together.[11]

11 Section 1983 claims asserted directly against New York State, the NYSTA, or the individual defendants in their official capacities are subject to dismissal on the basis of Eleventh Amendment immunity for essentially the same reasons explained *supra.* But a § 1983 individual-capacity claim is still available against a state actor for his "personal involvement" in a constitutional harm. So these claims are construed against the individual defendants in their personal capacities.

**1. Fourth Amendment**

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. These restrictions have been incorporated against the States through the Due Process Clause of the Fourteenth Amendment. *City of Ontario v. Quon*, 60 U.S. 746, 750 (2010); *Mapp v. Ohio*, 367 U.S. 643 (1961).

***13** Upon review, any § 1983 claim based on this general body of law must be dismissed. Broadly construed, plaintiff has attempted to assert a § 1983 false imprisonment claim, or perhaps a § 1983 excessive force claim, against Blais, the defendant identified by plaintiff as "confining" him or "assaulting" him.

Plaintiff alleges that on October 1, 2020, he was at a urinal in the men's bathroom when defendant Blais entered the room and ordered plaintiff "to put a mask on." Am. Compl. ¶ 17. Plaintiff responded to Blais that he had two doctor's notes that allowed him "to not wear a mask as long as [he] was social distancing." *Id.* Blais reported this to his supervisor. *Id.* ¶¶ 27, 31.

These allegations do not plausibly establish the kind of "confinement" that would state a § 1983 false imprisonment claim. Elsewhere, plaintiff makes reference to the fact that defendant Blais "assaulted" him by, among other things, "puffing his chest," "rushing" plaintiff, and "raising his voice in an aggressive manner," Am. Compl. ¶ 23, but a review of those allegations lead to the conclusion that they do not state a plausible claim for relief under this general body of federal law, either.

Putting a plaintiff in imminent fear of harm might give rise to one or more state-law claims, which plaintiff may re-file in state court.

**2. Sixth Amendment**

The Sixth Amendment provides in relevant part that: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. XI. This restriction has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400 (1965).

Upon review, any § 1983 claim based on this general body of law must be dismissed. Broadly construed, plaintiff alleges that defendants violated this right by generating false or inaccurate JCMs and enforcing discipline against him based on testimony for which he was not present and did not receive an opportunity to challenge in a meaningful way. Pl.'s Opp'n at 15.

The problem with this argument is that, at best, the JCMs are entirely *civil* or *administrative* in nature. The right to confront a witness "face-to-face," *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988), the right to a "meaningful" cross-examination, *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014), and the other rights emanating from the Sixth Amendment's Confrontation Clause do not protect *civil* litigants or those facing purely administrative discipline, even from a public employer. *Turner v. Rogers*, 564 U.S. 431, 441 (2011) ("[T]he Sixth Amendment does not govern civil cases.").

In a civil or administrative setting, the Due Process Clause does protect a much more limited version of these rights, which will be discussed below.

**3. Bills of Attainder & Ex Post Facto Laws**

Plaintiff's amended complaint also references Article I, Section 9, Clause 3 of the U.S. Constitution, which states that "[n]o Bill of Attainder or ex post facto Law shall be passed."

A "bill of attainder" is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Reynolds v. Quiros*, 990 F.3d 286, 295 (2d Cir. 2021) (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 468 (1977)).

***14** But plaintiff has not identified a particular statute or provision that would offend this constitutional provision. Broadly construed, plaintiff appears to allege that the JCMs and the statutory basis on which he received the bad job performance rating violate this restriction.

However, those provisions do not operate as a bill of attainder because, among other things, they preserve the right to administratively appeal (which plaintiff did) and can be challenged in other settings, such as in a state-court petition. In short, there is no indication that the JCMs, the Safety Gram about masking, the Wellness Survey, the formal discipline, or the unsatisfactory rating "fall[ ] within the historical meaning of legislative punishment." *ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010).

The Ex Post Facto Clause applies to government actions that "make[ ] more burdensome the punishment for a crime, after its commission." *Barna v. Travis*, 239 F.3d 169, 171 (2d Cir. 2001). "A criminal or penal law is ex post facto when it is: (1) retrospective, and (2) more onerous than the law in effect on the date of the offense." *United States v. Ramirez*, 846 F.3d 615, 619 (2d Cir. 2017). But any claim based on this constitutional provision would fail for the same basic reasons that plaintiff's Sixth Amendment challenge has failed: he was not subjected to any *criminal* process.

**4. Due Process**

Plaintiff's amended complaint has not identified the Due Process Clause of the Fourteenth Amendment, but his complaints about improper procedures and/or discipline might fit under this constitutional rubric.

The Due Process Clause protects procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020). Procedural due process requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

"To assert a violation of procedural due process rights, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014) (citation omitted). "Notice and an opportunity to be heard are the hallmarks of due process." *Id.*

Upon review, any procedural due process claim would fail. Assuming that plaintiff enjoyed a state-created interest (whether it is a property right in the pay raise or in a positive performance rating or perhaps a more generalized liberty interest in his good workplace reputation), the amended complaint indicates that he received constitutionally adequate pre-deprivation process.

In particular, plaintiff alleges that he received a written notice that he was being charged with misconduct for repeatedly violating the COVID-19 policies in accordance with the terms of the parties' collective bargaining agreement. Am. Compl. at 103; Am. Compl. ¶ 87. This letter explained that a hearing would be conducted on the charge. *Id.* Thereafter, plaintiff, after consulting with a union representative and hiring his own lawyer, entered into a stipulation in which he agreed to plead guilty to the charges and pay a fine. Am. Compl. at 101–102; Am. Compl. ¶¶ 87–94.

***15** The Second Circuit has repeatedly held that this kind of pre-deprivation notice, combined with a grievance process set forth in a collective bargaining agreement, satisfies the demands of procedural due process. *See, e.g.*, *Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008). Under those

circumstances, a plaintiff can still seek relief in a § 1983 procedural due process claim, but only if he can plausibly "establish that the grievance procedures in a collective bargaining agreement are an inadequate remedy." *Id.* at 129.

Plaintiff has not done so. He has not identified any shortcoming in this contractually defined grievance process that might raise constitutional concerns. Notably, the unsatisfactory job rating that plaintiff received was issued for the one-year period during which he pleaded guilty to these misconduct charges.

To the extent that plaintiff sought to challenge that determination directly, the amended complaint alleges that he *also* had an opportunity to appeal that determination. In fact, his pleading alleges that he pursued an administrative appeal of that bad job rating to the NYSTA.

Where, as here, the deprivation occurred pursuant to an established state procedure, the state can foresee when the deprivation will occur and is in a position to provide a pre-deprivation hearing. *King v. N.Y. City Emp. Ret. Sys.*, 212 F. Supp. 3d 371, 401 (E.D.N.Y. 2016). Under those circumstances, the mere availability of post-deprivation process will not *necessarily* satisfy due process. *See id.*

Importantly, however, a pre-deprivation hearing is not *always* necessary to pass constitutional muster. There is no indication that this rating system causes the kind of serious or significant deprivation of a state-created interest (*e.g.*, a termination of employment) that would necessarily *require* a further pre-deprivation hearing beyond the notice-and-hearing process that already occurred on the underlying charges of misconduct. [12]

12 Under these circumstances, the availability of a post-deprivation procedure, with an Article 78 proceeding in state court being the big one, would be more than sufficient. "Article 78 of the New York Civil Practice law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 811 (2d Cir. 1996), "provides the mechanism for challenging a specific decision of a state administrative agency," *Campo v. N.Y. City Emp. Ret. Sys.*, 843 F.2d 96, 101 (2d Cir. 1988).

In sum, plaintiff has not plausibly alleged a violation of his procedural due process rights in light of the alleged fact that he (1) received written notice of impending discipline based on the three JCMs; (2) participated in a counseled hearing process on those accusations; (3) did not contest the validity of the JCMs in that setting but rather pleaded guilty; and, as a result (4) later received an unsatisfactory job rating for that time period, which he (5) also administratively appealed. *Cf. Kieffer v. N.Y. State Thruway Auth.*, 522 N.Y.S.2d 747, 749 (3d Dep't 1987) (rejecting due process claim based on unsatisfactory rating).

To the extent plaintiff's amended complaint might be understood to raise a substantive due process claim, it must also be dismissed. Substantive due process protects against government action that is "arbitrary, conscience shocking, or oppressive in a constitutional sense," but not against official conduct that is merely "incorrect or ill-advised." *Page*, 478 F. Supp. 3d at 371 (citation omitted). In other words, "substantive due process rights are violated only by conduct 'so outrageously arbitrary as to constitute a gross abuse of governmental authority.' " *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 237 (E.D.N.Y. 2009) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). There is no such outrageous conduct alleged here.

**5. Equal Protection**

***16** Plaintiff's amended complaint has not identified the Equal Protection Clause of the Fourteenth Amendment, either. But again, his complaints about improper discipline imposed upon him by his public employer might fit under this constitutional rubric.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "There are a number of common methods for pleading an equal protection claim." *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018).

First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.' " *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999)).

Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *City of Oneonta*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).

Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Floyd*, 959 F. Supp. 2d at 570 (citation omitted).

Under any one of these three theories, a plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (cleaned up); *see also Keles v. Davalos*, 642 F. Supp. 3d 339, 366–67 (E.D.N.Y. 2022).

Plaintiff has not done any of that. However, even "[w]here there is no allegation of membership in a protected class, the plaintiff may still prevail on either a 'class of one' or 'selective enforcement' theory." *Brown v. Griffin*, 2019 WL 4688641, at *4 (S.D.N.Y. Sept. 25, 2019).

Pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff may assert a "class of one" claim by alleging that "they were intentionally treated different from others similarly situated and that there was no rational basis for this difference in treatment." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).

Alternatively, pursuant to *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing that they were treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citations omitted).

Measured against these theories, there is no indication that plaintiff has a viable § 1983 Equal Protection claim. There is not even a whiff of any class-based animus from any of the named defendants. Nor is there any hint that any of the defendants treated plaintiff differently than his peers based on any constitutionally impermissible criteria.

### E. Other Federal Statutes

Plaintiff's amended complaint also purports to assert claims under 18 U.S.C. §§ 241, 242, 351(e) and 28 U.S.C. § 4101. Am. Compl. at 7. But plaintiff cannot bring claims under those federal statutes because they do not create any causes of action that can be pursued by private plaintiffs.

***17** First, a private plaintiff cannot pursue a claim under the criminal statutes found in Title 18 of the United States Code. "It is a truism, and has been for many decades, that in our federal system crimes are always prosecuted by the Federal Government, not ... by private complaints." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86–87 (2d Cir. 1972). Consequently, the Second Circuit has repeatedly held that there is no private right of action under Title 18 of the U.S. Code. *See, e.g.*, *Storm-Eggink v. Gottfried*, 409 F. App'x 426, 427 (2d Cir. 2011) (summary order) (collecting cases).

Second, 28 U.S.C. § 4101 does not create a cause of action, either. This provision contains definitions, including a definition of "defamation," in the context of a statute that allows actions recognizing foreign defamation judgments. "Although the tort of defamation is a well-recognized cause of action under state common law, federal law does not create a general cause of action or provide a basis for federal question jurisdiction for defamation." *Thomas v. Brasher-Cunning ham*, 2020 WL 4284564, at *10 (D. Conn. July 27, 2020) (collecting cases).

### F. State-Law Claims

Broadly construed, plaintiff's amended complaint also asserts various common law tort claims, or perhaps breach of contract claims. Those claims arise under state law. But the basis for jurisdiction in this forum is federal question, since all the parties are from New York.

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016). There are no exceptional circumstances presented in this case. Accordingly, plaintiff's state law claims will be dismissed without prejudice.

### G. Leave to Amend

The final question is whether plaintiff should be given leave to amend his pleading, which he has already amended once as of right. "Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid

claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up). Even so, "it is well established that leave to amend a complaint need not be granted where amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

After considering the matter, plaintiff will not be given further leave to amend because the problems with his claims are substantive—they involve an objection to progressive discipline arising from his non-compliance with COVID-19 policies that applied generally to NYSTA employees.

Plaintiff has not plausibly alleged that the discipline he received—which came after notice and a hearing in accordance with his collective bargaining agreement—was incompatible with the reasonable accommodation he received regarding the COVID-19 face mask policy (as opposed to the facial hair or respirator fit test accommodation he had previously received).

Notably, plaintiff might well have a viable state-law claim based on these facts, perhaps for some violation of the collective bargaining agreement or for a breach of some other contractual relationship with his employer. But those are questions for state court. Because plaintiff cannot sustain any cognizable *federal* claims based on this fact pattern, leave to amend those claims would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Accordingly, leave to amend must be denied.

## V. CONCLUSION

***18** Plaintiff's amended complaint must be dismissed. Liberally construed, he has failed to plausibly allege any cognizable federal claims against any of the named defendants. The Court's decision today does not preclude plaintiff from re-filing his state-law claims in state court.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss (Dkt. No. 32) is GRANTED;

2. Plaintiff's amended complaint is DISMISSED without leave to amend;

3. Plaintiff's federal-law claims are DISMISSED with prejudice; and

4. Plaintiff's state-law claims are DISMISSED without prejudice.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2024 WL 1053222

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Memorandum of Law in Support of Defendants Motion to Dismiss**<br>William Paul BENNETT, Plaintiff, v. NEW YORK STATE THRUWAY AUTHORITY, Joanne M. Mahoney, Mary Boehm, Matthew Driscoll, John Barr, James Konstalid, Frank Multari, Carlos Millan, David Naples, Kevin Post, Michael Blais, Robert Dressing, Todd P. Summerson, Patrick K. Hoehn, Barry Oaksford, Defendants.<br>2022 WL 18110332 | — | N.D.N.Y. | Oct. 31, 2022 | Motion |
| **2. Docket 6:22-CV-00337**<br>Bennett v. New York State Thruway Authority et al | — | N.D.N.Y. | Apr. 08, 2022 | Docket |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Bennett v. New York State Thruway Authority
2024 WL 1053222 , N.D.N.Y. , Mar. 11, 2024

**Related References (1)**

2. Bennett v. New York State Thruway Auth.
2022 WL 2105842 , N.D.N.Y. , June 10, 2022

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2140019
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shanise SHIDAGIS, Plaintiff,
v.
BROOME COUNTY D.S.S.
and Jill Dominguez, Defendants.

3:23-cv-31 (BKS/ML)
|
Signed February 21, 2023

**Attorneys and Law Firms**

Plaintiff pro se: Shanise Shidagis, Endicott, NY 13760.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

***1** Plaintiff pro se Shanise Shidagis filed this action alleging "falsification of documents" and "forgery" against Defendants Broome County DSS and Case Manager Jill Dominguez in connection with a "Permanency Hearing Report," asserting federal question jurisdiction, and seeking, as relief, that the "law [be] pressed to the fullest." (Dkt. No. 1). This matter was referred to United States Magistrate Judge Miroslav Lovric who, on January 17, 2023, issued a Report-Recommendation recommending that Plaintiff's complaint be dismissed without prejudice and without leave to replead on the ground that there is no private cause of action to enforce criminal violations. (Dkt. No. 4). Magistrate Judge Lovric advised Plaintiff that under 28 U.S.C. § 636(b)(1), she had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (*Id.* at 7–8). Plaintiff did not file an objection to the Report-Recommendation.

As no objection to the Report-Recommendation has been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment.

The Court notes, as a preliminary matter, that it must consider whether it has subject matter jurisdiction. *See Speer v. City of New London*, 537 F. Supp.3d 212, 223 (D. Conn. 2021) ("At the outset of any case, the Court must consider whether the action falls within its subject matter jurisdiction."). The Complaint does not assert a basis for this Court's subject matter jurisdiction. There is no federal question jurisdiction under 28 U.S.C. § 1331 because, as Magistrate Judge Lovric determined, Plaintiff does not have a private right of action to enforce federal criminal statutes. (Dkt. No. 4, at 4–5). And the Plaintiff has not alleged any basis for diversity jurisdiction under 28 U.S.C. § 1332: both she and Defendant Dominguez are alleged to be citizens of New York State. (Dkt. No. 1, at 3). The Complaint therefore must be dismissed without prejudice for lack of subject matter jurisdiction. *Katz v. Donna Karan Co.*, 872 F.3d 114, 121 (2d Cir. 2017).

Having reviewed the remainder of the Report-Recommendation for clear error and found none, the Court adopts the recommendation that the complaint be dismissed without prejudice and without leave to amend.

For these reasons, it is hereby

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 4) is **ADOPTED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED WITHOUT PREJUDICE BUT WITHOUT LEAVE TO REPLEAD**; and it is further

**ORDERED** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2140019

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 3:23-CV-00031** Shidagis v. Broome County D.S.S. et al | — | N.D.N.Y. | Jan. 10, 2023 | Docket |


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Shidagis v. Broome County D.S.S.
2023 WL 198143 , N.D.N.Y. , Jan. 17, 2023

*Report and Recommendation Adopted by*

2. Shidagis v. Broome County D.S.S.
2023 WL 2140019 , N.D.N.Y. , Feb. 21, 2023

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4870495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matthew H. COLE, Plaintiff,
v.
Honorable Michael W. SMRTIC, et al. Defendants.

No. 1:24-CV-00847 (MAD/CFH)
|
Signed November 21, 2024

**Attorneys and Law Firms**

MATTHEW H. COLE, 271 Market Street, Amsterdam, New York 12010, Plaintiff pro se.

**REPORT-RECOMMENDATION & ORDER**

CHRISTIAN F. HUMMEL, United States Magistrate Judge

**I. In Forma Pauperis**

***1** Plaintiff pro se Matthew H. Cole ("plaintiff") commenced this action (No. 1:24-CV-00623) on May 6, 2024, by filing a complaint. See Dkt. No. 1 ("Compl."). On September 26, 2024, plaintiff submitted what the Court construes to be a supplement to the complaint. [1] See Dkt. No. 7. In lieu of paying this Court's filing fees, he submitted an application for leave to proceed in forma pauperis ("IFP"). See Dkt. No. 2. The undersigned has reviewed plaintiff's IFP application and determines that he financially qualifies to proceed IFP. [2] Thus, the Court proceeds to its review of the complaint pursuant to 28 U.S.C. § 1915. Plaintiff has also submitted for the Court's review a Pro Se Application for Permission to File Electronically and a Motion to Appoint Counsel. See Dkt. Nos. 4, 5.

1 The submission includes a letter addressed to District Judge D'Agostino, titled, "Requirements for Cases Removed From State Court," Dkt. No. 7; a receipt from Montgomery County Clerk dated December 8, 2022; and a "Notice of Claim" with the caption of Cole v. County of Montgomery, dated December 7, 2022. See Dkt. No. 7. The undersigned has reviewed this submission in connection with the initial review of plaintiff's complaint. See Sira v. Morton, 380 F. 3d 57, 67 (2d Cir. 2004).

2 Plaintiff is advised that, although he has been granted IFP status, he is still required to pay all fees and costs he may incur in this action, including, but not limited to, copying fees, transcript fees, and witness fees.

**II. Initial Review**

**A. Legal Standards**

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (internal quotation marks omitted); see also Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). As the Second Circuit stated,

> There are many cases in which we have said that a pro se litigant is entitled to "special solicitude," that a pro se litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]"

***2** Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

"The [Second Circuit]'s 'special solicitude' for pro se pleadings has its limits, because pro se pleadings still must comply with ... the Federal Rules of Civil Procedure [('Fed. R. Civ. P.')]." Kastner v. Tri State Eye, No. 19-CV-10668 (CM), 2019 WL 6841952, at *2 (S.D.N.Y. Dec. 13, 2019) (quoting Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir. 1994)). Pleading guidelines are provided in the Federal Rules of Civil Procedure. Specifically, Rule 8 requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought...

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order).

Further, Fed. R. Civ. P. 10 provides:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of a defendant's duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted).

***3** This Court also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " Aguilar v. United States, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) [3] (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis.").

3 Any unpublished cases cited within this Report-Recommendation & Order have been provided to plaintiff.

### B. Complaint

Plaintiff's civil cover sheet indicates that he seeks to bring this action pursuant to "Title U.S.C. 18 Section 241, Conspiracy Against Rights & Title U.S.C. 18 Section 242 Deprivation of rights Under Color of Law." Dkt. No. 1-1 at 1. The civil cover sheet further provides that his cause of action involves, "Violation of Due process, Speedy Trial Rights, Ineffective Assistance of Counsel. I feel I am being targeted for being black and gay." Id.

Plaintiff's form complaint checks the box indicating that he seeks to bring this case pursuant to 42 U.S.C. § 1983.

See Compl. at 3. In response to the question in the form complaint asking in "what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials," plaintiff responds, "Due Process, 30.30 Speedy Trial Violation, Ineffective Assistance of counsel."[4] Id. In response to a question asking him to explain "how each defendant acted under color of state or local law," plaintiff states "Each judge deliberately denied me due process, and refused to look into the paperwork to see that i was improperly denied my speedy trial rights. It was a tean [sic] effort. The ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me. All mentioned actions were done and upheld even after I showed federal law with supportive case law as a pro se litigant." Id.

4 Although plaintiff generally references ineffective assistance of counsel, Compl. at 4, he does not name any attorney who may have represented him. Any claims against the prosecutor would not be considered ineffective assistance of counsel because Mr. Maxwell, as the prosecutor, was not plaintiff's attorney.

Plaintiff provides that his "case is still on appeakl [sic] in Appellate Court Third Department. I feel they are guilty, or part of what I call a scandal. I went to them from the very start with a complaint to the grievance committee, where they denied any wrongdoing. It must be ok to violate Constitutional rights there. This is from March 2019 to present" Id.

In response to a question that asks plaintiff to state the facts underlying his claims, plaintiff states, "Please see attached Article 78 that is attached. It was dismissed being in the wrong court, but is on point." Id. at 4. Plaintiff did not provide the Court with any such attachment and has not submitted any Article 78 materials. See Compl., Dkt. No. 7.

In response to the form complaint's question asking about any injuries suffered as a result of the conduct he complains of, plaintiff states, "Sever [sic] depression over 20 years, irreperable [sic] harm, defamation of charcter [sic] by arguments not legally allowed to give. Loss of income, inability to gain and keep employment, mental trauma, instilled disbelief in justice in the legal system, familial traumam [sic] due to my legal battles." Id. Indicating the relief sought, plaintiff states

> ***4** Petitioner seeks reinstatement of driving priveldges [sic], and 10 million dollars for damages caused by conflict of interest, deliberate violation of Due Process, Speedy Trial rights, Ineffective assistance of counsel, malice, Brady Violation, Petitioner claims deliberate misconduct and malice in Montgomery County Court, the Saratoga Disrict Attorney's Office, and the Supreme Court Appellate Division Third department. ** This is subject to change if an attorney agrees to represent.

Compl. at 5. Although he typed his name, plaintiff does not sign the complaint where a signature is indicated. See id. at 8.

Plaintiff provides in his supplement that he "removed this action to district court asserting jurisdiction pursuant to 42 U.S.C. 1983, and § 1441." Dkt. No. 7. at 1. Plaintiff states that he removed this case from Montgomery County Supreme Court. See id. He states that he seeks or sought the removal because he was told he was "not guarantee counsel" at the state, but that "[i]n Federal Court, there is that option, pending qualification, and I am told, if a lawyer agrees to take it, then I really have something. I am in dire need of counsel." Id.

Plaintiff states, "[t]he ineffective assistance of counsel and The County Court are a matter already mentioned in the appeal." Dkt. No. 7 at 2. Plaintiff states that "[t]o get my conviction, I allege judicial and prosecutorial misconduct, and ineffective assistance of counsel × 4. That is why I am pro se. I had to protect myself when appointed counsel did not. It also went through a couple judges which is why they are mentioned in the preliminary complaint/paperwork, and why I mention bias." Id. Plaintiff states he can "prove each thing I saw not just with my words, but with transcripts[5] from the County Court, and the Adult Drug Court." Id. Plaintiff refers to being drug free for four and a half years and having academic success in college. Id. at 3. He states that he wishes this Court to hear his case because he believes he will not "see bias" in federal court "like I saw in others." Id. Plaintiff states that he "also put in a Notice of Removal in the Federal Court for those criminal charges that led to the Complaint. I do not trust the assigned appellate attorney. That case too has

Constitutional violations. That case number is 1:24-CR-301 (AMN)." Id.

5 Plaintiff did not provide any transcripts.

### C. Discussion [6]

6 As a courtesy, the Court has provided plaintiff with copies of any unpublished cases cited within this Report-Recommendation & Order.

#### 1. Rule 8

As a threshold issue, plaintiff's complaint fails to meet the requirements of Rule 8. See FED. R. CIV. P. 8(a)(2). He does not provide a short and plain statement of the claim demonstrating why he is entitled to relief. Although he makes general references to both an Article 78 proceeding and a criminal proceeding and unexplained references to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel," he does not provide factual support or context. Thus, his complaint does not provide "fair notice" to defendants of the claims against them. See FED. R. CIV. P. 8(a)(2).

#### 2. Heck v. Humphrey

However, there are several substantive concerns that further lead the undersigned to recommend dismissal. First, in referencing to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel" and explicitly referencing a criminal conviction, it is clear that plaintiff is attempting to seek some kind of review of a criminal proceeding or conviction. See Compl. at 3. Plaintiff also accuses all named judges of denying him due process and contends that an unnamed "ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me." Compl. at 4. Plaintiff also references a conviction. See Dkt. No. 7 at 4. Such claims would be barred by Heck v. Humphrey.

***5** As this Court, citing the District of Connecticut, has set forth:

> In Heck, the Supreme Court held that in order for a plaintiff "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87. The court further held that "[a] claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 487 (emphasis in original).
>
> [ ]
>
> Thus, under Heck and its progeny, if a conviction has not been invalidated previously, a "§ 1983 action is barred ... no matter the target of the prisoner's suit ... if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) (emphasis in original).

Ali v. Shattuck, No. 8:24-CV-0128 (DNH/CFH), 2024 WL 2747619, at *3 (N.D.N.Y. May 29, 2024), report-recommendation adopted sub nom. Ali v. Dow, No. 8:24-CV-128, 2024 WL 3460745 (N.D.N.Y. July 18, 2024) (quoting Zografidis v. Richards, No. 3:22-CV-00631 (AVC), 2022 WL 21756775, at *7 (D. Conn. July 6, 2022), report and recommendation adopted (Oct. 7, 2022), aff'd, No. 22-3197, 2023 WL 7538211 (2d Cir. Nov. 14, 2023)).

Plaintiff has failed to demonstrate that any criminal charge(s), conviction, or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Zografidis, 2022 WL 21756775, at *7. Although plaintiff's complaint wants for detail, the undersigned can clearly determine that plaintiff seeks review of his criminal proceedings, conviction, and/or sentence. The claims plaintiff seeks to pursue relate to allegations that he was denied due process, denied speedy trial rights, and experienced ineffective assistance of counsel. Accordingly, plaintiff's claims are barred by Heck unless and until he can demonstrate favorable termination of his criminal conviction. [7]

7 The undersigned recognizes that claims that are determined to be barred by Heck are dismissed without prejudice. However, the undersigned has recommended dismissal with prejudice because

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

plaintiff has only named defendants who are immune from relief. Accordingly, the undersigned is recommending dismissal of the claims based on these immunities, rather than a Heck dismissal. The undersigned has included the Heck review for sake of completeness.

### 3. Immunities

Plaintiff names as defendants several defendants who are immune from suit. Insofar as plaintiff names Hon. Michael W. Smrtic, Interim Montgomery County Judge and Tatiana N. Coffinger, "County/Family/Surrogate's Court Judge"[8] such claims would be barred by judicial immunity.

8 Although plaintiff provides no facts regarding any family court proceedings, that he named a family court judge and makes general reference to that he seeks review over actions taken by a family court judge. Even if plaintiff were to amend his complaint to provide facts about any possible family court proceedings and details about any alleged violations of his rights that he believes he faced in that Court, if plaintiff seeks this Court's review of an order of the family court, such review would be barred by Rooker-Feldman, and if plaintiff seeks this Court's review or intervention of a currently pending/ongoing Family Court proceeding, such review would be barred by Younger. See Porter v. Nasci, No. 5:24-CV-0033 (GTS/TWD), 2024 WL 1142144, at *4 (N.D.N.Y. Mar. 15, 2024) (citations omitted), report and recommendation adopted, 2024 WL 3158645 (N.D.N.Y. June 25, 2024) ("Under the Rooker-Feldman doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."); see also Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002) ("[F]ederal courts [must] abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.").

***6** "With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions." Zavalidroga v. Girouard, No. 6:17-CV-682 (BKS/ATB), 2017 WL 8777370, at *8 (N.D.N.Y. July 7, 2017) (citing Mireles v. Waco, 502 U.S. 9, 9-10 (1991) (per curiam)). "Judicial immunity has been created for the public interest in having judges who are 'at liberty to exercise their functions with independence and without fear of consequences.' " Id. (quoting Huminski v. Corsones, 396 F.3d 53, 74 (2d Cir. 2004)). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." Id. (citation omitted); see Positano v. New York, No. 12-CV-2288 (ADS/AKT), 2013 WL 880329, at *4 (E.D.N.Y. Mar. 7, 2013) (explaining that the plaintiff may not bring action against a judge for actions taken in his judicial capacity, even when the actions violated the ADA).

"Judicial immunity is immunity from suit, not just immunity from the assessment of damages." Zavalidroga, 2017 WL 8777370, at *8 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The only two circumstances in which judicial immunity does not apply is when he or she takes action 'outside' his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.' " Id. (quoting Mireles, 502 U.S. at 11-12). "In determining whether or not a judge acted in the clear absence of all jurisdiction, the judge's jurisdiction is 'to be construed broadly, and the asserted immunity will only be overcome when the judge clearly lacks jurisdiction over the subject matter.' " Pacherille v. Burns, 30 F. Supp. 3d 159, 163 (N.D.N.Y. 2014) (quoting Ceparano v. Southampton Just. Ct., 404 F. App'x 537, 539 (2d Cir. 2011) (summary order)). "Whether a judge acted in a judicial capacity depends on the nature of the act [complained of] itself, i.e., whether it is a function normally performed by a judge, and [on] the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Ceparano, 404 F. App'x at 539 (internal quotation marks and citation omitted). "Further, if the judge is performing in his judicial capacity," he " 'will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.' " Ceparano, 404 F. App'x at 539 (quoting Stump v. Sparkman, 435 U.S. 349, 362 (1978)). "Judges are not, however, absolutely 'immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity.' " Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009) (quoting Mireles, 502 U.S. at 11).

Thus, as plaintiff names the judicial defendants in relation to actions or omissions that they took in their roles as judges, their actions are protected by absolute judicial immunity. To the extent plaintiff names Hon. Felix Catena, "Retired

Administrative Law Judge," Judge Catena is also protected by absolute judicial immunity as a judge's retirement, "does not impact [his or] her immunity for acts taken in [his or] her official capacity before her retirement." McCray v. Lewis, No. 16-CV-3855 (WFK/VMS), 2016 WL 4579081, at *2 (E.D.N.Y. Aug. 31, 2016). To the extent plaintiff may seek to sue the judges their official capacities, the suit is barred by the Eleventh Amendment. See Pacherille v. Burns, 30 F. Supp. 3d 159, 163 n.5 (N.D.N.Y. 2014) ("The Eleventh Amendment shields judges from suit to the extent that they are sued in their official capacities.").

***7** In addition, plaintiff also references, exclusively in his "relief" section of the form complaint, "the Supreme Court Appellate Division, Third Department" when stating that he experienced "deliberate misconduct and malice." Compl. at 7. He does not name this Court as a defendant anywhere in the complaint. However, even if plaintiff were to have named the Appellate Division, Third Department as a defendant, such defendant would also need to be dismissed based on Eleventh Amendment immunity as the Appellate Division "is merely an agency or arm of New York State." Benyi v. New York, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at *5 (N.D.N.Y. Mar. 23, 2021), report and recommendation adopted, No. 3:20-CV-1463, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citation omitted). Accordingly, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division as a defendant, such claims are barred by Eleventh Amendment immunity. See Compl.

Finally, insofar as plaintiff seeks to sue Prosecutor Samuel V. Maxwell, Esq., Assistant District Attorney, in addition to the Heck issues noted above, he would be protected by absolute prosecutorial immunity. As this Court has recently reiterated,

> Prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities 'intimately associated with the judicial phase of the criminal process.' " Barr v. Abrams, 810 F.2d 358, 360-61 (2d Cir. 1987) (citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). This immunity encompasses "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995) (internal quotations and citation omitted). Absolute immunity applies when a prosecutor's conduct, acting as an advocate during the judicial phase of the criminal process, "involves the exercise of discretion." Flagler v. Trainor, 663 F.3d 543, 547 (2d Cir. 2011) (citing Kalina v. Fletcher, 522 U.S. 118, 127 (1997)).
>
> Accordingly, absolute immunity extends to functions such as "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013) (citing Imbler, 424 U.S. at 431 n.33); see also Flagler, 663 F.3d at 547 (explaining, "the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct during a probable cause hearing, in initiating a prosecution, and in presenting the State's case ... [but] withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, holding a press conference, or acting as a complaining witness."). "[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused ...." Bernard v. Cnty. of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004) (citing Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985)).

Williams v. Atkins, No. 5:24-CV-0573 (DNH/TWD), 2024 WL 3649849, at *5 (N.D.N.Y. June 11, 2024), report and recommendation adopted, No. 5:24-CV-573, 2024 WL 3548760 (N.D.N.Y. July 26, 2024).

Plaintiff appears to suggest that Mr. Maxwell "withheld potentially exculpatory material" that was used against him. Compl. at 4. Beyond the Heck barriers already discussed, even if plaintiff could amend to provide greater detail, absolute immunity would extent to even this alleged misconduct as such allegations clearly fall within the scope of prosecutorial immunity. Accordingly, it is recommended that any claims against ADA Samuel V. Maxwell be dismissed for absolute prosecutorial immunity. "Furthermore, because the District Attorney's prosecutorial immunity is substantive and not something that can be corrected by a better pleading, I recommend that the dismissal be with prejudice." Phillips v. New York, No. 5:13-CV-927, 2013 WL 5703629, at *5 (N.D.N.Y. Oct. 17, 2013) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 223 (2d Cir. 2000)).[9]

9 Plaintiff appears to characterize his submissions as a purported removal to federal court or suggests that he seeks to remove his case from Montgomery County Court to this Court. See Dkt. No. 7 (citing 28 U.S.C. § 1441). However, in addition

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to the infirmities mentioned above, plaintiff has not demonstrated that any proceeding related to this complaint has been properly removed to, or is subject to removal to, this Court. See, e.g., 28 U.S.C. § 1446. Indeed, plaintiff's submissions appear to indicate that plaintiff is the plaintiff in the County Court action. See id. § 1446(a).

### III. Conclusion

***8** It is **ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be **GRANTED**; and it is

**RECOMMENDED**, that plaintiff's section 1983 claims against Honorable Michael W. Smrtic; Tatiana N. Coffinger, County/Family/Surrogate's Court Judge; and Felix Catena, Retired Administrative Law Judge (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** as follows: (1) claims brought against them in their personal/individual capacities for judicial immunity, and (2) claims brought against them in their official capacities for Eleventh Amendment immunity; and it is further

**RECOMMENDED**, that plaintiff's section 1983 claims against Assistant District Attorney Samuel V. Maxwell (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** due to absolute prosecutorial immunity; and it is further

**RECOMMENDED**, that, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division, Third Department, as a defendant (Dkt. Nos. 1, 7), such claims be **DISMISSED WITH PREJUDICE** as barred by Eleventh Amendment immunity, and it is

**RECOMMENDED**, that plaintiff's pro se motion for permission to file electronically (dkt. no. 4) and motion to appoint counsel [10] (dkt. no. 5) be **DISMISSED AS MOOT** based on the above recommendations, and it is

10 The undersigned also notes that plaintiff did not contend that he made any efforts to obtain counsel on his own, show proof of any attorneys he contacted. See Terminate Control Corp v. Horowitz, 28 F.3d 1335 (2d Cir. 1994). See Dkt. No. 5.

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), parties have **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72. [11]

11 If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4870495

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:24-CV-00847**<br>Cole v. Smrtic et al | — | N.D.N.Y. | July 08, 2024 | Docket |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Cole v. Smrtic
2024 WL 4870495 , N.D.N.Y. , Nov. 21, 2024

*Report and Recommendation Adopted by*

2. Cole v. Smrtic
2025 WL 247901 , N.D.N.Y. , Jan. 21, 2025

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1291533
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Scott LESSON, Plaintiff,
v.
Jane DOE / State Trooper, Defendant.

1:25-cv-00188 (AMN/TWD)
|
Signed May 5, 2025

**Attorneys and Law Firms**

SCOTT LESSON, Saratoga County Jail, 6010 County Farm Road, Ballston Spa, New York 12020, Plaintiff, pro se.

## ORDER

Anne M. Nardacci, United States District Judge:

### I. INTRODUCTION

***1** On February 10, 2025, *pro se* plaintiff Scott Lesson ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against an unknown New York State Trooper. Dkt. No. 1 ("Complaint"). Plaintiff sought and was granted leave to proceed *in forma pauperis.* Dkt. Nos. 4, 6.

This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks, who reviewed the Complaint pursuant to 28 U.S.C. § 1915(e) and, on March 26, 2025, recommended that the Complaint be dismissed with leave to amend. Dkt. No. 6 ("Report-Recommendation"). Magistrate Judge Dancks advised that pursuant to 28 U.S.C. § 636(b)(1), the parties had fourteen days within which to file written objections and that failure to object to the Report-Recommendation within fourteen days would preclude appellate review. *Id.* at 7-8.[1] No party has filed objections to the Report-Recommendation and the time for filing objections has expired.

1 Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

For the reasons set forth below, the Court adopts the Report-Recommendation in its entirety.

### II. STANDARD OF REVIEW

This Court reviews *de novo* those portions of a magistrate judge's report-recommendation that have been properly preserved with a specific objection. 28 U.S.C. § 636(b)(1)(C). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012) (alteration in original) (quoting N.D.N.Y. Local Rule 72.1(c)). If no specific objections have been filed, this Court reviews a magistrate judge's report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 229 (citing Fed. R. Civ. P. 72(b) advisory committee's notes to 1983 addition). Similarly, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 08-cv-322, 2011 WL 933846, at *1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim); *Petersen*, 2 F. Supp. 3d at 228-29 & n.6 (collecting cases). "When performing such a 'clear error' review, 'the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Dezarea W. v. Comm'r of Soc. Sec.*, No. 21-cv-01138, 2023 WL 2552452, at *1 (N.D.N.Y. Mar. 17, 2023) (quoting *Canady v. Comm'r of Soc. Sec.*, No. 17-cv-0367, 2017 WL 5484663, at *1 n.1 (N.D.N.Y. Nov. 14, 2017)).

***2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 22-cv-567,

2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**III. DISCUSSION**

Because no party has filed any objections to the Report-Recommendation, the Court reviews the Report-Recommendation for clear error.

Magistrate Judge Dancks determined that Plaintiff's allegations failed to set forth a claim for excessive force, as Plaintiff did not identify what force the unidentified state trooper purportedly used against him, nor how it was excessive. Dkt. No. 6 at 5-6. Magistrate Judge Dancks also found that Plaintiff's allegations failed to comply with the pleading requirements set forth in the Federal Rules of Civil Procedure. *Id.* at 4-5. As a result, Magistrate Judge Dancks recommended that the Complaint be dismissed with leave to amend. *Id.* at 6-7. The Court agrees with Magistrate Judge Dancks' findings and recommendations for the reasons set forth in the Report-Recommendation. Having reviewed the Report-Recommendation for clear error, and found none, the Court adopts the Report-Recommendation in its entirety.

**IV. CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation, Dkt. No. 6, is **ADOPTED** in its entirety; and the Court further

**ORDERS** that the Complaint, Dkt. No. 1, is **DISMISSED with leave to amend**; [2] and the Court further

2 As set forth in the Report-Recommendation, any amended pleading must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Dkt. No. 5 at 6–7.

**ORDERS** that any amended complaint must be filed within **thirty (30) days** of the filing date of this Order; and the Court further

**ORDERS** that, if Plaintiffs file a timely amended complaint, it shall be referred to Magistrate Judge Dancks for review; and if Plaintiff fails to file a timely amended complaint, the Clerk is directed to close this case without further order of this Court; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on all parties in accordance with the Local Rules. [3]

3 The Clerk shall also provide Plaintiff, at both his address of record and the future address he provided, Dkt. No. 2, with copies of all unreported decisions herein.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 1291533

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Lesson v. Doe
2025 WL 915777 , N.D.N.Y. , Mar. 26, 2025

*Report and Recommendation Adopted by*

2. Lesson v. Doe
2025 WL 1291533 , N.D.N.Y. , May 05, 2025

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1143619
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shveta Kakar KURTZ, Daniel L. Kurtz, A.K., a minor child, and M.K., a minor child, Plaintiffs,
v.
David HANSELL, as the Duly Appointed Commissioner of the New York City Administration for Children's Services, Division of Child Protection, New York Comptroller, City of New York, Yscary Rodriguez, individually and as a caseworker employed by ACS, Bhojranie Maygoo, as a caseworker employed by ACS, Eunice Iwenofu, as a caseworker employed by ACS, Brenda Lawson, as an ACS case manager/supervisor, Esperanza Sandoval, as a supervisor in the family support unit employed by ACS, Dr. Peter Fabricant, as a treating physician and state actor operating under color of law, Dr. Marie Lupica, treating physician and state actor operating under color of law, Dr. Ramzi Marwan Shaykh, as a treating physician, DR. Shari L. Platt, as a treating physician and state actor operating under color of law, Dr. Sheena Ranade, as a treating physician, LSW Karen Glass, as a state actor, Unnamed ACS Workers and Employees 1–10, Unnamed Employees and Workers of New York Presbyterian Hospital/Weill Cornell Medical Center 1–10, Unnamed Workers and Employees of Mt. Sinai Hospital 1–10, New York Presbyterian Hospital/ Weill-Cornell Medical Center, Mt. Sinai Hospital, Administration for Children's Services, Defendants.

20 Civ. 3401 (PAE)
|
Signed 03/24/2021

**Attorneys and Law Firms**

Robert J. Del Col, Smithtown, NY, for Plaintiffs.

Thais R. Ridgeway, New York City Law Department, New York, NY, Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach, White Plains, NY, Daniel Scott Ratner, Richard Michael Sullivan, Jr., Heidell, Pittoni, Murphy & Bach, LLP, Stamford, CT, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge

***1** This case arises from—and challenges conduct by doctors and government officials in connection with—child-removal proceedings carried out by the New York Administration for Children's Services ("ACS"). Plaintiffs Shveta Kakar Kurtz ("Kakar") and Daniel Kurtz ("Kurtz," and together with Kakar, the "parents") are the parents of twin, infant girls, A.K. and M.K., who were born nearly two months premature. One night while changing A.K.'s diaper, Kurtz dropped her on the floor of the family's kitchen, breaking her femur. After the first doctor who examined A.K. failed to diagnose that injury, the parents took A.K. to a second hospital, which correctly diagnosed it. Over the ensuing weeks, after follow-up visits at multiple hospitals, several medical workers filed reports of suspected abuse or neglect to ACS. ACS then launched removal proceedings in New York family court, starting nine months of litigation. During that time, the parents were either separated from M.K. and A.K. or had restrictions placed on their contact with them. Ultimately, after the family moved for summary judgment in family court, ACS withdrew its removal petition and the family court dismissed the action with prejudice.

Plaintiffs allege that the removal proceedings resulted from an unlawful conspiracy between the medical staff who initially failed to diagnose A.K.'s broken femur, other doctors and medical institutions, and ACS, aimed at covering up the first hospital's failure to diagnose A.K.'s femur fracture and retaliating against the family for its litigiousness. They sue the City of New York, ACS, two hospitals, and many employees of each institution under 42 U.S.C. §§ 1983 and 1985, alleging malicious prosecution, abuse of process, conspiracy, false imprisonment, and violation of their constitutional rights to family integrity and freedom of association. They also bring claims under state law for, *inter alia*, intentional infliction of emotional distress ("IIED"), medical malpractice, loss of consortium and companionship, and defamation.

Before the Court now are four motions to dismiss: three by groups of private medical professionals ("Medical Defendants") and the fourth by the City of New York on behalf of all municipal employees and entities sued and served thus far ("Municipal Defendants"). For the reasons that follow, the Court grants those motions in part and denies them in part.

### I. Background

### A. Factual Background [1]

1 This factual account draws from the amended complaint, Dkt. 55 ("Am. Compl."). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered publicly filed documents from the underlying family-court proceedings, although not for the truth of the matters asserted in those documents. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)); *Davis v. Whillheim*, No. 17 Civ. 5793 (KPF), 2019 WL 935214, at *6 (S.D.N.Y. Feb. 26, 2019) (taking judicial notice of "publicly available filings, orders, and appeals in the Family Court system"); *Lamont v. Farucci*, No. 16 Civ. 7746 (KMK), 2017 WL 6502239, at *1 n.4 (S.D.N.Y. Dec. 18, 2017) (same). Those include the removal petition, order of dismissal, and similar documents submitted by the defendants in connection with the motions to dismiss.

#### 1. Parties

*a. Plaintiffs*

***2** Kakar and Kurtz are the biological parents of A.K. and M.K. Am. Compl. ¶¶ 8–9. A.K. and M.K. are fraternal twins who were born nearly two months premature, on June 4, 2018. *Id.* ¶ 10. Between August 2018 and May 2019, the parents were named as respondents in child-removal proceedings in New York family court, in which ACS alleged that they had abused A.K. and derivatively neglected M.K. *Id.* ¶¶ 8–10.

*b. Defendants*

Plaintiffs have sued many people and entities. For clarity, the Court groups them as they have grouped themselves in filing motions to dismiss.

i. Municipal Defendants

Plaintiffs have sued ACS employees, ACS itself, the City of New York ("the City"), and others. [2] David Hansell is the Commissioner of ACS. *Id.* ¶ 12. Brenda Lawson is a director of field operations for ACS and is alleged to have "made the determination to commence an emergency removal proceeding" in order to "teach [the parents] a lesson." *Id.* ¶ 15. Yscary Rodriguez, Bhojranie Maygoo, and Eunice Iwenofu are ACS caseworkers. *Id.* ¶¶ 13–14, 17. Rodriguez was the primary point of contact between plaintiffs and ACS, and worked with Maygoo. *Id.* ¶¶ 13–14. Iwenofu took over Rodriguez's responsibilities in October 2018. *Id.* ¶ 17. Plaintiffs allege that both Rodriguez and Iwenofu disagreed with ACS's decision to commence removal proceedings. *Id.* Lawson supervised Rodriguez. *Id.* ¶ 15. Esperanza Sandoval supervised Iwenofu. *Id.* ¶ 18.

2 Plaintiffs also name the New York Comptroller and Division of Child Protection as defendants, but do not allege any facts about them. In any event, as discussed below, these are not proper parties to this lawsuit.

ii. Medical Defendants

*Weill Cornell Defendants*: New York Presbyterian Hospital/ Weill Cornell Medical Center ("Weill Cornell") is a hospital on the Upper East Side of Manhattan, where the parents first took A.K. on the night of her injury because of its proximity to their home. *Id.* ¶ 33. Dr. Marie Lupica is an attending physician there who treated A.K. that night. *Id.* ¶ 34. Plaintiffs allege that she negligently failed to diagnose A.K.'s femur fracture, improperly discharged A.K., and later sought to cover up that error by reporting the parents to ACS. *Id.* ¶¶ 34–35. Dr. Ramzi Marwan Shaykh is a resident at Weill Cornell who also treated A.K. the same night. *Id.* ¶ 36. Dr. Shari Platt

is the director of emergency medicine at Weill Cornell. *Id.* ¶ 37. Although she never saw or treated A.K., she supervises Dr. Lupica and, after being notified of Dr. Lupica's alleged misdiagnosis, allegedly conspired with others to cover up that error. *Id.*

*Mt. Sinai Defendants*: A.K. and M.K. were born at Mt. Sinai Hospital ("Mt. Sinai"), where they remained in the neonatal intensive care unit ("NICU") for nearly two months after their birth. *Id.* ¶ 49. On the night of A.K.'s injury, the parents took her to Mt. Sinai after Dr. Lupica discharged her from Weill Cornell but A.K. continued to be in pain. *Id.* There, A.K. was diagnosed with a femur fracture. *Id.* ¶ 20. Several days later, after the parents brought A.K. back to Mt. Sinai for a follow-up visit, she was examined by Dr. Sheena Ranade, a pediatric orthopedist, who administered additional x-rays to assess a potential clavicle fracture. *Id.* ¶¶ 22–24. Dr. Ranade is the co-author of an article published in the *Journal of the American Academy of Orthopedic Surgeons* titled "The Role of the Orthopedic Surgeon in the Identification and Management of Non-Accidental Trauma"; plaintiffs allege that Dr. Ranade was "predisposed" to perceive abuse where there was, in fact, none. *Id.* ¶ 58. Dr. Ranade reported the parents to ACS for suspected abuse or neglect after the August 13, 2018 visit. *Id.* ¶ 57.

***3** *HSS Defendants*: Weeks later, the parents took A.K. for a single follow-up examination at the Hospital for Special Surgery ("HSS"). *Id.* ¶ 38. There, she was seen by Dr. Peter Fabricant. *Id.* Karen Glass is a social worker at HSS who also had contact with the parents and A.K. that day. *Id.* ¶ 41. Dr. Fabricant later contacted Dr. Platt at Weill Cornell, an alleged "affiliate" of HSS, to notify her about Weill Cornell's failure to diagnose A.K.'s femur fracture. *Id.* ¶¶ 38–39. Glass later filed a report of suspected abuse to ACS and Dr. Fabricant met with ACS, Dr. Lupica, and Dr. Ranade on the morning that ACS ultimately commenced removal proceedings. *Id.* ¶ 83.

### 2. The August 8, 2018 Injury

On August 8, 2018, while changing A.K.'s diaper, Kurtz dropped her onto the kitchen floor. *Id.* ¶ 47. He and Kakar then walked her to the emergency room ("E.R.") at Weill Cornell, two blocks from their home. *Id.* They arrived at about 7 p.m.; A.K. spent the several hours in the ER. *Id.* ¶ 48. There, Dr. Lupica treated her for "no more than five minutes." *Id.* Weill Cornell conducted a CT scan of A.K.'s head, but not a full body exam "despite obvious discomfort to her lower extremities." *Id.* Kurtz also "had to urge the resident" to mind A.K.'s neck, which "was still in obvious pain." *Id.* Dr. Lupica discharged A.K. around midnight. *Id.*

Once home, the parents noticed that A.K. was in continued pain and not moving her left leg. *Id.* ¶ 49. Concerned, they took her to Mt. Sinai later that night. *Id.* There, she was diagnosed with a femur fracture, as well as "healing" and "calcified" rib fractures, which plaintiffs allege occurred in the NICU after her premature birth. *Id.* ¶ 50. She was also examined by, among others, non-defendant Dr. Katherine Grimm, a pediatric-abuse specialist, who concluded there was no evidence of abuse and, on August 9, 2018, discharged A.K. *Id.* ¶ 51. On August 10, 2018, the parents took A.K. to their pediatrician, Dr. Laura Popper, who expressed concern at Weill Cornell's failure to diagnose A.K.'s broken femur. *Id.* ¶ 52.

### 3. August 13, 2018 Follow-Up at Mt. Sinai and First ACS Report

On August 13, 2018, the parents took A.K. to Mt. Sinai for a follow-up examination. *Id.* ¶ 53. There, she was examined by Dr. Ranade. *Id.* Dr. Ranade expressed concern that, in addition to the femur fracture, A.K. might have suffered a clavicle fracture. *Id.* ¶¶ 54–55. She also told the parents that she suspected A.K. might have brittle-bone disease, and advised them to have A.K. admitted to the E.R. for genetic testing. *Id.* ¶¶ 55–56. The parents heeded that recommendation; A.K. was admitted to the Mt. Sinai E.R. *Id.* ¶ 56.

However, the parents soon learned that Dr. Ranade had contacted ACS and that A.K. would not be able to leave the hospital that day. *Id.* ¶¶ 56–57.[3] Soon, two detectives and two ACS caseworkers—Rodriguez and Maygoo—arrived at Mt. Sinai to speak with the parents. *Id.* ¶ 61. While A.K. remained in the hospital, the detectives and caseworkers, along with the parents, went back to the family's home to perform an inspection. *Id.* ¶ 62. There, they spoke with the family's 24-hour live-in baby nurse, who corroborated Kurtz's account of how A.K.'s injury had occurred on August 8, 2018. *Id.* The detectives left, and never contacted the family again. *Id.* ¶ 63. ACS's Rodriguez stated that, although she had few concerns, the matter would have to remain open for 60 days, during which time she would periodically visit the home. *Id.* Between August 14 and 30, 2018, she did so, without event. *Id.* ¶ 65. On August 14, 2018, Dr. Grimm interviewed the parents, conducted further tests, and was left

with no suspicion of abuse or neglect. *Id.* ¶ 64. A.K. was then discharged from Mt. Sinai. *Id.*

3 Plaintiffs allege that those x-rays did not show additional fractures or injuries, including to A.K.'s clavicle, but elsewhere state that the results were "inconclusive." *Id*. ¶¶ 25, 59, 105.

### 4. August 23, 2018 Follow-Up at HSS

***4** On August 23, 2018, the parents took A.K. for a second follow-up examination, this time at HSS, where she was examined by Dr. Fabricant. *Id.* ¶ 68. He took an x-ray and concluded that A.K.'s femur was healing well. *Id.* He also informed the parents that he was a mandatory reporter and would have to report the injury to ACS. *Id.* ¶ 69. After the parents told him that ACS had already been contacted, Dr. Fabricant responded that, in that case, he would need only to access Mt. Sinai's medical records. *Id.* The parents agreed to authorize such access, and met with Glass, a social worker at HSS, to sign a medical release. *Id.*

### 5. August 27-29, 2018 Email Chain and Second ACS Report

On August 27, 2018, Dr. Fabricant wrote Dr. Platt at Weill Cornell to give her a "heads up" that Weill Cornell had apparently failed to diagnose A.K.'s injury. *Id.* ¶ 70. He asked whether, in fact, the treating doctor had solely focused on "head trauma," rather than the broken femur and, if so, whether it was "perhaps a systems issue that could be addressed?" *Id.* Dr. Platt responded, confirming that it was "a definite miss" and that she had "educated her attending," *i.e.*, Dr. Lupica. *Id.* ¶ 71.

However, Dr. Platt soon emailed again. In that follow-up, she forwarded Dr. Lupica's response to her. Dr. Lupica there claimed that, having reviewed the Mt. Sinai records that Dr. Platt had apparently sent her, "there was no way that the baby had that injury when [I] saw him," given that "I watched him for 4 hours." *Id.* ¶¶ 73–74.[4] Dr. Lupica also stated that the femur break seemed "as though it required brute force of pressure to break," and that "child abuse seems to be the diagnosis now." *Id.* ¶ 75. In response, HSS social worker Glass emailed back that she "HIGHLY recommend[ed] for [Weill] Cornell to contact the ACS worker and share [Dr. Lupica's story]." *Id.* ¶ 77. Dr. Fabricant agreed, recommending that Dr. Lupica "talk with the ACS worker." *Id.* ¶ 78.

4 Plaintiffs note that Dr. Lupica, in this email, misidentified A.K.'s gender. They also allege that Dr. Lupica's claim to have spent four hours with A.K. in the E.R. was a lie. Am. Compl. ¶ 74.

On August 28, 2018, Glass contacted Rodriguez and the ACS-mandated reporter line, filing a report of suspected child abuse based on the August 8, 2018 injury. *Id.* ¶ 79. On August 29, 2018, Dr. Platt responded on the email chain, describing the parents as "dangerous," thanking Glass and Dr. Fabricant for "partnering" with Weill Cornell, and asking them to let her know if they needed to "collaborate" further. *Id.* ¶ 80. On August 30, 2018, Dr. Lupica wrote to the email chain, confirming that she had spoken with an ACS caseworker. *Id.* ¶ 81.

### 6. ACS's Investigation and Commencement of Removal Proceedings

On August 28, 2018, after Glass made her report to ACS, two ACS caseworkers arrived at the hotel where the parents were staying while their apartment underwent repairs. *Id.* ¶ 92. They informed the parents that they were there as a result of a separate report by Dr. Fabricant. *Id.* ¶¶ 93–94. The parents reacted with astonishment, anger, and outrage, admonishing the caseworkers for announcing themselves as child-protective services at the hotel reception. *Id.* ¶ 95. On August 29, 2018, Rodriguez visited the parents again, informing them that a family support conference ("FSC") had been scheduled for the next morning at 10:30 a.m.[5]

5 Plaintiffs allege that FSCs are expected to seek to maintain intact families and pursue solutions other than removal. Am. Compl. ¶ 98.

On August 30, 2018, ACS held an FSC, at which the parents, their family, and many friends testified in support of the parents. *Id.* ¶¶ 99–100. It was cut short, however, when Brenda Lawson, representing ACS, stated that ACS was recommending removal and intended to take the matter to family court that afternoon. *Id.* ¶ 101. Kakar alleges that, the same morning, she learned from an unidentified source that Lawson had been "livid" about the parents' treatment of ACS's caseworkers at the hotel on August 28, 2018, and had

been overheard stating, "Who do they think they are? ... Just because they are rich lawyers.... I will show them." *Id.* ¶ 102.

***5** The same day, ACS filed, in New York family court, a petition to terminate parental rights.[6] The Petition's addendum, which set forth the Petition's factual basis, stated that Dr. Ranade had reported that A.K. "presented with injuries to her collarbone," and that the x-rays she took "came back inclusive."[7] *Id.* ¶ 105. It also cited Dr. Lupica's claim that, when she examined A.K. on August 8, 2018, "there [was] no way that the baby had a leg fracture," given that she "was moving her arms and legs," and that her medical opinion was that A.K.'s injuries did not occur as Kurtz had reported. Petition at 6–7. It did not disclose Dr. Grimm's prior assessment that "this was an unfortunate accident for a premature baby," that "both clavicles looked the same" from the x-rays, and that "no one can testify at this time that this infant was abused," despite evidence that Lawson had spoken with Dr. Grimm twice on August 14, 2018. Am. Compl. ¶ 109; *see id.* ¶ 108 (Dr. Grimm reporting that a "clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously").

6 The Amended Complaint characterizes the petition as an "emergency petition," but the petition is not styled as such. The protective order issued that day, citing "exigent circumstances and allegations in the petition" and entitled "ORDER (Directing Temporary Removal of Child-After Petition Filed)," was issued by a court, after a preliminary hearing, pursuant to N.Y. Fam. Ct. Act. § 1027, which does not provide for emergency removal. *See* Dkt. 100 ("Ridgeway Decl."), Exs. A ("Petition"), C ("Removal Order"); *cf.* N.Y. Fam. Ct. Act § 1024 ("Emergency Removal Without Court Order").

7 The Amended Complaint notes that the results of the August 13, 2018 x-rays were, in fact, "inconclusive," not "inclusive." Am. Compl. ¶¶ 25, 105.

Also on August 30, 2018, the family court, with Judge Frias-Colon presiding, held a preliminary hearing on the ACS Petition. *Id.* ¶ 106. ACS's attorney represented at the hearing that A.K. "does have a collarbone fracture," which had been confirmed by x-rays, despite the above evidence, allegedly in ACS's possession, to the contrary. Am. Compl. ¶ 106. According to the hearing transcript, doctors Lupica, Fabricant, and Ranade had met with ACS that morning to, as plaintiffs characterize it, "press the case" for removal. *Id.* ¶ 83. After the hearing, the family court issued an order directing A.K.'s temporary removal from the family home, because she "has presented with injuries and allegations of physical abuse were made with no plausible explanation given." Removal Order at 1. The court directed that A.K. and M.K. be temporarily placed with Rahul Kakar, their maternal uncle, pending the removal proceeding. *Id.*; Am. Compl. ¶ 117.

### 7. Post-Removal Events

Between August 30 and October 2, 2018, A.K. and M.K. resided with their uncle on Long Island. Am. Compl. ¶ 117. The family court then modified its order to allow Kakar's mother, who moved from India to New York City "on a moment's notice," to assume custody of the children while living in plaintiffs' home and sleeping on their floor. *Id.* At no point were the parents permitted to be alone with either daughter. *Id.* ¶ 118.

On September 10, 2018, the parents took A.K. for a follow-up appointment with Dr. Ranade, accompanied by their live-in baby nurse. *Id.* ¶¶ 120, 124. There, they confronted Dr. Ranade about her "misleading" ACS report; Dr. Ranade recommended that they see another doctor, but the parents stated that, given the ACS proceeding, they had no choice but to remain with her. *Id.* ¶ 122. After the appointment, Dr. Ranade reported to ACS that the parents had brought A.K. to the appointment unsupervised. *Id.* ¶ 123. The plaintiffs allege this was wrong, and that the baby nurse waited in the reception area while the parents met with Dr. Ranade. *Id.* ¶ 124. On October 4, 2018, at another follow-up visit with Dr. Ranade, she ordered x-rays of A.K.'s clavicle to look for "healing fractures," which the parents did not authorize *Id.* ¶ 125.

***6** On October 30, 2018, ACS's Rodriguez and Iwenofu visited the parents and A.K., and told the parents they did not agree with their supervisors and "did not believe this was an abuse case." *Id.* ¶¶ 127–28. Yet Iwenofu stated, if the parents wanted to see the case resolved, they would likely have to admit to some neglect. *Id.* ¶ 129. She also stated that she "had never seen a case discharged without 'someone taking the blame.' " *Id.*

On December 4, 2018, the parents gave ACS and the family court four affidavits—one from Dr. Grimm, one from the

family's pediatrician, and two from doctors with whom ACS had consulted "for over a decade"—each concluding that (1) the femur fracture was consistent with an accidental fall, not abuse; (2) any rib fractures were consistent with bone fragility due to premature birth; and (3) there was no "conclusive" evidence of a clavicle fracture on August 13, 2018. *Id.* ¶¶ 136–40. After reviewing these reports, the family court judge's clerk counseled ACS that it "may want to reconsider its position." *Id.* ¶ 141.

On January 9, 2019, ACS stated that it was seeking to retain a neutral expert, and if the expert agreed there was no abuse, they would withdraw the petition. *Id.* ¶ 155. At a February 4, 2018 hearing, ACS represented that its expert, Dr. Hoffman-Rosenfeld, had reviewed all of Mt. Sinai's and HSS's medical records. *Id.* ¶ 158. But it soon became clear that that statement was untrue, as ACS had instead sent her the August 27–30, 2018 email chain between the HSS Defendants, Dr. Platt, and Dr. Lupica, and not other actual medical records. *Id.* ¶¶ 159–62.

At a February 6, 2018 hearing, ACS's position began to soften. It stated that Dr. Hoffman-Rosenfeld "cannot state physically what happened at this time," and that she would need to interview the parents and conduct physical examinations of A.K. and M.K. *Id.* ¶ 163. In response, Judge Frias-Colon remarked that this substantial reversal gave her "some concern about the decision to have filed this as an abuse case as opposed to being truly what everyone said from the beginning which was a tragic accident." *Id.* ¶ 167.

On April 10, 2019, the parents moved for summary judgment in the removal proceeding. *Id.* ¶ 172. On May 2, 2019, Dr. Hoffman-Rosenfeld concluded that A.K.'s femur break "could have resulted from a fall," that the "rib fractures are consistent with fractures related to metabolic bone disease of prematurity," that the healing timeline comported with their occurrence before discharge from the NICU, and that, after "review of the radiology, no clavicle fracture was identified." *Id.* ¶ 175.

On May 7, 2019, ACS withdrew its Petition. *Id.* ¶ 176. The same day, the family court dismissed it with prejudice. *Id.*

### B. Procedural History

On May 1, 2020, plaintiffs filed the Complaint, Dkt. 1, and on May 5, 2020, the Amended Complaint. Dkt. 55. On August 14, 2020, the Mt. Sinai Defendants filed a motion to dismiss, Dkt. 89, and a memorandum of law in support, Dkt. 89-1 ("Mt. Sinai Mem."). The same day, the HSS Defendants filed a motion to dismiss, Dkt. 93, and a memorandum of law in support, Dkt. 97 ("HSS Mem."). On August 18, 2020, the Municipal Defendants filed a motion to dismiss, Dkt. 99, along with a memorandum of law in support, Dkt. 101 ("City Mem."), and the declaration of Thais. R. Ridgeway, Esq., with supporting exhibits.

On August 19, 2020, the Court issued an order directing plaintiffs either to amend their complaint or oppose the pending motions to dismiss, and noting that no further opportunities to amend would be given. Dkt. 102. On September 16, 2020, the Court granted the Municipal Defendants' request that their motion also apply to the claims against Commissioner Hansell, who had not been served at the time they filed their motion. Dkt. 110. On September 23, 2020, the Weill Cornell defendants filed a motion to dismiss, Dkt. 112, and a memorandum of law in support, Dkt. 114 ("Weill Cornell Mem."). The same day, the Court again notified plaintiffs of their right to amend and stated that no further opportunities to do so would ordinarily be granted. Dkt. 115.

***7** On November 13, 2020, plaintiffs opposed the motions to dismiss. Dkt. 123 ("Pl. Opp'n"), and filed the declaration of Robert Del Col, Dkt. 123-1 ("Del Col Decl."), and exhibits. On December 10, 2020, the HSS Defendants and Weill Cornell Defendants replied. Dkts. 126 ("HSS Reply"), 129 ("Weill Cornell Reply"). On December 29, 2020, the Mt. Sinai defendants replied. Dkt. 133 ("Mt. Sinai Reply"). On January 13, 2020, the Municipal Defendants replied, Dkt. 136 ("City Reply").

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer

only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**III. Discussion**

Plaintiffs—the parents and their minor daughters—claim here that ACS's child-removal action, and the reports of child abuse by the Medical Defendants that prompted it, resulted from an elaborate conspiracy between all named defendants to deprive plaintiffs of their constitutional rights. The Medical Defendants, they allege, sought to cover up Weill Cornell's failure to diagnose A.K.'s femur fracture by concocting spurious reports of child abuse that shifted blame away from Weill Cornell. And ACS, they allege, relying on those false reports and lacking probable cause, launched removal proceedings that it was ultimately forced to abandon, in retaliation for the parents' litigiousness and hostility toward ACS's caseworkers. The result, they allege, was a nine-month ordeal in which the parents were forcibly separated from their newborn twin daughters and, once reunited, subjected to unjustified restrictions on their association with them.

Based on this version of events, plaintiffs bring three sets of federal claims: under § 1983, for malicious prosecution, abuse of process, conspiracy, intentional deprivation of constitutional rights, and false imprisonment, against all defendants; under § 1985, for conspiracy, against all defendants; and for the deprivation of constitutional rights against the City of New York, based on, *inter alia*, an alleged custom and practice of commencing child-removal proceedings without probable cause, actionable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).[8] Plaintiffs also bring state-law claims for malicious prosecution, abuse of process, loss of consortium and companionship, and IIED, against all defendants; for medical malpractice against the Weill Cornell Defendants and Dr. Ranade; and for defamation against Dr. Platt, Dr. Ranade, and Glass.

8 Confusingly, plaintiffs purport to bring a *Monell* claim against all defendants. The *Monell* doctrine, however, relates uniquely to § 1983 claims against municipal entities.

***8** In response, the Medical Defendants, across three separate motions to dismiss, argue that the Amended Complaint does not plausibly allege either that they are state actors or that they conspired with any state actor, and so they cannot be sued under § 1983. They also argue that, even if state actors, they are immune to liability for reporting suspected child abuse in their roles as mandatory reporters of such abuse. Finally, they contend that plaintiffs fail to plausibly allege the elements of any of their causes of action. The Municipal Defendants, too, urge dismissal of all claims against them.[9] First, they assert that several defendant entities are not proper parties to this action. Second, they argue that none of plaintiffs' causes of action states a claim.

9 With a narrow exception, these defendants do not argue that they are entitled to qualified immunity. Their opening brief cursorily referenced such a defense, solely as to plaintiffs' conspiracy claims, but this argument was not developed until their reply—and, even then, only in a single paragraph. *See* City Mem. at 19; City Reply at 6. "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived." *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 (S.D.N.Y. 2018). And qualified immunity provides an affirmative defense, as to which defendants have the burden of proof. *Se McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). The Court thus will not consider these arguments on the present motion to dismiss.

The Court first addresses whether plaintiffs have improperly sued certain non-suable entities. Then, the Court considers plaintiffs' federal claims under §§ 1983 and 1985. Finally, the Court addresses plaintiffs' state-law claims.

**A. Proper Parties**

The Municipal Defendants first argue that plaintiffs' claims against ACS, the New York Comptroller, and the Division of Child Protection must be dismissed because, by statute, they are not suable entities. That is correct. *See* N.Y. City Charter, Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Graham v. City of New York*, 869 F. Supp. 2d 337, 348 (E.D.N.Y. 2012) ("ACS is an agency of the City of New York and cannot be sued independently."); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395–96 (S.D.N.Y. 2010) (same). Plaintiffs are silent in the face of this motion. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a

plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

Accordingly, the Court dismisses ACS, the New York Comptroller, and the Division of Child Protection. [10]

10 The latter entity, the Division of Child Protection, is named (although not discussed) in the Amended Complaint. Plaintiffs appear not to have served that entity, despite the Court's having several times extended the deadline to effect service, *see* Dkts. 106, 119, which has now passed. This independently warrants its dismissal. *See* Fed. R. Civ. P. 4(m); *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007) (dismissal under Rule 4(m) appropriate even where plaintiff would be time-barred from bringing renewed action). Contemporaneous with this decision, the Court is issuing an order as to plaintiffs' claims against other non-served defendants.

### B. Federal Claims

#### 1. State Action

At the threshold, each group of Medical Defendants argues that they cannot be liable under § 1983 because they are not state actors. *See* Mt. Sinai Mem. at 5–9; HSS Mem. at 11–15; Weill Cornell Mem. at 8–12. Plaintiffs concede that, as a matter of law, the mere reporting of a crime or child abuse to the authorities does not typically rise to the level of state action. But, they argue, the Medical Defendants went beyond reporting, and became active participants in ACS's child-removal proceedings, so as to make them state actors subject to liability under § 1983. On this issue, the Court holds with the Medical Defendants.

***9** "An essential element of a § 1983 claim is that the defendant act under color of state law." *Mortimer v. City of New York*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at *12 (S.D.N.Y. Mar. 29, 2018). Section 1983 thus generally applies to public officers, not private citizens. However, in certain circumstances, private actors can be considered to have acted "under color of state law." *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). For purposes of § 1983,

> the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate" ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see Ciambriello*, 292 F.3d at 324 ("[A] private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the state or its agents.' " (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))).

With near uniformity, courts in this Circuit have applied these principles to hold that "reporting suspected child abuse alone does not constitute state action." *J.C. v. Mark Country Day Sch.*, No. 03 Civ. 1414 (DLI) (WDW), 2007 WL 201163, at *3 (E.D.N.Y. Jan. 23, 2007) (collecting cases); *Topolski v. Wrobleski*, No. 13 Civ. 872 (LEK), 2013 WL 5652724, at *1–3 (N.D.N.Y. Oct. 16, 2013) (allegations that private actors falsely reported child abuse in effort to commence child-removal proceedings insufficient to plead state-actor status); *Ogunbayo v. Montego Med. Consulting P.C.*, No. 11 Civ. 4047 (NGG) (CLP), 2012 WL 6621290, at *12 (E.D.N.Y. Sept. 18, 2012) (report of suspected child abuse not state action where no allegation that "ACS influenced the substance of the medical defendants' evaluation"), *adopted as modified*, 2012 WL 6625921 (E.D.N.Y. Dec. 19, 2012); *Mione v. McGrath*, 435 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) (hotel employees who reported suspected child abuse to authorities, leading to initiation of neglect proceedings, not state actors under § 1983); *Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) (doctors who "reported their suspicions of child abuse pursuant to a state statute" not state actors); *Deckon v. Chidebere*, No. 93 Civ. 7965 (LMM), 1995 WL 555684, at *4 (S.D.N.Y. Sept. 19, 1995), *aff'd*, 101 F.3d 1393 (2d Cir. 1996); *cf. Est. of Keenan v. Hoffman-Rosenfeld*, No. 16 Civ. 0149 (SFJ) (AYS), 2019 WL 3410006, at *19 (E.D.N.Y. July 29, 2019) (holding, at summary judgment, that hospital defendants were not state actors where they allegedly " 'conspired with each other to advance a false narrative and took advantage of the plainly incompetent [Child Protective Services] workers' to cause the Protective Proceedings to be brought against the Parents"), *aff'd*, 833 F. App'x 489 (2d Cir. 2020); *Estiverne v. Esternio-Jenssen* ("*Estiverne III*"), 910 F.

Supp. 2d 434, 444 (E.D.N.Y. 2012) (holding, after trial, doctor not state actor where she did not "play[ ] any role—other than to provide her medical opinion—in the decision to file a petition for removal").

***10** The Medical Defendants argue that they similarly were private actors who simply reported suspected abuse to ACS. Plaintiffs respond that the facts alleged show the Medical Defendants to have gone beyond their role as mandatory reporters and "exert[ed] undue influence to obtain a desired outcome." Pl. Opp'n at 24. They rely on the following allegations. First, Dr. Ranade had x-rays of A.K.'s clavicle taken on August 13, 2018, at the follow-up visit during which she contacted ACS, after admitting A.K. to the E.R. for the ostensible purpose of taking genetic tests. Am. Compl. ¶ 59. Second, Glass, Dr. Fabricant, Dr. Lupica, and Dr. Platt engaged in discussions over email that ostensibly reflect a conspiracy to falsely report child abuse to ACS. In that thread, Dr. Fabricant first wrote to Dr. Platt to notify her that Weill Cornell appeared to have failed to diagnose A.K.'s broken femur and to ask if that failing was indicative of any "systems issue" that could be remedied. *Id.* ¶ 70. Dr. Platt responded that "it was a definite miss" and that she had "educated" Dr. Lupica. *Id.* ¶ 71. Then, however, Dr. Lupica responded to Dr. Platt (in a response that Dr. Platt forwarded to Dr. Fabricant and Glass) that she did not believe A.K. had had those injuries when she saw "him," and that she now suspected abuse. *Id.* ¶¶ 72–75. Apparently believing Dr. Lupica's story, the others then agreed that she should report to ACS; then, she and others did so. *Id.* ¶¶ 77–81. Third, without supporting allegations, plaintiffs contend that Dr. Fabricant, Dr. Ranade, and Dr. Lupica met with ACS on August 30, 2018, to "press the case for [A.K.] and [M.K.] to be removed from their parents' care," and that ACS filed its removal petition the same day. *Id.* ¶ 83. Last, they state that on September 10, 2018, Dr. Ranade falsely reported the parents for bringing A.K. to see her alone, and on October 4, 2018, took unauthorized investigatory x-rays. *Id.* ¶¶ 120–25.

These allegations do not make any of the Medical Defendants state actors.

As to Dr. Fabricant, Dr. Platt, and Glass, the Amended Complaint does not allege more than that they, apparently believing Dr. Lupica's story, decided it was appropriate to report the suspected abuse to ACS, as required under N.Y. Soc. Serv. Law § 413. In fact, the Amended Complaint largely depicts Dr. Fabricant and Dr. Platt as open to recognizing, and addressing, Weill Cornell's lapse in failing to diagnose A.K.'s fracture. *See, e.g.*, Am. Compl. ¶¶ 70–71. Glass merely reported to ACS, *see id.* ¶ 79, and Dr. Platt does not even appear to have done that much. And Fabricant's meeting with ACS—along with Dr. Lupica and Dr. Ranade—on August 30, 2018, which is described only in vague terms in the Amended Complaint, as alleged did not entail more than furnishing ACS with a medical assessment based on his observations of A.K. and the parents. *See id.* ¶ 83. Fabricant is not alleged to have urged ACS to take specific action. The Amended Complaint states that, at that meeting, Fabricant "press[ed] the case" for removal, but that conclusory allegation is unsupported by any concrete facts. It cannot be relied upon for purposes of this motion. *Id.*

The allegations about Dr. Lupica, taken as true, are of a different character. She is alleged to have lied about A.K.'s condition at the time she examined A.K. on August 8, 2018, with the goal of shifting attention from her errant diagnosis, and the consequence of giving the false diagnosis of a later act of child abuse. According to the Amended Complaint, Dr. Lupica's statement that A.K. could not possibly have had a femur fracture when she saw her on August 8, 2018, was deliberately false. *See id.* ¶ 75. Although some allegations as to this act are conclusory, *see, e.g.*, *id.* ("This was a slanderous fiction made up by Defendant Lupica"), the overall facts alleged as to this point are concrete enough to make the parents' claim of such a falsehood plausible. For example, the Amended Complaint alleges that, despite only seeing A.K. for five minutes on August 8, 2018, Dr. Lupica later falsely reported spending four hours with her. *Id.* ¶ 74. And although A.K. is female, Dr. Lupica stated that she watched "him" for that entire four-hour period, calling into doubt her claim of such a long, or of an attentive, observation. *Id.* Moreover, the circumstances of the email exchange—that Dr. Lupica's superior, Dr. Platt, had emailed her to "educate" her as to her significant "miss"—provides a plausible motive for Dr. Lupica to dissemble: to cover up her own malpractice. Claiming that A.K.'s femur had not been broken when she examined the child deflected blame and changed the narrative from a faulty diagnosis to a later act of child abuse. *See, e.g.*, *id.* ¶ 75. The Amended Complaint's allegation is thus well-pled that Dr. Lupica falsely claimed that A.K.'s injuries were not present when she examined her on August 8, 2018, and that the parents' account of how such injuries occurred was inconsistent with her diagnosis.

***11** But this falsehood, while exposing Dr. Lupica to potential liability under state law, *see infra* pp. 46–47, does not make her a state actor under § 1983. *See, e.g.*,

*Moreno v. Town of Greenburgh*, No. 13 Civ. 7101 (VB), 2014 WL 3887210, at *3 (S.D.N.Y. June 9, 2014) (no state action where defendant provides "false and misleading" information to prosecutors "even if the information provided is deliberately false"); *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 429 (S.D.N.Y. 2013) ("[E]ven assuming that [defendant] had deliberately provided false information to police, such provision alone is not sufficient" to make him a state actor); *Vazquez v. Combs*, No. 04 Civ. 4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("But merely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, *even if the complaint or report is deliberately false*, does not give rise to a claim against the complainant for a civil rights violation." (emphasis added)). Rather, "one's motivation is irrelevant to the determination of whether one is a state actor." *Shapiro v. Goldman*, No. 14 Civ. 10119 (NRB), 2016 WL 4371741, at *11 (S.D.N.Y. Aug. 15, 2016) (quoting *Young v. Suffolk County*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010)). Indeed, in a similar context, a court in this District has held that doctor not a state actor under § 1983 even though he had been hired by ACS in connection with a neglect proceeding and "knowingly provided false information to ACS." *Emanuel v. Griffin* ("*Emanuel I*"), No. 13 Civ. 1806 (JMF), 2013 WL 5477505, at *5–6, 7 (S.D.N.Y. Oct. 2, 2013). Thus, even taking as true plaintiffs' allegation that Dr. Lupica scurrilously lied about A.K.'s injuries to cover up her failure to diagnose A.K.'s broken femur, that does not show that she acted under color of state law.

Finally, as to Dr. Ranade, plaintiffs argue that her reporting of suspected abuse or neglect, taking of x-rays, and follow-up reports to ACS make her a state actor because she became "part of the reporting and enforcement machinery" of the state. *See* Pl. Opp'n at 24 (quoting *Estiverne v. Esternio-Jenssen* ("*Estiverne II*"), 833 F. Supp. 2d 356, 367–68 (E.D.N.Y. 2011)). For the reasons above, Dr. Ranade's reporting, both before and after August 13, 2018, does not make her a state actor. That is so even though she had multiple contacts with ACS. *See, e.g.*, *Est. of Keenan*, 2019 WL 3410006, at *19 ("Additional input and updates from the Northwell Defendants as CPS's source for medical information regarding Lana's case, which presented a dynamic situation, does not morph the Northwell Defendants from private actors into persons or entities acting under color of state law[.]"). As to Dr. Ranade's admission of A.K. to the E.R. on August 13, 2018, courts have recognized that private medical entities' *detention* of children, for the purposes of conducting abuse investigations, can sometimes amount to state action. *See, e.g.*, *Kia P. v. McIntyre*, 235 F.3d 749, 756–57 (2d Cir. 2000) (finding state action based on hospital's "discrete and distinguishable role in the complex relationship among the State, the parent and the child in determining the safety and propriety of releasing [a child] to the care of her mother"); *J.C.*, 2007 WL 201163, at *2–3 (discussing *Kia P.* and finding no state action where school reported suspected abuse, but did not detain child). But plaintiffs' § 1983 claims do not focus on A.K.'s brief, August 13, 2018 stay at Mt. Sinai pending ACS's investigation. And even were Dr. Ranade considered a state actor with respect to that isolated incident, that would not convert her other actions—including making reports to ACS—into state action. *See Kia P.*, 235 F.3d at 757 (hospital was state actor only as to period where it lacked medical reason for detaining child). Finally, that Dr. Ranade took unauthorized x-rays on October 4, 2018, allegedly to check for "healing fractures," does not make her a state actor. *See* Am. Compl. ¶ 125. Plaintiffs do not plead that Dr. Ranade ever reported the results of those x-rays to ACS, or that they had anything to do with the removal proceedings that, by then, had been pending for several months.

Nor does the Amended Complaint plausibly allege that the Medical Defendants participated in a § 1983 conspiracy with ACS. *See Ciambriello*, 292 F.3d at 324–25 (private actors may be liable under § 1983 where plaintiffs show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages"). Plaintiffs rely on the email thread between Glass and Drs. Fabricant, Platt, and Lupica to establish this conspiracy. *See* Pl. Opp'n at 12–14 (discussing Am. Compl. ¶¶ 69–82). But even assuming those communications established an agreement between those individuals to act unlawfully—rather than a conversation in which others were persuaded in good faith by Dr. Lupica's allegedly false claim that her original diagnosis had been correct—plaintiffs do not allege that ACS participated in that discussion. The principal alleged communications between ACS and the Medical Defendants were: (1) the reports of suspected child abuse reviewed above; and (2) the August 30, 2018 meeting between Lawson at ACS and Drs. Ranade, Fabricant, and Lupica. As to the former, such reporting cannot establish a § 1983 conspiracy, even if the reporting were false. *See, e.g.*, *Rodriguez*, 973 F. Supp. 2d at 429 ("[E]ven assuming that Mr. Morrissey had deliberately provided false information to police, such provision alone is not sufficient to form the basis of a conspiracy claim."). As to the latter, the Amended Complaint lacks concrete allegations, beyond the fact of this meeting, to show an agreement

between those defendants at any point. Its allegations on this point are conclusory. *See* Am. Compl. ¶ 114 ("Plaintiffs allege that Defendant Lawson was complicit in the 'Weill Cornell/Ranade/HSS conspiracy' " (emphasis removed)). In fact, the only concretely pled communication from ACS to any private defendant is ACS's report to Glass that "there was no reason to remove [A.K.] ... as the [Parents'] story was consistent with injuries as reported by Mt. Sinai." *Id.* ¶ 77. Instead, the Amended Complaint alleges that, after receiving *additional* reports of suspected child abuse, and meeting with the reporting doctors, ACS independently decided to commence removal proceedings.[11] That ACS did so after receiving those reports, even if those reports were false, does not plausibly suggest any conspiracy.

11 In opposition, plaintiffs rely on a single case. *See* Pl. Opp'n at 17–19 (discussing *Estiverne II*, 833 F. Supp. 2d at 356–57). But it is far afield. There, plaintiffs sought to hold a single doctor—the head of a hospital's "child protective services team"—liable under § 1983 because she had been "the driving force behind ACS's decision to initiate removal proceedings." *Estiverne II*, 833 F. Supp. 2d at 369–70. The supporting evidence was that the doctor had "recommended removal of [the child], that she diagnosed [the child's] injuries as consistent with being 'grabbed and shaken,' that if she had not made such a diagnosis, Infant Plaintiffs would not have been removed from their home, that ACS always follows the recommendations of [this doctor], and, perhaps most importantly, that ACS made the decision to file a petition 'in unison' with [the doctor] and the [hospital's] Child Protection Team." *Id.* at 369. Here, plaintiffs do not allege, except conclusorily, that any Medical Defendant recommended removal, that ACS "always," or has ever, followed any of their recommendations, or that—aside from the meeting on August 30, 2018—ACS decided to file a removal petition "in unison" with them. In fact, the Amended Complaint alleges that ACS, far from being driven by any Medical Defendant, had a preexisting motive to seek the children's removal. *See* Am. Compl. ¶¶ 110–15. And the removal petition belies that any Medical Defendant urged removal. *See* Petition at 6–7 (basing removal petition solely on medical assessments by Medical Defendants); *see also* *Estiverne III*, 910 F. Supp. 2d at 444 (finding, after trial, doctor not a state actor because ACS, not she, decided to petition for removal and doctor provided only medical opinion). *Estiverne* is thus inapposite.

***12** Accordingly, the Amended Complaint does not plausibly allege any Medical Defendant to have been a state actor. The Court thus dismisses the § 1983 claims against these defendants.[12] The Court next turns to plaintiffs' federal claims against persons and entities which undisputedly were state actors.

12 Inexplicably, the Amended Complaint also names Dr. Shaykh as a defendant in all six federal claims, even though its only allegation is that he, like Dr. Lupica, failed to diagnose A.K.'s femur fracture. *See* Am. Compl. ¶¶ 36, 287–301. There is no allegation that Dr. Shaykh ever spoke with anyone at ACS, had any contact with any government official, or took any action conceivably supporting § 1983 liability of any kind. The § 1983 claims against him are also therefore dismissed. The Amended Complaint's grapeshot approach—casting wide claims of illegality well beyond what the facts could remotely bear, as exemplified by the senseless inclusion of Dr. Shaykh as a § 1983 defendant—is regrettable. The Court expects more responsible lawyering as the case moves forward.

### 2. Malicious Prosecution

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf v. Long Island R.R.*, 761 F.3d 192, 198 (2d Cir. 2014) (quoting *Manganiello*, 612 F.3d at 161). Under § 1983, state "tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018). A plaintiff must also show "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment." *Id.* at 24

(quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

*a. Civil vs. Criminal Proceedings*

Most commonly, a claim for malicious prosecution arises from a criminal proceeding. The HSS Defendants thus argue that plaintiffs do not state a claim, because the family court proceeding was civil and plaintiffs have not pled "special damages." *See* HSS Mem. at 19. The Second Circuit has stated, however, that "our case law does not forbid a § 1983 malicious prosecution claim premised on a civil or administrative proceeding." *Washington*, 373 F.3d at 317. To bring a malicious prosecution claim arising from a civil action in general, a plaintiff must make "a showing of some interference with plaintiff's person or property ... by the use of such provisional remedies as arrest, attachment, replevin or injunction, ... or other burden imposed on plaintiff beyond the ordinary burden of defending a law suit." *McCaul v. Ardsley Union Free Sch. Dist.*, No. 11 Civ. 5586 (VB), 2012 WL 1898897, at *3 (S.D.N.Y. May 3, 2012), *aff'd*, 514 F. App'x 1, 4 (2d Cir. 2013) (summary order). Relevant here, the Circuit has noted "that the law in our Circuit is unsettled as to whether child removal proceedings can give rise to a federal claim for malicious prosecution of a parent." *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015) (summary order); *see also McCaul*, 514 F. App'x at 4–5 (discussing without resolving whether neglect proceeding could give rise to a malicious prosecution claim).

***13** Absent definitive Circuit guidance, the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim. *See, e.g.*, *Cornejo v. Bell*, No. 04 Civ. 341 (BMC), 2008 WL 5743934, at *12 (E.D.N.Y. May 19, 2008) ("[T]he removal of Cornejo's son is sufficient to meet that threshold."), *aff'd*, 592 F.3d 121 (2d Cir. 2010); *Providencia V. v. Schutlze*, No. 02 Civ. 9616 (LTS), 2007 WL 1582996, at *5 n.3 (S.D.N.Y. May 31, 2007) ("[T]he removal of Plaintiffs' son is sufficient to meet the threshold for applicability of this doctrine.") (collecting cases); *Yuan v. Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) ("[D]epriving Ms. Chi of the custody of her children for several months reaches this threshold."). *But see Walker v. City of New York*, 63 F. Supp. 3d 301, 317 n.12 (E.D.N.Y. 2014) ("It is likely that no plaintiff in this action can even state a claim for a malicious prosecution as the 'Adult Plaintiffs have not been seized, and Infant Plaintiffs have not been prosecuted.' " (quoting *Estiverne II*, 833 F. Supp. 2d at 380)). Here, A.K. and M.K. were removed from their parents' custody for more than a month, and the parents' access to their children was highly restricted for eight more months. That impingement is substantial enough to support a claim for malicious prosecution. Accordingly, the Court will not dismiss plaintiffs' § 1983 malicious prosecution claim solely because it arises from a civil proceeding.

*b. Initiation of Proceedings*

The Municipal Defendants do not dispute that they initiated proceedings against the parents. They briefly contend that the Amended Complaint erroneously attributes prosecutorial decision-making to Brenda Lawson. City Mem. at 12; City Reply at 9–10. But "individuals other than the agent who actually prosecutes the action can be held liable for malicious prosecution." *Emanuel I*, 2013 WL 5477505, at *7. Such liability can exist when the non-prosecuting individual "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (citation omitted). Here, the Amended Complaint plausibly alleges that Lawson recommended removal and caused the removal action to be commenced. *See, e.g.*, Am. Compl. ¶¶ 101–02, 110–14. Thus, plaintiffs have plausibly pled that she, and potentially other ACS caseworkers, were among those who initiated the proceedings.

*c. Favorable Termination*

Under § 1983, unlike New York law, "[p]roceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *Lanning*, 908 F.3d at 26 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)). "A termination is not favorable to the accused ... if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citation omitted).

The Municipal Defendants argue that, because ACS withdrew its petition and the parents consented to that withdrawal, the action was "abandoned pursuant to a compromise," leaving the guilt or innocence undetermined. City Mem. at 9 (citing *Rothstein*, 373 F.3d at 286). In their reply, they also argue

that ACS's withdrawal was in the "interest of justice," and so cannot qualify as favorable termination. *See Lanning*, 908 F.3d at 28–29 ("[W]here a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered[,] ... it cannot provide the favorable termination required as the basis for [that] claim." (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367–68 (2d Cir. 1992)); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Plaintiffs respond that, as pled, there was no compromise, and that ACS withdrew its petition because it lacked evidence of liability. The Court holds with plaintiffs.

First, neither the Amended Complaint nor the cognizable records of the family court proceedings reflect any compromise on plaintiffs' part. Rather, as pled, after plaintiffs produced evidence of their innocence of child abuse, *see* Am. Compl. ¶¶ 136–41, and moved for summary judgment, *id.* ¶ 172, and after ACS's own expert concluded that the facts on which the removal petition had been based could not be confirmed, *id.* ¶¶ 174–75, ACS moved to withdraw its case against the parents, with prejudice, *id.* ¶ 176; *see* Del Col Decl., Ex. 2 ("Withdrawal Tr.") at 2–3. In that context, plaintiffs' consent to ACS's dismissal does not bespeak a lack of favorable termination. As pled, plaintiffs could not have received a more favorable resolution. In fact, at the hearing on ACS's petition to withdraw its removal action, its lawyer embraced ACS's experts' conclusion as meriting dismissal. Withdrawal Tr. at 3 ("When we filed this petition we do believe that we had a basis to file, but based on the medical report that was provided to counsel and Your Honor's Court Attorney yesterday, we were able to speak with our independent expert. And after she reviewed all documents we, at this time, do believe that it would be—[t]hat we are asking to withdraw the petition."). These statements show, "in so many words," that plaintiffs were entitled to a dismissal on the merits—not that the withdrawal reflected a compromise or settlement. *McKenzie v. City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *14 (S.D.N.Y. July 22, 2019); *see Mortimer v. Wilson*, No. 15 Civ. 7186 (KPF), 2020 WL 3791892, at *11 (S.D.N.Y. July 7, 2020) (denying summary judgment to defense where "the dismissal was because the prosecution determined that it would not be able to prove that C.S. was guilty of the charged crimes").

***14** Second, the Municipal Defendants rely on *Lanning* to suggest that a "dismissal in the interest of justice ... preclude[s] a finding that the neglect proceeding was 'terminated in Plaintiffs' favor.' " City Reply at 3. But that case is distinct. It involved a procedural dismissal "in the interest of justice" under N.Y. Crim. Proc. Law § 170.40, which does not apply here. *See Lanning*, 908 F.3d at 23. And although the Municipal Defendants depict plaintiffs as claiming the family court action was dismissed in the "interest of justice," City Reply at 2–3, plaintiffs have not so stated, here or in the cognizable family court records. *See* Withdrawal Tr.; Dkt. 100-21 ("Order of Dismissal"). More fundamentally, *Lanning* declined to find a favorable termination not only because the dismissal arose under section 170.40, but also because, as to some claims, jurisdiction lacked, and as to others, the state court stated that the dismissals were " 'neither an acquittal of the charges nor any determination of the merits,' but rather 'le[ft] a question of guilt or innocence unanswered.' " 908 F.3d at 28. Here, in contrast, the circumstances of ACS's withdrawal reflect plaintiffs' innocence.

*d. Probable Cause*

The Municipal Defendants next argue that the existence of probable cause to commence the removal proceeding, and the family court's initial grant of a temporary order of protection removing A.K. and M.K. from the parents' custody, defeats plaintiffs' malicious-prosecution claim. Plaintiffs counter that both decisions—ACS's to begin removal proceedings, and the family court's to grant an order of protection—rested on falsehoods, without which there was not probable cause. Although the question is close, plaintiffs are correct that, on the standards governing a motion to dismiss, the facts do not establish probable cause.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.' " *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (citation omitted). "It is a more exacting standard than the standard required to support an arrest." *Emanuel v. Griffin* ("*Emanuel II*"), No. 13 Civ. 1806 (JMF), 2015 WL 1379007, at *8 (S.D.N.Y. Mar. 25, 2015). However, "[b]ecause obviously less in the way of grounds for belief will be required to justify a reasonable [person] in bringing a civil rather than a criminal suit, when the underlying action is civil in nature[,] the want of probable cause must be patent." *Emanuel I*, 2013 WL5477505, at *8 (quoting *Fink*

*v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 790 (3d Dep't 2005)).

"[T]he issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the burden of pleading facts sufficient to overcome it." *Emanuel II*, 2015 WL 1379007, at *9 (quoting *Butler v. Ratner*, 210 A.D.2d 691, 693–94 (3d Dep't 1994)); *see also* *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (presumption of probable cause created in criminal case by grand jury indictment). That presumption "is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts ... [,] that they have misrepresented or falsified evidence[,] ... or otherwise acted in bad faith.' " *Boyd*, 336 F.3d at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82–83 (1983)). But to succeed on a malicious prosecution claim after an indictment or other judicial imprimatur, a plaintiff "must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (quoting *Colon*, 60 N.Y.2d at 83). In the context of child-removal proceedings specifically, one court has held that the presumption of probable cause arising from a removal order may be rebutted where the petition for removal "was either intentionally or recklessly false, as the result of defendants' conduct." *Estiverne II*, 833 F. Supp. 2d at 379. In assessing probable cause, courts "must consider those facts available to the officer at the time of" her actions. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

***15** The facts pled and otherwise cognizable here give the Municipal Defendants a solid basis to argue that probable cause existed. As of August 30, 2018, when ACS commenced removal proceedings in family court, it had received two reports of potential child abuse about A.K. As reflected in the Petition, on August 13, 2018, Dr. Ranade had reported that, along with a broken femur, A.K. "presented with injuries to her collarbone," which contradicted the parents' account of how A.K.'s injuries had occurred. Am. Compl. ¶ 105. In addition, around August 30, 2018, Dr. Lupica reported to ACS that, when she had seen A.K. on August 8, 2018, A.K. did not have the femur fracture with which she was ultimately diagnosed, and that, based on the Mt. Sinai and HSS x-rays, she did not believe the injuries occurred in the manner or at the time the parents had claimed. According to the Amended Complaint, Glass and Dr. Fabricant had also contacted ACS caseworkers with similar concerns. *Id.* ¶ 79. After receiving these reports, on August 30, 2018, ACS commenced removal proceedings. *See* Removal Order at 1–2. That ACS's petition was granted by a family court judge after a hearing also gives rise to a rebuttable presumption of probable cause. *See, e.g.*, *Boyd*, 336 F.3d at 76; *Emanuel II*, 2015 WL 1379007, at *9.

Plaintiffs, however, have pled sufficient facts, at this preliminary stage of the litigation, to rebut that presumption. To do so, plaintiffs must show that the relevant government officials have not made a complete statement of facts, have misrepresented or falsified evidence, or have otherwise acted in bad faith. *Boyd*, 336 F.3d at 76. A showing that defendants' submissions to the family court were "intentionally or recklessly false, as the result of defendants' conduct," can meet this standard. *Estiverne II*, 833 F. Supp. 2d at 379.

Here, although the contrary outcome is entirely possible, plaintiffs have plausibly pled that the Municipal Defendants, in seeking the infants' removal, included materially false statements and were reckless in presenting information to the family court. As plaintiffs emphasize, before August 30, 2018, although ACS did not reveal this to the court, *no* doctor had diagnosed A.K. with a clavicle fracture. Dr. Ranade had affirmatively disavowed a conclusive diagnosis of such a fracture, and Dr. Grimm appears to have concluded that A.K. did not even have a clavicle *injury*. *See* Am. Compl. ¶¶ 105 (Dr. Ranade told ACS that x-rays from August 13, 2018 were "inconclusive."), ¶¶ 108–09 (Dr. Grimm stated on August 14, 2018, that "[a] clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously," and informed ACS's Lawson that she reviewed the x-rays "and saw that both clavicles looked the same."). ACS's notes from August 14, 2018 confirm that a positive diagnosis had not been made. *See id.* ¶ 105. Yet, when ACS filed its removal petition on August 30, 2018, it affirmatively claimed that the August 13, 2018 x-rays had been "inclusive" of clavicle injuries. *Id.*; *see also* Petition at 7. Conceivably, that awkward locution as to this key point could stem from a mere error in typing "inconclusive," but the Court cannot assume this on a motion to dismiss. In any event, plaintiffs plead that, at the hearing on the petition, ACS doubled down on this false claim and represented that A.K. "does have a collarbone fracture," that x-rays had "confirmed the collarbone fracture," and that "[m]ost medical doctor staff were able to take x-rays and were able to see that there was also a collarbone fracture." Am. Compl. ¶ 106. Those statements, as pled, were recklessly false, and had no basis in the records or reports before ACS at the time.

These falsehoods, as pled, were consequential. The Removal Order expressly relied on that aspect of the Petition, citing the presence of *multiple* unexplained injuries as the family court's basis for granting the application. *See* Removal Order at 1. And ACS's own expert, reviewing the same radiological evidence nine months later, ultimately concluded that "no clavicle fracture was identified," proximately leading ACS to withdraw its petition, with prejudice. *Id.* ¶¶ 175–76. To be sure, discovery may well reveal that these were errors made in good faith, or that evidence not now cognizable or apparent buttressed ACS's claim, at the time, of a clavicle fracture.[13] But on a motion to dismiss, the Court must draw all inferences in plaintiffs' favor. *See Koch*, 699 F.3d at 145. Given that standard, the Court cannot find as a matter of law that the Municipal Defendants' decision to initiate removal proceedings, based in significant part on evidence of a clavicle fracture impeached by the medical facts before them, was supported by probable cause and in good faith.[14]

13 It is possible, too, that, after discovery, the Municipal Defendants will prove entitled to qualified immunity. *See, e.g.*, *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (affirming grant of qualified immunity to ACS caseworkers at summary judgment); *Walker*, 621 F. App'x at 76. They did not, however, move to dismiss on this ground. And bad faith, if established, can offset facts that might otherwise warrant a finding of qualified immunity. *See, e.g.*, *Carossia v. City of New York*, 39 A.D.3d 429, 430 (1st Dep't 2007). The Court accordingly does not consider this question at the pleading stage.

14 Other challenges plaintiffs make to probable cause fare less well. Most significant, they fault the Municipal Defendants for bringing the removal action in the face of Dr. Grimm's assessment that there had not been child abuse. But Dr. Grimm's assessment pre-dated reports of abuse to ACS, including by Dr. Lupica and others, suggesting the parents concealed the true nature and timing of A.K.'s injury. Am. Compl. ¶¶ 64, 79–81, 105. These later reports gave ACS sound reason to reassess its (and Dr. Grimm's) conclusion. *See Id.* ¶¶ 61–67, 77 (noting that, before such reports, ACS had concluded that "there was no reason to remove [A.K.] ... as the [Parents'] story was consistent with injuries as reported by Mt. Sinai"). And contrary to the parents' claim, ACS's decision not to cite Dr. Grimm's opinion before the family court does not mean that it "suppressed" exculpatory evidence. Plaintiffs do not cite authority that, at any stage of removal proceedings, ACS had a duty to set out for the court all contrary opinions. On the contrary, the Second Circuit has specifically rejected any duty of ACS caseworkers to present exculpatory evidence in family-court proceedings. *See Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (no constitutional violation where "the heart of the complaint ... is that [ACS] failed to adequately apprise the Family Court of exculpatory information"). Plaintiffs also overreach in claiming that ACS was wrong to rely on Dr. Lupica's assessment, because it, as alleged, was untrue. Unless the Municipal Defendants had a basis to appreciate that Dr. Lupica's account was false, they could consider it in determining whether probable cause supported commencing removal proceedings. *See Simpson v. Town of Warick Police Dep't*, 159 F. Supp. 3d 419, 436–37 (S.D.N.Y. 2016) (collecting cases); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 527 (S.D.N.Y. 2015) ("Even assuming the version of facts set forth by Plaintiff, that Rose felt coerced and gave false information, this alone does not defeat probable cause to arrest.").

*e. Actual Malice*

***16** Last, plaintiffs must allege that the defendants acted with "actual malice." *Stampf*, 761 F.3d at 198. That burden is easily satisfied because, at the pleadings stage, "lack of probable cause generally raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997); *see Emanuel I*, 2013 WL 5477505, at *7. Accordingly, plaintiffs have pled each element of their claim for malicious prosecution.[15]

15 The Municipal Defendants have not moved specifically as to any individual ACS employees, instead arguing that plaintiffs' claims fail across the board. Thus, although it appears that plaintiffs have pled this claim as to only some subset of those defendants, the Court will not *sua sponte* dismiss this claim as to the others.

**3. Abuse of Process**

Plaintiffs also allege abuse of process. "In order to state a [§ 1983] claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action ... [and] that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (quoting *Savino*, 331 F.3d at 77). Thus, plaintiffs must show that defendants: "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (citation omitted).

As with malicious prosecution, the existence of probable cause is a complete defense to an abuse-of-process claim. *See Irish v. City of New York*, No. 09 Civ. 5568 (RMB), 2010 WL 5065896, at *6 (S.D.N.Y. Dec. 6, 2010) ("[T]he presence of probable cause negates a claim for abuse of process." (quoting *Sforza v. City of New York*, No. 07 Civ. 6122 (DLC), 2009 WL 857496, at *17 (S.D.N.Y. Mar. 31, 2009))). And the mere presence of an improper motive in commencing or continuing legal proceedings is insufficient to state a claim for abuse of process; instead, plaintiffs must allege that defendants used legal process to achieve a "collateral objective" outside the aims of that process. *See Savino*, 331 F.3d at 77. Thus, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing [a legal action]. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*; *see Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010) (citing "extortion, blackmail, retribution, or similar extraneous harmful goal" as examples of improper collateral purposes).

In moving to dismiss, the Municipal Defendants argue that they had probable cause to commence the removal proceedings, that abuse-of-process claims cannot arise from civil proceedings, and that plaintiffs have not alleged any collateral objective on their part outside the legitimate ends of the process. The first two arguments largely overlap with arguments the Court has found unavailing in the context of plaintiffs' malicious prosecution claims. But the last, the lack of a collateral objective, is unique to the abuse of process claim. And plaintiffs have not responded to that argument. [16] By failing to do so, plaintiffs have abandoned that claim. *Romeo & Juliette*, 2014 WL 4723299, at *7.

16 The only references to abuse of process in plaintiffs' opposition are in two footnotes, in which plaintiffs state that this claim "implicate[s] rights that [are] clearly established under the Constitution" and that it is one of their state-law claims. Pl. Opp'n at 16 n.6, 43 n.15.

***17** In any event, defendants are right that the Amended Complaint pleads insufficient facts as to a collateral objective on their part. The Amended Complaint alleges that all defendants commenced the family court proceeding "to insulate [defendants] from various levels of civil liability," to "deprive Plaintiffs of their fundamental constitutional protections," and to "financially harm them by draining a substantial part of their personal resources, in order to leverage and otherwise extract a plea/admission and shield themselves from liability." Am. Compl. ¶¶ 229–30. The first of the theories does not sensibly apply to the Municipal Defendants, who, far from deflecting civil liability, exposed themselves to such liability (viz, this lawsuit) by commencing proceedings. And none reach "beyond and in addition to" the removal proceedings themselves. *See, e.g.*, *Moritz v. Town of Warwick*, No. 15 Civ. 5424 (NSR), 2016 WL 3248494, at*5 (S.D.N.Y. June 9, 2016) ("Deprivation of liberty, embarrassment, inconvenience, and legal expenses are direct, rather than collateral, consequences of arrest that are insufficient to support a malicious abuse of process claim."). At best, plaintiffs insinuate improper motives on the part of these defendants (*e.g.*, retaliation for the parents' litigiousness). But "neither retaliation nor a malicious motive ... is a sufficient collateral objective" to state a claim for abuse of process. *Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013) (summary order). Accordingly, the Court dismisses plaintiffs' claim for abuse of process.

### 4. Conspiracy Under §§ 1983 and § 1985

#### a. *Section 1983*

To succeed on a § 1983 claim for conspiracy, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or

tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation omitted). "Allegations of 'joint conduct' are not sufficient." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 520 (S.D.N.Y. 2015). Further, a "plaintiff alleging a § 1983 conspiracy must allege a predicate violation of constitutional rights." *Norales v. Acevedo*, No. 20 Civ. 2044 (DLC), 2021 WL 739111, at *10 (S.D.N.Y. Feb. 24, 2021). And "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).

As discussed above, plaintiffs have failed to plausibly allege a conspiracy between any Medical Defendant and ACS. *See supra* pp. 23–24. Nor, beyond conclusory allegations, do plaintiffs plead a conspiracy within ACS, or with any other state actors. The only alleged state participant in the supposed conspiracy was Lawson, who could not have conspired with herself. And, as stated, even had Lawson agreed with other ACS employees, such could not support a § 1983 conspiracy. *See Herrmann*, 576 F.2d at 459. Accordingly, the Court dismisses plaintiffs' claims of a § 1983 conspiracy against all defendants.

*b. Section 1985*

To prevail on a conspiracy claim under § 1985, Plaintiffs must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). It also requires a showing that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* (citation omitted).

For the reasons above, the Court agrees with the Municipal Defendants that plaintiffs have failed to plausibly allege a conspiracy at all. That alone requires dismissal of this claim. *See, e.g.*, *id.* at 792. Further, as the Municipal Defendants note, plaintiffs have also not alleged that any of the defendants' actions were motivated by a discriminatory animus. Rather, they allege that defendants acted either out of a desire for self-preservation or retaliation. Again, plaintiffs offer no counter to these points. Accordingly, the Court dismisses plaintiffs' § 1985 claim, both because plaintiffs have abandoned it and because it is deficient on the merits. *See Romeo & Juliette*, 2014 WL 4723299, at *7.

**5. Intentional Deprivation of Constitutional Rights**

***18** Plaintiffs broadly assert a separate cause of action for "intentional violation of federally protected constitutional rights" against all defendants, accusing all of attempting to interfere with their "rights to effectively and without unnecessary governmental intrusion, parent and otherwise associate with their children." Am. Compl. ¶ 258. Although the Medical Defendants moved to dismiss this claim, the Municipal Defendants appear to have overlooked it. *See generally* City Mem. (seeking dismissal of entire Amended Complaint but failing to address Count Four); City Reply. Without arguments directed to this claim, the Court will not dismiss it *sua sponte*, and, in any event, this claim appears to track (seemingly completely) plaintiffs' claim —which the Court has allowed to proceed against the Municipal Defendants—of malicious prosecution. The Court accordingly does not yet have occasion or cause to dismiss this claim.

**6. False Imprisonment**

Plaintiffs also assert false imprisonment under § 1983. To prevail on that claim, they must plead that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016).

In the Amended Complaint, plaintiffs allege that the "restrictions upon [their] collective liberty to associate with one another constitutes '*confinement*' as a matter of New York

State and Constitutional law." Am. Compl. ¶ 283. They do not cite any authority in support of this broad conception of "confinement," and do not otherwise allege any actual confinement, let alone that A.K. or any other plaintiff was aware of it. *See id.* ¶¶ 281–86. And after defendants each moved to dismiss because of these failures, plaintiffs again did not respond. [17] This claim is therefore also abandoned, and the Court dismisses it. *See Romeo & Juliette*, 2014 WL 4723299, at *7.

17 Plaintiffs mention this claim twice in their opposition, but only to state that it "implicate[s] rights that [are] clearly established under the Constitution," and that it is among their state-law claims. *See* Pl. Opp'n at 16 n.6, 43 n.15.

### 7. *Monell* Liability

Finally, plaintiffs pursue liability on all the above counts against the City of New York under *Monell*, 436 U.S. 658. Municipal liability in a § 1983 action may not rest on *respondeat superior* or vicarious liability. *Id.* at 691. Instead, to hold a municipality liable under § 1983 for unconstitutional actions of its employees, a plaintiff must prove that there was a municipal policy or custom that directly subjected her to a constitutional violation. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." (citation omitted)).

A plaintiff can establish the existence of a policy or custom by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted) (collecting cases).

Absent an underlying constitutional violation, the Court need not address municipal liability. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Accordingly, at the threshold, *Monell* liability cannot obtain for plaintiffs' claims for abuse of process, conspiracy under §§ 1983 and 1985, or false imprisonment. Further, plaintiffs largely base their *Monell* claim on the City's alleged "widespread policy and custom of having doctors and social workers act under the color of law ... and bring the coercive and overwhelming forces of governmental authority to bear on individuals and families without accountability." Am. Compl. ¶ 262. However, the Court has already held that, here, the medical doctors of whom plaintiffs complain are not state actors, and so cannot have been party to any constitutional violations. Plaintiffs' notion that a City policy relating to these professionals—whose reporting is, in fact, required by state law, *see* N.Y. Soc. Serv. Law § 413—could support liability on the part of the City thus fails at the threshold. *See Segal*, 459 F.3d at 219. In any event, plaintiffs do not plausibly allege any such policy. Instead, they merely recite the facts of their own experience with ACS, and conclusorily declare it representative of a broader policy or custom. *See* Am. Compl. ¶¶ 266–71; *e.g.*, *Aragon v. New York*, No. 14 Civ. 9797 (ER), 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing *Monell* claim where plaintiffs "allege[d] the existence of a practice adopted by the City solely based on Plaintiff's alleged experience").

***19** As to plaintiffs' surviving § 1983 claims, the Amended Complaint alleges only the third basis for *Monell* liability: a consistent and widespread practice, custom, or usage of the City. [18] Where this theory is adequately pled, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

18 Plaintiffs' opposition brief also suggests the City may be liable based on a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference." Pl. Opp'n at 41 (quoting *Brandon*, 705 F. Supp. 2d at 276–77). But the Amended Complaint does not allege facts supporting this theory of municipal liability. *See* Am. Compl. ¶¶ 261–80; *Cruz v. City of New York*, No. 15 Civ. 2265 (PAE), 2016 WL 234853, at *6 (S.D.N.Y. Jan. 19, 2016) (holding that plaintiffs "cannot add [new theories of *Monell* liability] in an opposition brief" and collecting cases). Similarly, plaintiffs cite cases discussing instances in which "a municipality may be liable for a single incident under proper circumstances," Pl. Opp'n at 40–41 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)), but do not explain why such circumstances are present here, let alone identify allegations that support that theory. These theories, too, cannot survive.

Here, plaintiffs allege that it is a "custom and practice" of the City to

> initiate[ ] a removal proceeding on less than probable cause knowing and relying on the fact that for an overwhelming percentage of parents the financial and emotional wherewithal to stand their ground to the bitter end is not possible and that they accept a negotiated plea which, in turn, insulates ACS from liability.

Am. Compl. ¶ 278. Plaintiffs provide one factual datum in support: Iwenofu's statement that, in her 16 years working for ACS, she had never seen a case discharged without "someone taking the blame." *Id.* ¶¶ 129, 279. But that stray observation does not speak to any broader policy of maliciously prosecuting individuals. It says nothing about whether the actions she described were commenced with or without probable cause or malice. And if all those actions, in fact, concluded in a compromise, as Iwenofu's statement implies, none would have terminated in favor of the accused. *See, e.g.*, *Rothstein*, 373 F.3d at 286.

Otherwise, plaintiffs do not cite any facts in support of the existence of this alleged policy. Nor do they allege any prior legal actions involving the same or similar issues, or even any specific family-court proceedings, even if they did not lead to a § 1983 action, that fit the pattern alleged here. *See, e.g.*, *Cruz*, 2016 WL 234853, at *5 (allegations of eight previously settled civil rights actions "fall far short of establishing a custom sufficient to support a *Monell* claim"); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) (dismissing *Monell* claims where plaintiff "does not cite *any* civil cases that implicated the unlawful practice she challenges"); *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (same where plaintiff cited 13 prior cases involving similar allegations, but none had "result[ed] in an adjudication of liability"). Devoid of any concrete factual allegations from which the existence of an unconstitutional municipal policy, custom, or usage that caused plaintiffs' injuries could be inferred, the Amended Complaint fails to state a claim for municipal liability under § 1983. The Court thus dismisses plaintiffs' *Monell* claim against the City. [19]

19 Plaintiffs also name Hansell, ACS's Commissioner, as a defendant, but only in his official capacity and insofar as he is "the government official whose edicts and acts represent the official policy, practices, customs and regulations of ACS." *See* Am. Compl. ¶ 12. They do not allege his personal involvement in any unconstitutional acts. His dismissal may well be warranted under the same principles discussed above. *See, e.g.*, *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017). Defendants, however, have not moved to dismiss him from this action based on his lack of personal involvement, and the Court will not do so *sua sponte*.

***20** Accordingly, the Court will dismiss all federal claims against the Medical Defendants, because plaintiffs have not plausibly alleged that they were state actors or conspired with state actors in any relevant way. The Court also dismisses plaintiffs' claims against the Municipal Defendants under § 1983 for abuse of process, false imprisonment, and conspiracy, and under § 1985 for conspiracy. However, the Court denies the Municipal Defendants' motion to dismiss plaintiffs' § 1983 claim for malicious prosecution and a violation of their substantive due process rights. As to the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

City of New York, however, the Court dismisses those latter claims, as well.

### C. State Claims

#### 1. Supplemental Jurisdiction

Federal district courts have discretion to exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Federal and state law claims are part of the same case or controversy if they share "a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997). Claims share such a nucleus if "the facts underlying the federal and state claims substantially overlap or the federal claim necessarily brings the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (cleaned up). Here, plaintiffs bring many state-law claims, some of which overlap nearly entirely with their federal claims, and others of which arise from a common nucleus of operative facts. Accordingly, with one exception discussed below, the Court exercises its supplemental jurisdiction over plaintiffs' state-law claims.

#### 2. Malicious Prosecution

As to the Municipal Defendants, the elements of malicious prosecution under New York law are largely the same as under § 1983, save for the requirement of a constitutional violation. *See Stampf*, 761 F.3d at 198; *see also Lanning*, 908 F.3d at 24–25 (noting that New York law requires a lesser "favorable termination" showing than § 1983 does, as New York law requires only that the termination of the action is "not inconsistent with the Plaintiff's innocence" (citation omitted)). The Court thus denies the Municipal Defendants' motion to dismiss plaintiffs' state-law claim for malicious prosecution for the reasons given above.

Plaintiffs have also named the City of New York in this count. Although § 1983 claims may not be asserted based on a theory of *respondeat superior*, New York law does provide for vicarious liability in some circumstances. *See, e.g.*, *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 539–40 (S.D.N.Y. 2013); *Swierczynski v. O'Neill*, 41 A.D.3d 1145, 1146 (4th Dep't 2007). The Municipal Defendants have not addressed this point. The Court accordingly leaves standing the state-law claim for malicious prosecution against the City.

As to the Medical Defendants, the question is more complex. To state a claim for malicious prosecution under New York law, a plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf*, 761 F.3d at 198. As under § 1983, such claims, under New York law, can arise out of civil proceedings. *See, e.g.*, *Perryman v. Village of Saranac Lake*, 41 A.D.3d 1080, 1081 (3d Dep't 2007). Unlike under § 1983, however, New York law authorizes claims for malicious prosecution against private individuals, even if not state actors, where they "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman*, 215 F.3d at 217 (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696 (2d Dep't 1992)).

***21** The Medical Defendants argue, *inter alia*, that plaintiffs' state-law claim for malicious prosecution against them fails because ACS, not they, initiated the removal proceeding. As to most such defendants, the Court agrees. Under New York law, "[t]he mere reporting of a crime to police and giving testimony are insufficient" to establish liability for malicious prosecution. *Estiverne v. Esernio-Jenssen* ("*Estiverne I*"), 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008) (quoting *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999)). That applies even if a defendant gave "false information to the authorities." *Id.* (quoting *Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2d Dep't 2006)). A private individual who falsely reports to the authorities can be held responsible for initiating a prosecution only upon a "showing that, at the time the information was provided, the defendant knew it to be false." *Id.*

Largely for the reasons given above in explaining why such private reporters are not state actors, the Court holds that plaintiffs have not plausibly alleged that Dr. Ranade, Dr. Fabricant, Dr. Platt, Dr. Shaykh, or Glass played an active role in the removal proceedings, either by encouraging or advising ACS to act. Rather, setting aside the Amended Complaint's speculative and conclusory allegations, plaintiffs allege only that these defendants reported suspected child abuse to ACS, as they were required to do by N.Y. Soc. Serv. Law § 413.

Dr. Ranade had examined A.K. and observed both a femur fracture and potentially injured clavicle, and reported such observations to ACS—tempering her assessment by noting that she could not confirm a clavicle fracture. *See* Am. Compl. ¶ 105. Dr. Fabricant and Glass may have repeated Dr. Lupica's story to ACS but, even assuming that story was false, plaintiffs have not plausibly alleged that these defendants knew it to be so at the time. And Dr. Platt and Dr. Shaykh are not alleged to have ever contacted ACS. Accordingly, plaintiffs have not plausibly alleged that any of these defendants initiated the removal proceedings. The Court grants their motions to dismiss the state-law claims for malicious prosecution against them. [20]

20 Although the above reasoning independently requires dismissal, these defendants are also protected by N.Y. Soc. Serv. Law § 419, which confers immunity against state-law liability for the mandatory reporting of suspected child abuse or neglect, absent "willful misconduct or gross negligence." *Isabelle V. v. City of New York*, 150 A.D.2d 312, 313 (1st Dep't 1989). Thus, "[m]andated reporters need not await conclusive evidence of abuse or maltreatment but must act on their reasonable suspicions[,] and the law allows them a degree of latitude to err on the side of protecting children who may be suffering from abuse." *Id.* Because plaintiffs have not plausibly alleged willful misconduct or gross negligence by these doctors, and have pled that A.K. presented with severe injuries, these defendants, even taking plaintiffs' non-conclusory allegations as true, acted reasonably in the situation, triggering immunity under section 419.

As to Dr. Lupica, however, the analysis differs. The Amended Complaint plausibly alleges that her reports, both to the other private individuals on the August 27–30, 2018 email chain and to an ACS caseworker, were *deliberately* false. *See supra* pp. 20–21. It alleges that, once confronted with her failure to diagnose A.K.'s broken femur, she declared that there was "no way" that A.K. had that injury at the time of her initial examination. *See* Am. Compl. ¶¶ 74–75. And it alleges that Dr. Lupica, apparently to enhance the credibility of her false statement, further falsely claimed to have examined—or at least been in the presence of—A.K. for four hours, rather than the five minutes that she actually spent with A.K. The Amended Complaint further alleges that Dr. Lupica, in an error that exposed her unfamiliarity with A.K., misidentified A.K. as male. *Id.* Such allegations are enough to push plaintiffs' claim of Dr. Lupica's deliberate lying from merely conceivable to plausible. *See Iqbal*, 556 U.S. at 678. [21]

21 In their reply, the Weill Cornell defendants argue that Dr. Lupica was correct in late-August 2018, and that A.K. did not, in fact, have the alleged femur fracture when she appeared at Weill Cornell on August 8, 2018. *See* Weill Cornell Reply at 8–9. That is of course possible. And the discovery that will now commence will, of necessity, give the surviving defendants a fulsome opportunity to test whether Dr. Lupica's or the parents' version of events on August 8–9, 2018, is true, and whether Dr. Lupica had a good-faith basis to make the claims that she did. But at this stage of the litigation, where the Court's review is limited to the pleadings, the Court must credit the well-pled allegations in the Amended Complaint.

***22** Accepting that allegation as true, plaintiffs have plausibly asserted a claim under New York law for malicious prosecution against Dr. Lupica. A private defendant can "initiate" a prosecution by giving false information to the authorities if "at the time the information was provided, the defendant knew it to be false." *Lupski*, 32 A.D.3d at 998; *see Emanuel I*, 2013 WL 5477505, at *7; *Estiverne I*, 581 F. Supp. 2d at 347–49. Here, the Amended Complaint so alleges as to Dr. Lupica. It alleges that, on the day that ACS commenced removal proceedings against plaintiffs, Dr. Lupica contacted ACS to falsely report child abuse, knowing her report was false. *See* Am. Compl. ¶¶ 75, 81. Those facts plausibly assign her an "active role" in the initiation of the removal proceedings. *Rohman*, 215 F.3d at 217. The Amended Complaint also pleads the other elements of this tort as to Dr. Lupica. The removal proceedings terminated in the parents' favor. *See supra* pp. 28–29. And assuming that the content of Dr. Lupica's report to ACS was false, plaintiffs have pled a lack of probable cause to so report. *See, e.g.*, *Emanuel I*, 2013 WL 5477505, at *7. Last, because the "lack of probable cause generally raises an inference of malice," *Ricciuti*, 124 F.3d at 131, plaintiffs have also plausibly alleged malice. [22]

22 Dr. Lupica argues that she is immune under N.Y. Soc. Serv. Law § 419. *See* Weill Cornell Mem. at 13–14. But section 419 does not apply to instances of "willful misconduct" or "gross negligence," as


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

is plausibly alleged here. *Isabelle V.*, 150 A.D.2d at 313.

Accordingly, the Court denies Dr. Lupica's motion to dismiss this claim. Because New York law, unlike § 1983, recognizes vicarious liability for employers in some circumstances, *see Velez*, 730 F.3d at 136–37, and the Weill Cornell Defendants have not offered any counter on this point, the Court also denies the motion to dismiss the claim against Weill Cornell. As to all other Medical Defendants, this claim is dismissed.

**3. Abuse of Process**

Plaintiffs' claim for abuse of process under New York law is governed by the same standards as their claim under § 1983. *See Savino*, 331 F.3d at 76. For the same reasons given above in connection with the § 1983 abuse-of-process claim —that plaintiffs have abandoned this claim and also failed to plausibly allege a collateral objective by any defendant— the Court dismisses this claim. As to the latter point, insofar as plaintiffs allege false reporting by Medical Defendants such as Dr. Lupica, "courts have dismissed abuse of process claims for [lack of an ulterior motive] where" individuals "allegedly filed false allegations of abuse and harassment to obtain a protective order" against an individual, where the "ulterior and illegitimate" purpose identified was to harass a family member. *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir. 2007) (summary order). Even there, "the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process." *Id.* (quoting *Butler v. Ratner*, 210 A.D.2d 691, 692 (3d Dep't 1994)). Plaintiffs thus have not plausibly alleged abuse of process against any defendants under state law.

**4. False Imprisonment**

Plaintiffs' claim for false imprisonment under state law similarly tracks their § 1983 claim for false imprisonment. *See* Am. Compl. ¶¶ 281–86. For the reasons above, the Amended Complaint does not state a claim for false imprisonment based on the removal of A.K. and M.K. from the parents' custody; and plaintiffs, in any event, have abandoned this claim. The Court dismisses the state-law claim for false imprisonment.

**5. Intentional Infliction of Emotional Distress**

"Under New York law, a claim for intentional infliction of emotional distress must satisfy an 'exceedingly high legal standard.' " *DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d Cir. 2017) (summary order) (quoting *Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 57 (2016)). First, the tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (citation omitted). Second, a party alleging IIED must plead conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko*, 27 N.Y.3d at 56 (citation omitted). The time to bring a claim for IIED, as with most other intentional torts, is one year from the alleged actions giving rise to the claim. *See, e.g.*, *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (citing N.Y. C.P.L.R. § 215).

***23** Here, plaintiffs argue that the Medical Defendants' false reporting, and ACS's malicious prosecution of the removal proceeding, constitutes IIED. The Medical Defendants all argue that plaintiffs' IIED claim is time-barred because plaintiffs filed this action more than one year after the last of their alleged actions or communications with ACS took place. They are correct. Plaintiffs filed this action on May 1, 2020. *See* Dkt. 1. A timely claim for IIED thus must arise from actions on or after May 1, 2019. But the last alleged action by any Medical Defendant was Dr. Ranade's October 4, 2018 unauthorized x-rays of A.K. Am. Compl. ¶ 125; *see also id.* ¶ 29 (describing September 10, 2018 report to ACS that parents brought A.K. to see Dr. Ranade unaccompanied). And the last alleged acts by Dr. Lupica, Dr. Fabricant, Dr. Platt, Dr. Shaykh, and Glass occurred earlier, in August 2018. *See, e.g.*, *id.* ¶¶ 72–83. New York courts have specifically held that, for IIED claims based on false reporting to ACS, such claims accrue on the date of the false report, even where the resulting removal of a child takes place later on. *See, e.g.*, *Williams v. Georgopoulos*, 184 A.D.3d 608, 609 (2d Dep't 2020) (collecting cases). Accordingly, no acts on which the IIED claim against the Medical Defendants is based took place within the one-year statute of limitations set by N.Y. C.P.L.R. § 215. That forecloses plaintiffs' IIED claim against the Medical Defendants. [23]

23 Plaintiffs argue, summarily in a footnote, that the Medical Defendants' conspiracy with ACS makes their claim timely. *See* Pl. Opp'n at 46 n.16. They do not cite authority for that notion. And, as held above, the Amended Complaint does not plausibly allege any such conspiracy.

As to the Municipal Defendants, their actions arguably continued into May 2019, when they ultimately withdrew the removal Petition. Perhaps for this reason, they do not move on the basis of the statute of limitations. But dismissal of this claim against the Municipal Defendants is required for an independent reason. As defendants rightly argue, a "cause of action alleging intentional infliction of emotional distress should [be] dismissed as duplicative of [a] cause[ ] of action alleging malicious prosecution." *Leonard v. Reinhardt*, 20 A.D.3d 510, 510 (2d Dep't 2005) (collecting cases). Because IIED "may be invoked only as a last resort," where alleged conduct "falls well within the ambit of other traditional tort liability," IIED claims generally are to be dismissed. *Salmon*, 802 F.3d at 256; *see id.* at 257 ("[B]ecause other tort remedies were available to Salmon, the district court correctly dismissed his intentional infliction claim."); *see also Shaheed v. City of New York*, 287 F. Supp. 3d 438, 455 (S.D.N.Y. 2018) (citing malicious prosecution as one such tort, and dismissing IIED claim because injuries were not "irremediable through traditional tort remedies"), *aff'd sub nom. Shaheed v. Kroski*, 833 F. App'x 868 (2d Cir. 2020); *Leonard*, 20 A.D.3d at 510 (same). Here, as the Court has held, ACS's decision to pursue removal proceedings, to the extent it may be found outrageous or intolerable, is redressable within the framework of the familiar tort of malicious prosecution. Indeed, the facts that the Amended Complaint relies on in claiming IIED almost entirely repeat those offered in support of their malicious prosecution claim. *See* Pl. Opp'n at 46 ("ACS, therefore, acting in concert with the members of the Weil Cornell/Ranade/HSS Conspiracy both ignored significant exculpatory evidence and manufactured a false or reckless diagnosis." (footnote omitted)). *Compare* Am. Compl. ¶¶ 191–226 (malicious prosecution), *with id.* ¶¶ 322–30 (IIED). Accordingly, the Court dismisses plaintiffs' IIED claim against the Municipal Defendants, as duplicative of their malicious prosecution claim against those defendants.

### 6. Loss of Consortium and Companionship

All defendants have moved to dismiss plaintiffs' claims for loss of consortium and loss of companionship, on several grounds. Plaintiffs have not responded. This claim is abandoned, and the Court dismisses it. *See Romeo & Juliette*, 2014 WL 4723299, at *7.

### 7. Medical Malpractice

Plaintiffs bring two claims for medical malpractice: (1) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for allegedly failing to diagnose A.K.'s broken femur on August 8, 2018; and (2) against Dr. Ranade, for allegedly taking unauthorized x-rays of A.K., without informed consent, on October 4, 2018. *See* Am. Compl. ¶¶ 287–315. Those defendants each move to dismiss those claims against them.

***24** The Court denies the Weill Cornell Defendants' motion. They first argue that, because A.K. promptly received proper treatment for her fracture at Mt. Sinai, "any claim for purported malpractice is limited to treatment over the course of less than 24 hours." Weill Cornell Mem. at 22. Although that fact bears on the damages available to plaintiffs, it does not defeat the claim that defendants "deviat[ed] from accepted medical standards" in examining A.K. at the outset of her care. *E.g.*, *Gold v. Hershey*, 90 A.D.2d 704, 705 (1st Dep't 1982). Second, they argue that the Court should exercise its discretion to decline supplemental jurisdiction over this claim. But Weill Cornell's August 8, 2018 examination of A.K. is interwoven with other issues in this case—including whether Dr. Lupica truthfully reported her assessment that night. And other claims implicating these events, against both Dr. Lupica and others, are proceeding to discovery. Absent "exceptional circumstances" or "other compelling reasons for declining jurisdiction," the Court will not decline supplemental jurisdiction over this claim. 28 U.S.C. § 1367(c)(4).

As to the claim against Dr. Ranade, however, the Court declines to exercise such jurisdiction. *See* Mt. Sinai Mem. at 19. The Court has dismissed all other claims against Dr. Ranade. And Dr. Ranade's October 4, 2018 x-rays, which she took months after the removal proceedings commenced and never allegedly relayed to ACS or anyone else, are unrelated to any of plaintiffs' surviving claims against any remaining defendants. The Court dismisses this claim, without prejudice to plaintiffs' right to pursue it in state court.

### 8. Defamation

Last, plaintiffs bring a claim for defamation, solely against Dr. Ranade, Dr. Platt, and Glass. In support, they cite (1) Dr. Platt's emailed statements, on August 27–30, 2018, that the parents were “dangerous” and that she could not “imagine how ACS released this vulnerable infant to the family,” Am. Compl. ¶¶ 376–78; (2) Dr. Ranade's reports to ACS of suspected child abuse or neglect, *id.* ¶¶ 379–81; and that Glass “reiterated and repeated” the claim that the parents were “dangerous,” *id.* ¶ 382.

Defendants argue that these claims are time-barred. Plaintiffs have not responded. The Court holds with defendants. Under New York law, an action for defamation or slander must “be commenced within one year of the publication or utterance of the defamatory statement,” and “[d]iscovery does not extend the one-year period.” *Frederick v. Fried*, 10 A.D.3d 444, 445 (2d Dep't 2004) (collecting cases). Plaintiffs filed this action on May 1, 2020, meaning that only statements on or after May 1, 2019 may be actionable. *See id.* All of Glass's, Dr. Platt's, and Dr. Ranade's allegedly defamatory statements occurred between August and October 2018. Accordingly, plaintiffs' claim for defamation is dismissed as untimely.

## CONCLUSION

For the foregoing reasons, the Court rules as follows on the motions to dismiss.

The Court grants in full the motions to dismiss by the HSS Defendants and the Mt. Sinai Defendants.

The Court grants in part and denies in part the motion by the Municipal Defendants. The Court dismisses all claims against the Division of Child Protection, ACS, and the New York Comptroller, and all federal claims against the City of New York. The Court also dismisses plaintiffs' claims for abuse of process under federal and state law, false imprisonment under federal and state law, conspiracy under §§ 1983 and 1985, loss of companionship and consortium under state law, and IIED under state law, against all Municipal Defendants. However, the Court denies the Municipal Defendants' motion as to plaintiffs' claims (1) for malicious prosecution, under federal and state law, as alleged against the individual Municipal Defendants; (2) for violation of plaintiffs' right to family integrity under 42 U.S.C. § 1983, as alleged against the individual Municipal Defendants; and (3) for malicious prosecution, only under state law, as alleged against the City of New York.

Finally, the Court grants in part and denies in part the motion by the Weill Cornell Defendants. The Court dismisses all federal claims against those defendants, as well as the state-law claims against them for false imprisonment, abuse of process, loss of consortium and companionship, IIED, and defamation. The Court also dismisses all other claims against Dr. Platt, and the state-law malicious prosecution claim against Dr. Shaykh. The Court, however, denies the motion to dismiss plaintiffs' claims (1) against Dr. Lupica and Weill Cornell for malicious prosecution under state law; and (2) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for failure to diagnose.

***25** Accordingly, this case will proceed solely as to the following claims: (1) malicious prosecution under § 1983 against the individual Municipal Defendants; (2) violation of the family's substantive due process rights under § 1983 against the individual Municipal Defendants; (3) malicious prosecution under state law against the individual Municipal Defendants, the City of New York, Dr. Lupica, and Weill Cornell; and (4) failure to diagnose against Dr. Lupica, Dr. Shaykh, and Weill Cornell.

The Clerk of Court is respectfully directed to terminate as parties to this case defendants Dr. Sheena Ranade, Mt. Sinai Hospital, Dr. Peter Fabricant, LSW Karen Glass, the Division of Child Protection, the New York Comptroller, and the Administration for Children's Services. The Clerk of Court is further directed to terminate the motions pending at dockets 89, 93, 99, and 112.

An order scheduling an initial conference in this case will issue shortly.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 1143619

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (6)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Verified Complaint and Jury Demand**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, Amna Kakar Kurtz (A Minor Child), Mia Kakar Kurtz (A Minor Child), Plaintiffs, v. David HANSELL, as the Duly Appointed Commissioner of the New York City Administration for Children's Services, The Division of Child Protection, The City of New York, Yscary Rodriguez, Individually and as a Caseworker employed by ACS, "Ms. Bhojranie Maygoo," Individually and as a Caseworker employed by Acs, Eunice Iwenofu, Individually and as a Caseworker employed by Acs, Brenda Lawson, Individually and as an ACS Case Manager/Supervisor, Esperanza Sandoval, Individually and as a Supervisor in the Family Support Unit employed by ACS, Dr. Peter Fabricant, Individually and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Marie Lupica, as an Individual, Treating Physician and State Actor Operating Under Color of Law, Dr. Ramzi Marwan Shaykh, Individually and as a Treating Physician, Dr. Shari L. Platt, as an Individual and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Sheena Ranade, as an Individual, as a Treating Physician, and as an Individual Acting Under Color of Law, LSW Karen Glass, as an Individual and as a State Actor, Unnamed ACS Workers and Employees 1-10, Unnamed Employees and Workers of New York-Presbyterian Hospital/Weill Cornell Medical Center 1-10, Unnamed Workers and Employees of Mt. Sinai Hospital 1-10, and New York-Presbyterian Hospital/Weill-Cornell Medical Center., Defendants.<br>2020 WL 13856900 | — | S.D.N.Y. | May 01, 2020 | Pleading |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **2. Medical Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, Amna Kakar Kurtz (A Minor Child), Mia Kakar Kurtz (A Minor Child), Plaintiffs, v. David HANSELL, as the Duly Appointed Commissioner of the New York Administration for Children's Services, The Division of Child Protection, Administration for Children's Services, Mt. Sinai Hospital, New York Comptroller, The City of New York, Yscary Rodriguez, Individually and as a Caseworker employed by ACS, "Ms. Bhojranie Maygoo", Individually and as a Caseworker employed by ACS, Eunice Iwenofu, Individually and as a Caseworker employed by ACS, Brenda Lawson, Individually and as an ACS Case Manager/Supervisor, Esperanza Sandoval, Individually and as a Supervisor in the Family Support Unit employed by ACS, Dr. Peter Fabricant, Individually and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Marie Lupica, as an Individual, Treating Physician and State Actor Operating Under Color of Law, Dr. Ramzi Marwan Shaykh, Individually and as a Treating Physician, Dr. Shari L. Platt, as an Individual and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Sheena Ranade, as an Individual, as a Treating Physician, and as an Individual Acting Under Color of Law, LSW Karen Glass, as an Individual and as a State Actor, Unnamed ACS Workers and Employees 1-10, Unnamed Employees and Workers of New York-Presbyterian Hospital/ Weill Cornell Medical Center 1-10, Unnamed Workers and Employees of Mt. Sinai Hospital 1-10, and New York-Presbyterian Hospital/Weill-Cornell Medical Center, Defendants.<br>2022 WL 20717162 | — | S.D.N.Y. | Aug. 19, 2022 | Motion |
| **3. 2023 WL 7544216**<br>A.K. v. Lupica et al.<br>2023 WL 7544216 | — | S.D.N.Y. | July 13, 2023 | Jury Verdict |
| **4. Judgment**<br>Shveta Kakar KURTZ, et al., Plaintiffs, v. Dr. Marie LUPICA, et al., Defendants.<br>2023 WL 6367915 | — | S.D.N.Y. | Sep. 27, 2023 | Jury Verdict |
| **5. Verdict Form**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, solely in their roles as parent-guardians, and Amna Kakar Kurtz, Plaintiffs, v. Dr. Marie LUPICA and New York Presbyterian Hospital/ Weill-Cornell Medical Center, Defendants.<br>2023 WL 6367912 | — | S.D.N.Y. | July 13, 2023 | Jury Verdict |
| **6. Docket 1:20-CV-03401**<br>Kakar Kurtz et al v. Hansell et al | — | S.D.N.Y. | May 01, 2020 | Docket |

**History (4)**

**Direct History (1)**

1. Kurtz v. Hansell
2021 WL 1143619 , S.D.N.Y. , Mar. 24, 2021

**Related References (3)**

2. Kurtz v. Hansell
664 F.Supp.3d 438 , S.D.N.Y. , Mar. 27, 2023

*Affirmed by*

3. Kakar Kurtz v. Lawson
2025 WL 39860 , 2nd Cir.(N.Y.) , Jan. 07, 2025

4. Kurtz v. Lupica
2023 WL 3510646 , S.D.N.Y. , Apr. 26, 2023

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1981416
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donald James COON, Plaintiff,
v.
Frank MEROLA, et al., Defendants.

1:19-CV-394 (DNH/ATB)
|
Signed 04/08/2019

**Attorneys and Law Firms**

Donald James Coon, Troy, NY, pro se.

**ORDER and REPORT-RECOMMENDATION**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

***1** The Clerk has sent to the Court a civil rights complaint filed by pro se plaintiff Donald James Coon, together with a motion to proceed in forma pauperis ("IFP"). (Dkt. Nos. 1, 2).

**I. In Forma Pauperis ("IFP") Application**

A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. (Dkt. No. 2). The court finds for purposes of this recommendation, that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

**II. Complaint**

Although plaintiff's complaint is very conclusory, a liberal reading of the allegations contained therein show that plaintiff is attempting to allege that the Rensselaer County Clerk and his John/Jane Doe Deputy Clerks have violated plaintiff's constitutional rights in connection with a state court law suit that plaintiff has attempted to bring. (Complaint ("Compl.") *generally*) (Dkt. No. 1). In order to understand plaintiff's allegations in this action, the court must discuss another action filed by this plaintiff in 2016. In 2016, plaintiff filed a federal action in this court in which he named a variety of defendants, including Police Chief George Bell, the Villages of Cambridge and Greenwich, various district attorneys, Claverack Insurance Company, Glens Falls Hospital, Washington County Child Protective Services, and a police officer. *Coon v. Bell*, No. 1:16-CV-291 (TJM/DJS).

***2** After initial review of plaintiff's complaint in *Coon v. Bell*, Magistrate Judge Daniel Stewart found that plaintiff failed to state claims against the defendants and recommended that he be allowed to file an amended complaint in an effort to cure the deficiencies in the original. (Dkt. No. 8 in 16-CV-291). United States District Court Judge Thomas J. McAvoy adopted Magistrate Judge Stewart's recommendation on May 23, 2016. (Dkt. No. 11 in 16-CV-291). Plaintiff complied with the court's direction and filed an amended complaint on May 23, 2016. (Dkt. No. 12 in 16-CV-291).

Magistrate Judge Stewart conducted an initial review of the amended complaint and found that plaintiff failed to cure most of the deficiencies that were in the original. (Dkt. No. 13 in 16-CV-291). Magistrate Judge Stewart recommended dismissing most of the claims and most of the defendants from the action, while allowing a Fourth Amendment illegal search claim and Fourth Amendment excessive force claim to proceed against defendant Bell.[1] (Dkt. No. 13 in 16-CV-291). Magistrate Judge Stewart's recommendation was adopted by Judge McAvoy on November 2, 2016. (Dkt. No. 16 in 16-CV-291).

1 Defendant Bell has since passed away, and his estate's representative has been substituted as a party. (Dkt. Nos. 52, 71). Another defendant was joined to 16-CV-291, and there have been various other proceedings in that case, but those details are not relevant to this action.

In Magistrate Judge Stewart's report and recommendation, he found that plaintiff's defamation claims against defendant Bell and his attempted contract claims against defendant Bell and Claverack Insurance Company were, at best, state law claims.[2] (Dkt. No. 13 in 16-CV-291 at 4). Plaintiff then states that he "filed said claims" in the Rensselaer County Supreme Court. (Compl. at 1). Plaintiff states that in 2017, Judge Andrew G. Ceresia granted plaintiff poor person status, but that when he went to the Rensselaer County Clerk's office, defendant Merola told plaintiff that Judge Ceresia's order was "no good and they wouldn't honor it." (Compl. at 2). Plaintiff states that he brought Judge Ceresia's order to the Clerk's office four more times, and "finally" on March 11, 2019, a clerk that plaintiff had never seen before stamped the Judge's order and kept a copy. (*Id.*)

2 Although plaintiff states in this action that Magistrate Judge Stewart told plaintiff that the contract and defamation claims "needed to be refiled in Supreme Court," that is not exactly what Magistrate Judge Stewart said. His exact words were that "[l]iberally construed, plaintiff ***might*** be attempting to make state law defamation and intentional interference with a contract claims. ***Again, however, Plaintiff's vague and conclusory allegations fail to plausibly state such claims.***" (Dkt. No. 13 in 16-CV-291 at 4) (emphasis added). The court merely notes this for the record. Magistrate Judge Stewart's dismissal and his language are not relevant to the findings herein.

Plaintiff alleges that he has been denied his "rightful benefits and access to the court." Plaintiff states that he even had "to choose between the suit or my housing," and that he was homeless from January 12, 2018 until April 24, 2018. (*Id.*) Plaintiff states that the Rensselaer County Supreme Court wrote plaintiff "2 times the County Clerk's staff made me pay for RJI motion I had already paid for. They told me to give letter [sic] to the Clerk and I would get my monies back." (*Id.*)

Plaintiff states that he is seeking "just compensation" for the Rensselaer County Clerks' actions who refused to recognize his "poor person status" from 2017 until 2019. Plaintiff states that he still has not "received anything" from the "grant[ed] status" because the Clerks refused to grant "my said status." (*Id.*) Plaintiff seeks substantial monetary relief. (*Id.*)

## III. Judicial Immunity

### A. Legal Standards

***3** With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireles v. Waco*, 502 U.S. 9, 9-10 (1991). Judicial immunity has been created for the public interest in having judges who are "at liberty to exercise their functions with independence and without fear of consequences." *Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2004). Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12 (1976) (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The only two circumstances in which judicial immunity does not apply is when he or she takes action "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12.

Absolute immunity extends to court clerks who perform tasks " 'which are judicial in nature and an integral part of the judicial process.' " *Proctor v. Quinn*, No. 19-CV-833, 2019 WL 692935, at *2 (E.D.N.Y. Feb. 19, 2019) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997)). The court's " 'inherent power to control its docket is part of its function of resolving disputes between parties' and is thus 'a function for which judges and their supporting staff


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

are afforded absolute immunity.' " *Id.* (quoting *Rodriguez*, 116 F.3d at 66); and citing *Pikulin v. Gonzalez*, No. 07-CV-0412 (CBA), 2007 WL 1063353, at *2 (E.D.N.Y. Apr. 5, 2007) (finding that absolute judicial immunity extends to "the Clerk's Office activities of filing and docketing legal documents"). However, a court clerk may not be entitled to absolute immunity where the clerk's refusal to accept the papers of a litigant seeking to commence an action results in the deprivation of the individual's constitutional rights. *Glass v. New York Supreme Court Appellate Division*, No. 1:17-CV-226, 2017 WL 9487181, at *3 (N.D.N.Y. Apr. 26, 2017) (citations omitted).

In determining whether the clerk's conduct in a particular case is "judicial" in nature, the court takes a "functional approach" and allows the defendant absolute immunity when the clerk is performing a "discretionary act, or performing a duty that inherently relates to resolving a dispute." *Vance v. State of New York Dep't of Corrections*, No. 9:18-CV-748, 2018 WL 6047828, at *10 (N.D.N.Y. Nov. 19, 2018) (quoting *Dzwonczyk v. Suddaby*, No. 10-CV-0300, 2010 WL 1704722, at *6 (N.D.N.Y. Apr. 28, 2010) (citing *Rodriguez*, 116 F.3d at 67) (internal quotation marks omitted)).

### B. Application

Plaintiff's statements in this case are conclusory and essentially, he is suing the "clerks" because they would not file his poor person status order between 2017 and 2019. At best, he alleges a delay in granting him poor person status because it appears that a clerk finally took and filed plaintiff's order, and at the end of his complaint, plaintiff alleges that he "still" has not "received a thing or any help from ***the granyted [sic] status***." (Compl. at 2) (emphasis added). It is unclear what plaintiff believes he should have "received" or to what "help" he thinks he is entitled from the clerks beyond filing his order.

It is also unclear how plaintiff alleges that he was denied "access to courts" because he states that he filed his state law claims in the Rensselaer County Supreme Court. (Compl. at 1). However, he claims he was denied his "rightful benefits," and that somehow the clerk's actions in delaying the filing of his poor person order were related to his homelessness between January 12, 2018 and April 24, 2018. Plaintiff claims that he had to choose between "the suit" or his housing, but he does not explain why this is true or why this would be a denial of his constitutional rights. Plaintiff also states that the clerks made plaintiff pay for his RJI "motion," but that he was told that if he wrote a letter, he would get his money back.

***4** As it is written, plaintiff's complaint is too conclusory to state a claim against any of the clerks in this action, whether named or unnamed, [3] and the court will recommend dismissal.

3 Finally, the court must note that the United States Marshal would not be able to effect service of process on a "John or Jane Doe" defendant. In order for plaintiff to pursue his claims against John Doe defendants, he would ultimately be required to ascertain their identity. *LaPoint v. Vasiloff*, No. 5:15-CV-185, 2015 WL 1524437, at *4 (N.D.N.Y. Apr. 2, 2015).

## IV. Opportunity to Amend

### A. Legal Standards

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

### B. Application

In this case, the court will recommend dismissal without prejudice, even though the court has serious doubts that plaintiff will be able to amend his complaint to state a claim. However, because there are situations in which a clerk would not be entitled to absolute immunity, and plaintiff in this case has failed to include enough facts for the court to make an accurate determination, the court will recommend dismissal without prejudice to plaintiff submitting an amended complaint.

If the court adopts this recommendation, and plaintiff is afforded the opportunity to amend, he should be afforded forty-five (45) days from the date of the order adopting this court's recommendation. Plaintiff should also be advised that if he files an amended complaint, it must be a complete pleading which must supercede the original and may not incorporate any facts from the original by reference.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) be **GRANTED for purposes of filing**, and it is further

**RECOMMENDED**, that the complaint be **DISMISSED** based on quasi-judicial immunity and for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii) **WITHOUT PREJUDICE** to plaintiff filing an amended complaint, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, plaintiff be directed to file his amended complaint or ask for an extension of time to do so within **FORTY-FIVE (45) DAYS** from the date of the District Court's order adopting the recommendation, and it is

**RECOMMENDED**, that if plaintiff files an amended complaint within the appropriate time, the court return the proposed amended complaint to me for initial review, and it is

**RECOMMENDED**, that if the court adopts this recommendation, and plaintiff fails to file an amended complaint or ask for an extension of time to do so at the expiration of the forty-five (45) days, the complaint be dismissed with prejudice and the case closed, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1981416

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:19-CV-00394** Coon v. Merola et al | — | N.D.N.Y. | Apr. 03, 2019 | Docket |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Coon v. Merola
2019 WL 1981416 , N.D.N.Y. , Apr. 08, 2019

*Report and Recommendation Adopted by*

2. Coon v. Merola
2019 WL 1978595 , N.D.N.Y. , May 03, 2019

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.